Robert H. Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996

Daniel R. Suhr (*Pro Hac Vice to be filed*)
dsuhr@libertyjusticecenter.org
Reilly Stephens (*Pro Hac Vice to be filed*)
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60604
Phone: 312-637-2280

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK MCDONALD AND JEFF BARKE, <br><br> Plaintiffs, <br><br> v. <br><br> KRISTINA D. LAWSON, *in her official capacity as President of the Medical Board of California*; RANDY W. HAWKINS, *in his official capacity as Vice President of the Medical Board of California*; LAURIE ROSE LUBIANO, *in her official capacity as Secretary of the Medical Board of California*; MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, ASIF MAHMOOD, NICOLE A. JEONG, RICHARD E. THORP, VELING TSAI, and ESERICK WATKINS, *in their official* | Case No. _____ <br><br> **COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS** |

*capacities as members of the Medical Board of California*; and ROBERT BONTA, *in his official capacity at Attorney General of California*,

     Defendants.

## INTRODUCTION

1. Plaintiffs Mark McDonald, M.D. and Jeff Barke, M.D., physicians licensed in the State of California, bring this challenge to the recently enacted Assembly Bill (AB) 2098, which chills the protected speech of medical professionals on the basis of viewpoint.

2. AB 2098 declares that it will be deemed "unprofessional conduct" for doctors to advise their patients of any view that deviates from the official position of the State regarding COVID-19. It directs the Medical Board of California ("the Board") to punish any doctor who "disseminates" "misinformation," defined as anything that is not consistent with what the Board deems to be the official scientific consensus. This imposition of official government-approved orthodoxy cannot survive First Amendment scrutiny and is at odds with the scientific method itself.

3. Disagreement is integral to the progress of medical science, a value that cannot be served by using the power of the state to punish those who dissent from the official line. This is particularly objectionable in the context of a new disease like COVID-19, about which consensus opinions and official guidance have regularly adjusted as new information is learned.

4. At the beginning of the pandemic, public health authorities insisted that the public not wear masks, arguing they would provide little benefit and should be reserved for front-line medical professionals—that was soon replaced with broadly mandated mask wearing for much of the population. Schools were closed in the face of the fear that the disease would spread among children too young to adhere to quarantine procedures—but it

Case No.              2
COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

turned out that the young were at the least risk, and that such closures may well have been harmful to their development.

5. Reasonable minds disagreed then, and continue to disagree now, about any number of such topics, but the search for truth cannot be furthered by a government edict imposing orthodoxy from above, punishing those who disagree with the loss of their profession and their livelihood. Plaintiffs therefore ask that this court enjoin enforcement of AB 2098 and leave these important matters to the marketplace of ideas.

## PARTIES

6. Plaintiff Mark McDonald, M.D., is a resident of the State of California and a physician who is licensed to practice in the state.

7. Plaintiff Jeff Barke, M.D., is also a resident of the State of California and a physician licensed to practice in the state.

8. Defendants Kristina D. Lawson, Randy W. Hawkins, Laurie Rose Lubiano, Michelle Anne Bholat, David E. Ryu, Ryan Brooks, James M. Healzer, Asif Mahmood, Nicole A. Jeong, Richard E. Thorp, Veling Tsai, and Eserick Watkins are the President, Vice President, Secretary, and Members of the Medical Board of California, the state licensing authority that regulates the practice of medicine in the state, sued in their official capacities. The mailing address for the Board is 2005 Evergreen Street, Suite 1200 Sacramento, California 95815 in Sacramento County.

9. Defendant Attorney General Robert Bonta (the "Attorney General") is sued in his official capacity as the representative of the State of California charged with enforcement of state laws. His address for service of process is 1300 "I" Street, Sacramento, California 95814 in Sacramento County.

## JURISDICTION AND VENUE

10. This case raises claims arising under the First and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. § 1983, and 28 U.S.C. § 2201(a). The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

11. Venue is proper because Plaintiffs live and practice in, and a substantial portion of the events giving rise to the claims occurred in, the Central District of California. 28 U.S.C. § 1391(b)(2).

**FACTS**

**AB 2098**

12. On August 30, 2022, the California State Assembly approved the final version of AB 2098[1] ("the Act"), which the State Senate had passed the previous day. Governor Newsom signed the bill into law on September 30, 2022.

13. AB 2098 adds a new Section 2270 to the State's Business and Professions Code, entitled "Physicians and surgeons: unprofessional conduct."

14. Section 1 of the Act, outlining the legislature's findings, asserts *inter alia* that "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk" and that "[m]ajor news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals."

15. Section 1 likewise incorporates a recent statement by the Federation of State Medical Boards "warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information."

16. Section 2 of the Act is the substantive provision, which makes it "unprofessional conduct" for any California physician to make any statement to his or her patients that the Board considers "misinformation" about COVID-19:

> 2270. (a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.

---

[1] *Available at h*ttps://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2098.

Case No. 4
COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

(b) For purposes of this section, the following definitions shall apply:

(1) "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.

(2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

(3) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

(4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.

(5) "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000).

(c) Section 2314 shall not apply to this section.[2]

17. Section 3 of the Act specifies that each of its provisions are severable.

18. The Act therefore declares it "unprofessional conduct" for a doctor to "disseminate"—that is, speak—"misinformation," as judged by the State of California, to his or her patients regarding COVID-19.

19. AB 2098 intrudes into the privacy of the doctor-patient relationship, replacing the medical judgment of the government for that of the licensed professional, and chilling the speech of those who dissent from the official view.

20. AB 2098's codification of an official "scientific consensus" is at odds with the progress of science itself, which requires that conventional views be challenged by new theories, and that dissenters air their views for comment and criticism.

21. It is also at odds with the responsible practice of medicine, which requires that doctors employ individualized professional judgment as to the best course of treatment for each individual patient, rather than following official guidance to the letter in all cases.

---

[2] Cal. Bus. & Prof. Code § 2314 makes violations of this chapter of the code a misdemeanor offense. Section 2(c) of the Act prevents AB 2098 from creating criminal liability.

22. AB 2098 attempts to redefine the established understanding of standards of care, which require particularized assessment of medical decision-making in the individual context at issue, rather than the imposition of approved opinions that must be agreed with in all circumstances.

23. The goal of AB 2098 is to chill speech—in particular the speech of doctors who make a different assessment of the available evidence than the State of California.

24. Recognizing the profound defects with the Act, in signing the bill on September 30, 2022, Governor Newsom attached a statement in which he articulated a narrowing construction he claimed would render the bill constitutional:

> I am signing this bill because it is narrowly tailored to apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care while interacting directly with a patient under their care.
>
> To be clear, this bill does not apply to any speech outside of discussions directly related to COVID-19 treatment within a direct physician patient relationship. I am concerned about the chilling effect other potential laws may have on physicians and surgeons who need to be able to effectively talk to their patients about the risks and benefits of treatments for a disease that appeared in just the last few years. However, I am confident that discussing emerging ideas or treatments including the subsequent risks and benefits does not constitute misinformation or disinformation under this bill's criteria.

25. Plaintiffs share Governor Newsom's "concern[] about the chilling effect" "laws may have on physicians and surgeons," but the Governor's attempt to rewrite AB 2098 cannot overcome what the law in fact says by its terms.

26. The Governor is not the enforcement authority responsible for determining how AB 2098 should be applied—enforcement powers reside in the Board and Attorney General Bonta, and therefore the Governor's desired narrowing construction is simply wishful thinking.

27. And it would not matter if the Governor had any such authority, because an unconstitutional speech restriction cannot be saved by the announcement that it will be enforced in a narrow manner. *United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996) ("California has failed to show that this new policy represents an authoritative and binding

construction of [the statute] rather than a mere enforcement strategy, which would not be binding on the courts.").

28. Despite the Governor's assurances, AB 2098 does not "apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care."

29. Malicious intent is not a required element in the Act—rather, it appears only in the definition of "disinformation," which is not the only speech the law covers.

30. Nor does the Act require "clear[] deviat[ion] from the required standard of care." Instead, the act defines "Misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care," with no limitation on the clarity of the deviation or how well established the standard of care need be.

31. To the contrary, the Governor's attempt to provide a narrowing construction all but concedes the Act, as written, is not narrowly tailored to any government interest sufficient to survive First Amendment scrutiny.

**Dr. McDonald**

32. Dr. Mark McDonald, M.D., is a physician licensed by the Medical Board of California who is board-certified in both adult and child and adolescent psychiatry.

33. Dr. McDonald received an undergraduate degree from the University of California, Berkeley before beginning medical training at the Medical College of Wisconsin. After graduating from medical school in 2007, he completed his general psychiatry residency training at the University of Cincinnati, and child and adolescent psychiatry fellowship training at Harbor-UCLA Medical Center. He currently maintains a private psychiatry practice in the Los Angeles area, where most of his patients are children suffering from various mental health problems.

34. Dr. McDonald has never been disciplined by any medical regulatory authority, had his medical license suspended, or had a complaint against him sustained for unprofessional conduct.

35. Over the course of the pandemic, Dr. McDonald became increasingly concerned about the public-health response to COVID-19, and the way in which he feared that official public-health guidance held the potential to cause harm.

36. These concerns caused Dr. McDonald to become outspoken, as both a citizen and a medical professional, about the flaws he sees in the public-health response to the COVID-19 pandemic.

37. In particular, his expertise in adolescent mental health prompted concern about the potential harm to children that school closures and mandatory mask-wearing policies could have on young people. He objected that isolating children, and requiring them to wear masks, was not justified by the available scientific evidence, particularly since it is widely agreed that otherwise healthy children were at very low risk of either contracting or spreading COVID-19.

38. Dr. McDonald likewise objected to the broader use of mandatory masking for the adult population, pointing to a lack of evidence that otherwise-healthy adults would benefit from such face coverings.

39. Dr. McDonald has also supported the use of medications such as ivermectin and hydroxychloroquine as options to treat COVID-19, pre-existing drugs long approved as safe and effective by the Food and Drug Administration. While the use of such medications to treat COVID-19 is controversial, a number of studies have found positive results using them to treat the disease.

40. Dr. McDonald also raised concerns about the new vaccines developed to combat COVID-19, pointing to a lack of evidence that these brand-new drugs had been proven sufficiently safe and effective to be recommended, and in many cases mandated, for essentially the entire American public.

41. In particular, Dr. McDonald objected to administering these new vaccines to children, despite limited evidence that they would be safe and effective for this population, arguing that since children were already at low risk of the disease, there was little benefit as compared with the known and unknown potential harms from vaccination.

42. While these topics remain subjects of controversy, a number of Dr. McDonald's concerns have proved prescient—for instance, there is now considerable evidence that quarantine policies proved detrimental to both the education and mental health of children. *See, e.g.*, Sarah Mervosh, *The Pandemic Erased Two Decades of Progress in Math and Reading*, N.Y. Times, Sep. 1, 2022;[3] Claire Cain Miller & Bianca Pallaro, *362 School Counselors on the Pandemic's Effect on Children: 'Anxiety Is Filling Our Kids,'* N.Y. Times, May 29, 2022.[4]

43. Dr. McDonald has advocated publicly and privately about these and other objections to federal and state COVID-19 policies, including on social media, in various media interviews, and in his own published writing.

44. Dr. McDonald's advocacy on these issues has made him a subject of controversy.

45. It has also attracted the attention of the Medical Board of California. In December 2021, Dr. McDonald received a letter from the Board informing him of a complaint filed against him by "your patient, N/A." According to the Board, the anonymous complainant alleged "[McDonald's] posts on Twitter/Facebook about masks were flagged for spreading misinformation about Covid and using derogatory terms for disabled people. Alleges [McDonald] spreading misinformation about Covid."

46. Dr. McDonald responded by letter that he had never treated a patient named "N/A," and denied that he had offered medical opinions to the public that included inaccurate information.

47. Under traditional Board practice, the fact that the complaint was not made by a named patient of Dr. McDonald would have ended the matter, as the purpose of such complaints is to protect patients personally subjected to unprofessional conduct. However, the Board did not close the matter, instead responding in January 2022 with a request for

---

[3] https://www.nytimes.com/2022/09/01/us/national-test-scores-math-reading-pandemic.html.

[4] https://www.nytimes.com/interactive/2022/05/29/upshot/pandemic-school-counselors.html.

"[a] response to the allegation that you [McDonald] are promoting the use of Ivermectin to cure COVID on Twitter."

48. Dr. McDonald responded to this inquiry by letter, stating that it was his practice to advocate for medical treatments that have the strongest empirical evidence to support their efficacy and safety. His response then linked to a database of studies that supported the use of various medications to treat COVID-19, including ivermectin, vitamin D, zinc, hydroxychloroquine, and aspirin.

49. Rather than closing the matter, the Board appears to be proceeding with an investigation based on the anonymous complaint, with an investigator emailing Dr. McDonald on August 30 requesting an interview, which is expected to take place in the coming months.

50. The Board's unprecedent pursuit of Dr. McDonald based on an anonymous complaint about his social media activity demonstrates the intent of the Board to use the power granted to them by the State of California to punish doctors like Dr. McDonald for their speech.

51. As a medical professional, Dr. McDonald feels it is his professional duty to continue to provide his patients with medically sound advice in his counseling sessions, but if subject to AB 2098 he will be forced to choose between providing his best medical judgment and censoring that judgment to comply with the law, because of his well-founded fear that the Board will use this new authority to threaten his medical license.

**Dr. Barke**

52. Dr. Jeff Barke, M.D., is a physician licensed by the Medical Board of California who is board-certified in family practice.

53. Dr. Barke received an undergraduate degree from the University of Southern California before beginning medical training at the University of California, Irvine. After graduating from medical school in 1990, he completed his residency in family practice, also at UC Irvine. He currently maintains a private concierge medical practice in the Newport Beach area.

54. Dr. Barke has never been disciplined by any medical regulatory authority, had his medical license suspended, or had a complaint against him sustained for unprofessional conduct.

55. Like Dr. McDonald, over the course of the pandemic, Dr. Barke became increasingly concerned about the public-health response to COVID-19, and the way in which he feared that official public-health guidance held the potential to cause harm.

56. These concerns caused Dr. Barke to become outspoken, as both a citizen and a medical professional, about the flaws he sees in the public-health response to the COVID-19 pandemic.

57. Dr. Barke objected that isolating children, and requiring them to wear masks, was not justified by the available scientific evidence, particularly since it is widely agreed that otherwise healthy children were at very low risk of either contracting or spreading COVID-19.

58. Dr. Barke likewise objected to the broader use of mandatory masking for the adult population, pointing to a lack of evidence that otherwise-healthy adults would benefit from such face coverings.

59. Dr. Barke has also supported the use of medications such as ivermectin and hydroxychloroquine as options to treat COVID-19, pre-existing drugs long approved as safe and effective by the Food and Drug Administration. While the use of such medications to treat COVID-19 is controversial, a number of studies have found positive results using them to treat the disease.

60. Dr. Barke also raised concerns about the new vaccines developed to combat COVID-19, pointing to a lack of evidence that these brand-new drugs had been proven sufficiently safe and effective to be recommended, and in many cases mandated, for essentially the entire American public.

61. In particular, Dr. Barke objected to administering these new vaccines to children, despite limited evidence that they would be safe and effective for this population,

arguing that since children were already at low risk of the disease, there was little benefit as compared with the known and unknown potential harms from vaccination.

62. Again, while these topics remain subjects of controversy, a number of Dr. Barke's concerns have proved prescient—for instance, there is now considerable evidence that quarantine policies proved detrimental to both the education and mental health of children. *See, supra,* ¶ 42.

63. Dr. Barke has advocated publicly and privately about these and other objections to federal and state COVID-19 policies, including on social media, in various media interviews, and in his own published writing.

64. Dr. Barke's advocacy on these issues has made him a subject of controversy.

65. As a medical professional, Dr. Barke feels it is his professional duty to continue to provide his patients with medically sound advice to his patients, but if subject to AB 2098 he will be forced to choose between providing his best medical judgment and censoring that judgment to comply with the law, because of his well-founded fear that the Board will use this new authority to threaten his medical license.

## COUNT I

### (AB 2098 Constitutes Content And Viewpoint Discrimination In Violation of the First Amendment)

66. The allegations contained in all preceding paragraphs are incorporated herein by reference.

67. The rights to free speech and freedom of association in the First Amendment have been incorporated to and made enforceable against the states through the Fourteenth Amendment guarantee of Due Process. *NAACP v. Alabama*, 357 U.S. 449 (1958); *Gitlow v. New York*, 268 U.S. 652 (1925).

68. 42 U.S.C. § 1983 provides a cause of action against any person who, under color of law of any state, subjects any person within the jurisdiction of the United States to a deprivation of any rights, privileges, or immunities secured by the Constitution.

69. 28 U.S.C. § 2201(a) allows a court of the United States, as a remedy, to declare the rights and other legal relations of interested parties.

70. AB 2098 imposes a government mandate to espouse only those ideas that the State of California deems acceptable. This "on its face burdens disfavored speech by disfavored speakers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

71. No other professionals, even other medical professionals such as nurses, are covered. No speech about other diseases, no matter how serious, is covered. And speakers who parrot the contemporary "consensus" may continue speaking; only those who may dissent are silenced. There can be no question that "official suppression of ideas is afoot." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 390 (1992).

72. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

73. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

74. AB 2098 is not a traditional regulation of the conduct of medical professionals. Although the Act tries to disguise itself as a conduct regulation by defining "dissemination" to mean "the conveyance of information" "to a patient" "in the form of treatment or advice," information is not a "treatment" for COVID-19.

75. Rather, the law directly and specifically burdens speech, and discriminates against that speech based on both content and viewpoint.

76. The fact that some doctors' views are at odds with the official views of government health authorities does not undermine the right of doctors to express them; instead "minority views are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

77. The fact that doctors belong to a regulated profession does not undermine their right to speak their views. As the Supreme Court recently held, "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018). "To the contrary, professional speech may be entitled to 'the strongest protection our Constitution has to offer.'" *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

78. AB 2098 therefore constitutes content and viewpoint discrimination in violation of the First Amendment.

## COUNT II

### (AB 2098 Is Unconstitutionally Void For Vagueness Under The Fourteenth Amendment)

79. The allegations contained in all preceding paragraphs are incorporated herein by reference.

80. A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

81. Though civil laws are sometimes permitted a greater "degree of vagueness," if "the law interferes with the right of free speech or of association"—as here—"a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982).

82. "[W]here First Amendment freedoms are at stake, a "great[] degree of specificity and clarity of laws is required." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2020).

83. AB 2098 does not define its terms with any specificity and therefore does not give regulated physicians like Plaintiffs adequate notice of what will run afoul of the law.

84. The statute defines "misinformation" ambiguously as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." This definition is ambiguous even on the most basic level of grammar, as literally it applies to information that is contradicted by a consensus that is itself contrary to the standard of care.

85. Even beyond the linguistic challenges, the statute leaves to the caprice of the Board what it will or will not decide is misinformation: it does not provide notice of when information is sufficiently mainstream to be considered a scientific consensus, how that consensus is to be established, how that supposed consensus will be disseminated such that every licensed doctor in the state will be on notice of it, or how far one may deviate from that consensus without being subject to the censorship of the Board.

86. AB 2098 therefore imposes an unconstitutionally vague restriction on the speech of doctors like Plaintiffs and should be enjoined on that basis.

## PRAYER FOR RELIEF

Plaintiffs respectfully requests that this Court:

1. Declare that AB 2098 unconstitutionally discriminates against speech on the basis of viewpoint;

2. Declare that AB 2098 is unconstitutionally vague;

3. Enjoin Defendants from enforcing AB 2098 against Plaintiffs and physicians like them who wish to communicate their best medical judgment to their patients without interference from Defendants;

4. Award Plaintiffs their costs and attorneys' fees under 42 U.S.C. § 1988; and

5. Award Plaintiffs any further relief to which they may be entitled and such other relief as this Court may deem just and proper.

Dated: October 4, 2022

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr (*Pro Hac Vice to be filed*)
dsuhr@libertyjusticecenter.org
Reilly Stephens (*Pro Hac Vice to be filed*)
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60604
Phone: 312-637-2280

Robert H. Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996

*Attorneys for Plaintiffs*