ROB BONTA
Attorney General of California
ANYA BINSACCA, State Bar No. 189613
EDWARD KIM, State Bar No. 195729
Supervising Deputy Attorneys General
CHRISTINA SEIN GOOT, State Bar No. 229094
KRISTIN LISKA, State Bar No. 315994
Deputy Attorneys General
 455 Golden Gate Ave.
 San Francisco, CA 94102
 Telephone: (415) 510-3916
 Fax: (415) 703-5480
 E-mail: Christina.Goot@doj.ca.gov
        Kristin.Liska@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARK McDONALD AND JEFF BARKE,**<br><br>                              Plaintiffs,<br><br>**v.**<br><br>**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; RANDY W. HAWKINS, in his official capacity as Vice President of the Medical Board of California; LAURIE ROSE LUBIANO, in her official capacity as Secretary of the Medical Board of California; MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, ASIF MAHMOOD, NICOLE A. JEONG, RICHARD E. THORP, VELING TSAI, and ESERICK WATKINS, in their official capacities as members of the Medical Board of California; and ROBERT BONTA, in his official capacity at Attorney General of California,**<br><br>                              Defendants. | Case No. 8:22-cv-01805-FWS-ADS<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        November 17, 2022<br>Time:        10:00 a.m.<br>Courtroom:   10D<br>Judge:       Hon. Fred W. Slaughter<br>Trial Date:  Not scheduled<br>Action filed: October 4, 2022 |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................... 1

Factual and Procedural Background ...................................................... 1

    I.     Regulation of Medicine in California ...................................... 1

    II.    AB 2098 ................................................................................. 3

    III.   Plaintiffs' Challenge to AB 2098 ........................................... 5

Legal Standard ...................................................................................... 6

Argument ............................................................................................... 6

    I.     Plaintiffs Have Not Shown a Likelihood of Success ............. 7

          A.   Plaintiffs Have Not Established Standing ..................... 7

          B.   Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim ................................................................... 9

                  1.   AB 2098 Is a Permissible Regulation of Professional Conduct .......................................... 9

                  2.   AB 2098 Is Permissible as a Regulation of the Care Provided by Medical Professionals ............... 14

                  3.   AB 2098 Withstands Even Strict Scrutiny ............ 16

                        a.   AB 2098 Furthers a Compelling Government Interest ........................................ 16

                        b.   AB 2098 Is Narrowly Tailored to Serve Those Compelling Interests ....................... 18

          C.   Plaintiffs Are Unlikely to Succeed on Their Void for Vagueness Claim .......................................... 21

    II.    Plaintiffs Have Not Demonstrated that an Injunction Is Necessary to Prevent Irreparable Harm ............................... 24

    III.   The Balance of Equities and Public Interest Weigh Against Granting an Injunction ......................................................... 25

Conclusion ............................................................................................ 27

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Arce v. Douglas*
    793 F.3d 968 (9th Cir. 2015) ...................................................................21

*Arnett v. Dal Cielo*
    14 Cal. 4th 4 (1996) ........................................................................... 1, 2

*Avivi v. Centro Medico Urgente Med. Ctr.*
    159 Cal. App. 4th 463 (2008) ...............................................................22

*Caribbean Marine Servs. Co. v. Baldrige*
    844 F.2d 668 (9th Cir. 1988) ................................................................24

*Collins v. Texas*
    223 U.S. 288 (1912) ..............................................................................14

*Conant v. Walters*
    309 F.3d 629 (9th Cir. 2002) .................................................... 12, 13, 19

*Doe v. Harris*
    772 F.3d 563 (9th Cir. 2014) ................................................................22

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ..............................................................25

*Ettinger v. Board of Med. Quality Assurance*
    135 Cal. App. 3d 853 (1982) ................................................................23

*Flowers v. Torrance Mem. Hosp. Med. Ctr.*
    8 Cal. 4th 992 (1994) .......................................................................3, 22

*Frisby v. Schultz*
    487 U.S. 474 (1988) ..............................................................................18

*Fuller v. Bd. of Med. Exam'rs*
    14 Cal. App. 2d 734 (1936) ....................................................................2

*Garcia v. Google. Inc.*
    786 F.3d 733 (9th Cir. 2015) ..................................................................6

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

4

*Goldfarb v. Virginia State Bar*
    421 U.S. 773 (1975) ........................................................ 17

5

6

*Gore v. Board of Med. Quality Assurance*
    110 Cal. App. 3d 184 (1980) ............................................. 3

7

8

*Hill v. Colorado*
    530 U.S. 703 (2000) ........................................................ 24

9

*Kearl v. Board of Med. Quality Assurance*
    189 Cal. App. 3d 1040 (1986) ........................................... 3

10

11

*Kenneally v. Medical Board*
    27 Cal. App. 4th 489 (1994) ............................................ 15

12

13

*Klein v. San Clemente*
    584 F.3d 1196 (9th Cir. 2009) ........................................... 6

14

15

*Kolender v. Lawson*
    461 U.S. 352 (1983) ........................................................ 21

16

17

*Laird v. Tatum*
    408 U.S. 1 (1972) ............................................................. 9

18

19

*Lambert v. Yellowley*
    272 U.S. 581 (1926) ........................................................ 14

20

21

*Lewis v. Superior Court*
    3 Cal. 5th 561 (2017) ...................................................... 16

22

*Maryland v. King*
    133 S. Ct. 1 (2013) .......................................................... 25

23

24

*Mazurek v. Armstrong*
    520 U.S. 968 (1997) .......................................................... 6

25

26

*Nat'l Institute of Family & Life Advocates v. Becerra*
    138 S. Ct. 2361 (2018) ............................................*passim*

27

28

*Olsen v. Idaho State Bd. of Med.*
    363 F.3d 916 (9th Cir. 2004) .............................................. 9

1
2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3
4

*Pickup v. Brown*
740 F.3d 1208 (9th Cir. 2014)...................................................................*passim*

5
6

*Recht v. Morrisey*
32 F.4th 398 (4th Cir. 2022).......................................................................16

7
8

*Reed v. Town of Gilbert*
576 U.S. 155 (2015).....................................................................................16

9

*Roman Catholic Diocese of Brooklyn v. Cuomo*
141 S. Ct. 63 (2020)....................................................................................17

10
11

*Shea v. Board of Med. Quality Assurance*
81 Cal. App. 3d 564 (1978).........................................................................24

12
13

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014).......................................................................................7

14
15

*Tingley v. Ferguson*
47 F.4th 1055 (9th Cir. 2022)...................................................................*passim*

16
17

*Town of Chester v. Laroe Estates, Inc.*
137 S. Ct. 1645 (2017)...................................................................................7

18
19

*Trowbridge v. United States*
703 F. Supp. 2d 1129 (D. Idaho 2010).......................................................22

20
21

*Truman v. Thomas*
27 Cal. 3d 285 (1980)...........................................................................15, 17

22

*Valle del Sol, Inc. v. Whiting*
732 F.3d 1006 (9th Cir. 2013)....................................................................21

23
24

*Watson v. Maryland*
218 U.S. 173 (1910)....................................................................................18

25
26

*Williams-Yulee v. Florida Bar*
575 U.S. 433 (2015)....................................................................................20

27
28

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008).................................................................................6, 9, 25

**TABLE OF AUTHORITIES**
(continued)

Page

*Wollschlaeger v. Governor of Florida*
   848 F.3d 1293 (11th Cir. 2017) ........................................................................... 13

**STATUTES**

California Business and Professions Code
   § 741(a)(1) ........................................................................................................... 10
   § 741(a)(2) ........................................................................................................... 10
   § 2001.1 ................................................................................................................. 2
   § 2004 ................................................................................................................... 2
   § 2220(a) ............................................................................................................... 2
   § 2234 ................................................................................................................ 2, 3
   § 2234(b) ............................................................................................................. 26
   § 2234(c) ............................................................................................................. 26
   § 2234(d) ......................................................................................................... 3, 26
   § 2234(e) ............................................................................................................... 3
   § 2234.1 ............................................................................................................... 10
   § 2241.5(c)(5) ..................................................................................................... 10
   § 2241.5(c)(6) ..................................................................................................... 10
   § 2249(a) ............................................................................................................... 3
   § 2250 ................................................................................................................... 3
   § 2266 ................................................................................................................... 3
   § 3502(a)(1) ........................................................................................................ 20
   § 2836.1 .............................................................................................................. 20

2022 Cal. Stat., ch. 938 (Assembly Bill 2098) ............................................... *passim*
   § 1(a) ............................................................................................................ 3, 17
   § 1(b) ............................................................................................................ 4, 17
   § 1(d) ............................................................................................................ 4, 17
   § 1(e) ............................................................................................................ 4, 17
   § 1(f) ..................................................................................................................... 4
   § 2(a) ...................................................................................................... 5, 10, 12
   § 2(b)(2) ...................................................................................................... 5, 12
   § 2(b)(3) ...................................................................................................... 5, 11, 21
   § 2(b)(4) ...................................................................................................... 5, 11, 22

1876 Cal. Stat., ch. 518
   § 1 ......................................................................................................................... 2
   § 8 ......................................................................................................................... 2

**TABLE OF AUTHORITIES**
(continued)

Page

§ 10 ................................................................................................ 2

**CONSTITUTIONAL PROVISIONS**

United States Constitution
Article III ................................................................................ 7
First Amendment ............................................................. *passim*
Fourteenth Amendment ...................................... 1, 6, 21, 24

**OTHER AUTHORITIES**

CACI 501 ........................................................................................ 22

Robert Post, "Informed Consent to Abortion: A First Amendment
Analysis of Compelled Speech Cases," 2007 U. Ill. L. Rev. 939
(2007) .................................................................................... 10, 12

vi

### INTRODUCTION

Assembly Bill (AB) 2098 is a limited but important statute.  The California Legislature enacted AB 2098 to address concerns about doctors' spread of disinformation and misinformation about COVID-19 and the COVID-19 vaccines, which has placed lives at serious risk.  AB 2098 *only* applies to statements by doctors to their patients as part of their medical treatment.  It leaves untouched any other speech by doctors, including posts on public media or published works.  The statute therefore fits well within the traditional regulation of medicine.

Plaintiffs are two doctors who have publicly voiced their disagreement with the State's policies in responding to the COVID-19 pandemic.  They contend that AB 2098's requirements violate their First Amendment rights and that the statute is unduly vague under the Fourteenth Amendment.  They seek a preliminary injunction from the Court preventing AB 2098 from going into effect on January 1, 2023.  But plaintiffs have not carried their burden of demonstrating they are entitled to that extraordinary remedy.

First, plaintiffs have not shown a likelihood of succeeding in their suit.  As a threshold matter, plaintiffs lack standing because they identify no particular advice, care, or treatment they want to provide to their patients that would contravene AB 2098.  As to the merits of their claims, AB 2098 is permissible under the First Amendment as a regulation of physician-provided care and is not impermissibly vague.  Nor have plaintiffs demonstrated any irreparable harm that would result from allowing AB 2098 to go into effect or that the equities and public interest favor an injunction, since AB 2098 protects patients from receiving false medical advice or substandard care.  This Court should therefore deny the motion.

### FACTUAL AND PROCEDURAL BACKGROUND

#### I. REGULATION OF MEDICINE IN CALIFORNIA

California has long regulated the practice of medicine for the protection of the public.  *See, e.g.*, *Arnett v. Dal Cielo*, 14 Cal. 4th 4, 7 (1996).  As far back as 1876,

California has regulated the practice of medicine by imposing a licensing and training requirement on medical practitioners.  *See* 1876 Cal. Stats., ch. 518, p. 792, § 1.[1]  The 1876 Act also permitted licenses to be refused or revoked for unprofessional conduct.  *Id.*, §§ 8, 10.  Thus, "[s]ince the earliest days of regulation," the State has sought to "protect the public against incompetent, impaired, or negligent physicians, and, to that end," regulators have "been vested with the power to revoke medical licenses on grounds of unprofessional conduct." *Arnett*, 14 Cal. 4th at 7.  And since the earliest days, such unprofessional conduct has encompassed, in some circumstances, a practitioner's speech to patients.  *E.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 740-411 (1936), *abrogated on other grounds* (upholding sanctions on physician who made false claims about his ability to treat hernias).

Today, the practice of medicine is regulated primarily by the Medical Board of California (Board), which regulates physicians and surgeons by issuing or denying licenses, imposing discipline for unprofessional conduct, and enforcing the Medical Practice Act (MPA).  Cal. Bus. & Prof. Code § 2004; *see also* Prasifka Decl. ¶ 1.[2] The Board is required to investigate all complaints of professional misconduct "from the public, other licensees, from health care facilities or from the board [itself]," including anonymous complaints.  Cal. Bus. & Prof. Code § 2220(a).  The Board must maintain confidentiality during its investigations.  *See* Prasifka Decl. ¶ 4.  In carrying out its duties, the Board's highest priority must be protection of the public.  Cal. Bus. & Prof. Code § 2001.1.

California law provides that the Board "shall take action against any licensee who is charged with unprofessional conduct."  Cal. Bus. & Prof. Code § 2234. Section 2234 provides an illustrative list of examples of unprofessional conduct,

---

[1] The 1876 Act is included as Exhibit A to defendants' Request for Judicial Notice.
[2] California law generally uses the term "physicians and surgeons" to refer to medical doctors and doctors of osteopathy permitted to practice medicine.

including: "[t]he commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon" and incompetence.  *Id.* § 2234(d), (e).  Other sections of California law provide additional specific examples of unprofessional conduct, such as: failing to maintain adequate and accurate records, *id.* § 2266; failing to obtain proper informed consent prior to a sterilization procedure, *id.* § 2250; and failing to provide a standardized summary describing in layperson's terms symptoms and methods of diagnoses for gynecological cancer, *id.* § 2249(a).

California law also considers "gross negligence," "repeated negligent acts," and "incompetence" to be unprofessional conduct.  Cal. Bus. & Prof. Code § 2234.  "Gross negligence" is defined as "the want of scant care" or "an extreme departure from the standard of care," *Gore v. Board of Med. Quality Assurance*, 110 Cal. App. 3d 184, 196 (1980), while negligence is a "simple departure" from the standard of care, Nuovo Decl. ¶ 4.  The "standard of care" for medical practitioners is that reasonable degree of skill, knowledge, and care in diagnosis and treatment ordinarily possessed and exercised by practitioners under similar circumstances at or about the time in question.  *See, e.g.*, *Flowers v. Torrance Mem. Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997-98 (1994).  Typically, the standard of care is established through expert witness testimony.  *See id.* at 1001.  Incompetency is defined as "an absence of qualification, ability or fitness to perform a prescribed duty or function." *Kearl v. Board of Med. Quality Assurance*, 189 Cal. App. 3d 1040, 1048 (1986).

## II.   AB 2098

AB 2098 was enacted against this long history of regulation of doctors and the medical practice and the more recent backdrop of the COVID-19 pandemic.  As the Legislature found, "[t]he global spread of . . . COVID-19 ha[d] claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians," at the time of AB 2098's enactment.  2022 Cal. Stat., ch. 938 ("AB 2098"), § 1(a). Thankfully, COVID-19 vaccines have played a critical role in helping to stem the

spread of the disease and prevent its severity: the Legislature cited data from the Federal Centers for Disease Control and Prevention showing that "unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated."  AB 2098, § 1(b); *see also* Defendants' Request for Judicial Notice ("RJN"), Ex. B, p. 6.  Yet, as the Legislature recounted, as of July 21, 2022, a quarter of those over age five were not vaccinated.  RJN, Ex. E, p. 3.  The Legislature cited research estimating that "2 million to 12 million people in the US were unvaccinated against COVID-19 because of misinformation or disinformation."  RJN, Ex. E, p. 3; s*ee also* AB 2098, § 1(d); RJN, Ex. D, p. 4.  Such misinformation includes myths, for instance, that the vaccines contain microchips, would make a person magnetic, or would change someone's DNA.  RJN, Ex. D, p. 4

The Legislature found it particularly concerning that some of this medically inaccurate information came from physicians themselves.  The legislative findings for AB 2098 note that "[m]ajor news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals."  AB 2098, § 1(e); *see also* RJN, Ex. D, pp. 4-5; Ex. B, p. 7.  This behavior, the Legislature noted, would run contrary to a doctor's "duty to provide their patients with accurate, science-based information."  AB 2098, § 1(f).  In addition, as the Legislature explained, "[p]hysicians and healthcare professionals play a critical role in keeping communities healthy," and "[a] physician's recommendation and information sharing will educate and inform decisions made by their patients."  RJN, Ex. D, p. 5.  For this reason, whether a doctor provides accurate information or inaccurate information "will ultimately impact patient's health."  *Id.*

As the Legislature noted, doctors already face sanctions for repeated instances of negligence or for even a single instance of gross negligence.  *E.g.*, RJN, Ex. D, p. 6.  Some instances of spreading misinformation about COVID-19 would already

arguably fall within these existing provisions, the Legislature explained.  RJN, Ex. B, p. 8.  The Legislature enacted AB 2098, however, to "confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation" to their patients would be subject to formal discipline.  *Id.*

AB 2098 provides that "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."  AB 2098, § 2(a) (to be codified at Cal. Bus. & Prof. Code § 2270).  It defines "disseminate" as the "conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."  AB 2098, § 2(b)(3).  "Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."  AB 2098, § 2(b)(4).  And "disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead."  AB 2098, § 2(b)(2).

## III.  PLAINTIFFS' CHALLENGE TO AB 2098

Plaintiffs Jeff Barke and Mark McDonald are doctors licensed by the Board. Barke Decl. ¶ 2; McDonald Decl. ¶ 2.  Dr. Barke states that he operates a concierge medicine practice in Newport Beach, and Dr. McDonald states that he has a psychiatry practice in the Los Angeles area.  Barke Decl. ¶ 2; McDonald Decl. ¶ 2. Both plaintiffs allege that they have been "outspoken" about the "flaws [they] see in the public health response to the COVID-19 pandemic."  Barke Decl. ¶ 7; McDonald Decl. ¶ 7.  For instance, they each objected to now-rescinded policies requiring children to wear masks in schools or adults to generally wear masks. Barke Decl. ¶ 9; McDonald Decl. ¶ 9.  And they have each "advocated publicly about these and other objections to federal and state COVID-19 policies, including on social media, in various media interviews, and in [their] own published writing."

1   Barke Decl. ¶ 13, McDonald Decl. ¶ 13.

2        On October 4, 2022, plaintiffs filed suit against Attorney General Rob Bonta

3   and the members of the Medical Board in their official capacities.  Compl. ¶¶ 8-9.

4   They contend that AB 2098 violates their First Amendment rights because it "chills

5   the protected speech of medical professionals."  *Id.* ¶ 1; *see also id.* ¶¶ 66-78.  They

6   also contend that AB 2098 is void for vagueness under the Fourteenth Amendment.

7   *Id.* ¶¶ 79-86.  Shortly afterwards, plaintiffs filed the instant motion for a preliminary

8   injunction, seeking to enjoin AB 2098 in its entirety before the law goes into effect

9   on January 1, 2023.

10                              **LEGAL STANDARD**

11       "A preliminary injunction is an extraordinary remedy never awarded as of

12  right."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The party

13  seeking a preliminary injunction must establish that: (1) they are likely to succeed

14  on the merits; (2) they are likely to suffer irreparable harm absent preliminary

15  relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the

16  public interest.  *Id.* at 20.  If a movant fails to establish a likelihood of success, the

17  court generally need not consider the other three factors.  *Garcia v. Google. Inc.*,

18  786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Plaintiffs, as the movants here, bear

19  the burden of proving each of these elements, *Klein v. San Clemente*, 584 F.3d

20  1196, 1201 (9th Cir. 2009), by a "clear showing," *Mazurek v. Armstrong*, 520 U.S.

21  968, 972 (1997) ("It frequently is observed that a preliminary injunction is an

22  extraordinary and drastic remedy, one that should not be granted unless the movant,

23  by a clear showing, carries the burden of persuasion." (citation and emphasis

24  omitted)).

25                                  **ARGUMENT**

26       Plaintiffs have failed to carry their burden to show they are entitled to a

27  preliminary injunction here.  First, they have not shown a likelihood of success in

28  their suit.  Since plaintiffs do not have standing, the Court lacks jurisdiction to

consider the merits of their claims.  Even if the merits could be reached, plaintiffs have not shown a likelihood that AB 2098 violates the First or Fourteenth Amendments.  In addition, plaintiffs have not identified any irreparable harm, and the balance of equities and public interest do not favor injunctive relief.

## I.    PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS

### A.    Plaintiffs Have Not Established Standing

This court lacks jurisdiction over this case unless the plaintiffs demonstrate standing under Article III of the Constitution.  *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).  Standing requires: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  *Id.*  Plaintiffs bear the burden of establishing all three elements.  *Id.*

To demonstrate injury, a plaintiff must make a "clear showing" of injury-in-fact that is actual and concrete, not conjectural or hypothetical.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  For pre-enforcement review, the threat of enforcement must be sufficiently imminent to satisfy this requirement.  *Id*.  Neither the mere existence of a proscriptive statute, nor a generalized threat of prosecution suffices.  *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022).  When determining whether a plaintiff has sufficiently alleged a realistic threat of imminent prosecution, the Ninth Circuit looks to three factors: 1) "whether the plaintiff has articulated a 'concrete plan' to violate the law in question," 2) "whether the enforcing authorities have 'communicated a specific warning or threat to initiate proceedings,'" and 3) "whether there is a 'history of past prosecution or enforcement under the challenged statute.'"  *Id.* (citation omitted).

Plaintiffs have not met the first prong of this test.  They have not alleged a "concrete plan" to violate the standard of care or to intentionally mislead patients and to thereby violate AB 2098.  Indeed, plaintiffs themselves agree they have the duty to provide "medically sound advice", i.e., advice that is consistent with the

standard of care.  Barke Decl. ¶ 19; McDonald Decl. ¶ 26.  Such care would not violate AB 2098, *see infra* at pp. 11-12.  Plaintiffs' discussion of their general history of being "outspoken" and "advocat[ing] publicly" against certain federal and state policies—like most of what plaintiffs provide in their complaint and declarations—focuses on the *public* statements they have made.  *See, e.g.*, Barke Decl. ¶ 13; McDonald Decl. ¶ 13.  But AB 2098 has no bearing on such conduct since it does not involve providing advice or treatment to an individual patient in their care.  *See infra* at pp. 11-12.  Consequently, this case stands in sharp contrast to cases that have found pre-enforcement standing for providers.  In *Tingley*, for instance, the plaintiff's declaration detailed how he had worked with patients for several years providing the very treatment banned under the challenged statute, provided examples of specific patients for whom he had performed such treatments, and established his desire to continue providing that treatment.  47 F.4th at 1067-68.  Here, in contrast, plaintiffs do not identify *any* specific treatment, care, or advice they currently wish to provide to a patient that they believe will be prohibited under AB 2098.  The mere possibility that such circumstances could arise is insufficient to establish standing.

Plaintiffs' allegations are further insufficient to establish standing because they have not shown the conduct they wish to engage in was previously permissible but no longer would be under AB 2098.  Without AB 2098, it was already unprofessional conduct for a doctor to engage in an act of gross negligence, multiple acts of negligence, or incompetence.  *See supra* at p. 3.  AB 2098's sole change is to make a single incident of ordinary negligence (i.e., treatment below the standard of care) unprofessional conduct when such conduct falls within the scope of AB 2098 (i.e., disseminating disinformation or misinformation about COVID-19 to a patient).  Plaintiffs do not maintain, however, that whatever advice they intend to give contrary to the standard of care—and their declarations are silent on precisely what advice that is—would be given only one time or to only one patient

such that they face a new liability under AB 2098.  Plaintiffs therefore have not shown any harm to them *from AB 2098*.  In addition to undermining any showing of an actual injury, this further undermines a showing of traceability and redressability.

Finally, plaintiffs' bald assertion of a chilling effect caused by AB 2098 cannot fill that gap in showing an actual or imminent injury.  *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]") (citation omitted).  In sum, plaintiffs have no likelihood of succeeding because they lack standing.[3]

### B.   Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim

Plaintiffs' shortcomings as to the first *Winter* factor go beyond their jurisdictional problems: they also fail to show a likelihood of success on their First Amendment claim.  The First Amendment "prohibits laws that abridge the freedom of speech."  *Nat'l Institute of Family & Life Advocates v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371 (2018).  This protection encompasses the speech of professionals such as physicians.  *Id.* at 2372.  While AB 2098 does touch upon the speech of doctors, it does so in a way consistent with the First Amendment.  As an initial matter, AB 2098 is a permissible regulation of professional conduct.  But even if AB 2098 were considered a regulation of speech, it would still be constitutional as a regulation of the medical care provided by doctors.  Finally, should strict scrutiny apply, AB 2098 would be constitutional even under that standard.

### 1.   AB 2098 Is a Permissible Regulation of Professional Conduct

Although speech by professionals is protected by the First Amendment, states may still "regulate professional conduct, even though that conduct incidentally

---

[3] Relatedly, the Medical Board Defendants are entitled to absolute immunity for their quasi-judicial acts relating to a licensee's disciplinary proceedings. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922-26 (9th Cir. 2004). For this reason, their claims against these defendants would also fail.

involves speech." *NIFLA*, 138 S. Ct. at 2372.  Regulations of medical practitioners'
professional conduct that also touch upon their speech are widespread and
longstanding.  They include, for instance, "state regulation of malpractice" and
informed consent requirements.  *Tingley*, 47 F.4th at 1074.  "[D]octors are routinely
held liable for giving negligent advice to their patients, without serious suggestion
that the First Amendment protects their right to give advice that is not consistent
with the accepted standard of care."  *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th
Cir. 2014), *abrogated on other grounds by*, *NIFLA*, 128 S. Ct. 2361.  For instance,
"[d]octors commit malpractice for failing to inform patients in a timely way of an
accurate diagnosis, for failing to give patients proper instructions, for failing to ask
patients necessary questions, or for failing to refer a patient to an appropriate
specialist."  Robert Post, "Informed Consent to Abortion: A First Amendment
Analysis of Compelled Physician Speech," 2007 U. Ill. L. Rev. 939, 950-951
(2007) (compiling cases).  A doctor similarly "may not counsel a patient to rely on
quack medicine.  The First Amendment would not prohibit the doctor's loss of
license for doing so."  *Pickup*, 740 F.3d at 1228 (citation omitted).  California is no
different from other states in generally regulating the professional conduct of
medical practitioners in ways that implicate their speech but concern the medical
care they provide their patients.  *See, e.g.*, Cal. Bus. & Prof. Code § 741(a)(1), (2)
(requiring disclosures when prescribing certain high doses of opioids); *id.* § 2234.1
(requiring disclosures for complementary or alternative medicine); *id.*
§ 2241.5(c)(5), (6) (requiring providers prescribing opiates to create certain
records); *see also supra* at pp. 2-3.

  AB 2098 fits into this longstanding tradition.  It makes it unprofessional
conduct for a physician to "disseminate misinformation or disinformation related to
COVID-19."  AB 2098, § 2(a).  But this provision does not address physician
speech in the abstract; the definitions of "disseminate" and "misinformation" make
clear that the prohibition is directed at the *care* that a physician provides her patient.

The statute defines "disseminate" as "the conveyance of information from [a practitioner] *to a patient under the [practitioner's] care* in the *form of treatment or advice*." *Id.* § 2(b)(3) (emphasis added).  It defines "misinformation" as "false information that is contradicted by contemporary scientific consensus *contrary to the standard of care*." *Id.* § 2(b)(4) (emphasis added).  AB 2098 thus circumscribes the *care* a physician recommends or provides *to their patients* for a *specific health issue*.

In this way, AB 2098 is analogous to the statutes upheld by the Ninth Circuit in *Tingley* and *Pickup*.  In those cases, the Ninth Circuit addressed the validity of state statutes prohibiting conversion therapy—that is, efforts to change a person's sexual orientation—performed on minors.  *See Tingley*, 47 F.4th at 1071-72.  Both statutes regulated professional conduct, the Ninth Circuit concluded, because they regulated the kind of care a practitioner could provide their patients.  The fact that such care "is performed through speech alone" made no difference.  *Pickup*, 740 F.3d at 1230; *see also Tingley*, 47 F.4th at 1077-79.  AB 2098 similarly regulates the kind of care that a physician can provide.  As under the statutes in *Tingley* and *Pickup*, providers remain free under AB 2098 to generally discuss different treatment options for COVID-19, weigh the pros and cons of a patient obtaining a vaccine for COVID-19, provide patients with information that will ensure they receive informed consent, or advise a specific treatment for COVID-19.  Plaintiffs face no restrictions under AB 2098 on their ability to express their views on COVID-19 outside the context of treating a patient.  All they must do is act competently within the standards of their profession when providing information, treatment, or advice about COVID-19 to their patients, consistent with the standard of care.  Just as with the statutes banning conversion therapy, this is a regulation of the care a physician gives and thus a regulation of professional conduct.

Plaintiffs argue, however, that AB 2098 cannot be a conduct regulation because it "regulates only 'the conveyance of information,'" Pls.' Mem. Supp. Mot.

for Prelim. Inj. ("PI Mot.") at 15, requiring "no nexus with any treatment" and thus regulates "pure speech," PI Mot. at 16.  But as explained above, AB 2098 covers the "conveyance of information" only 1) "to a patient under the licensee's care" and 2) "in the form of treatment or advice."  AB 2098, § 2(a), (b)(2).  It does not encompass a doctor saying in casual conversation not material to providing care that he did or did not choose to receive the COVID-19 vaccine (*cf.* PI Mot. at 16), does or does not wear a mask in public, or agrees or disagrees with a particular state policy regarding COVID-19.  In none of these situations is the doctor providing care to his patients.  Plaintiffs thus err in contending that AB 2098 has no nexus to treatment; rather, its reach is expressly tied to doctor's provision of care to a patient.

More broadly, plaintiffs' attempt to erect an unbreachable barrier between "conveying information" and "treatment" is simply untenable.  "Most medical treatments require speech."  *Tingley*, 47 F.4th at 1073.  In many situations, the regulation of a doctor's speech "is theoretically and practically inseparable from the regulation of medicine."  Post, *supra*, at 751.  That is the case, for instance, when an endocrinologist advises a diabetic about which foods to eat, a neurologist advises a migraine sufferer to track and avoid migraine triggers, or a general practitioner advises a patient with back pain to perform a particular regimen of stretches and exercises.  In these situations, as in innumerable others, the care and treatment a physician provides comes in the form of speech.  And when the two are intertwined, regulating the provision of care involves regulating the speech of practitioners.

In contrast, AB 2098 is not like the statutes struck down in *NIFLA* and *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002).  In *NIFLA*, the Supreme Court found it significant that the challenged statute required clinics to post a notice regardless of whether a clinic provided any care, let alone the care referenced in the notice, to a patient.  138 S. Ct. at 2373.  In stark contrast, AB 2098 *is* tied to the provision of

medical care.  And in *Conant*, the Ninth Circuit disapproved of the federal government investigating a physician "solely on the basis of a recommendation of marijuana within a bona fide doctor-patient relationship, unless the government in good faith believes that it has substantial evidence of criminal conduct." *Conant*, 309 F.3d at 636.[4]  Unlike AB 2098, the governmental policy at issue in *Conant* was not targeted at treatment that was below the standard of care.  To the contrary, the policy in *Conant* precluded a doctor from discussing marijuana use as a possible treatment and from recommending marijuana use when doing so was *consistent* with the standard of care.  *See id.* at 637 (prohibiting all discussion of medical use of marijuana); *cf. Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1317 (11th Cir. 2017) (striking down statute that prohibited doctors from asking certain questions even when consistent with the standard of care and when there was no evidence the prohibited questions were "medically inappropriate, ethically problematic, or potentially ineffective").  Unlike the challenged policy in *Conant*, AB 2098 does not preclude a physician from asking questions to gather information about potential COVID-19 treatment or advice, from discussing the pros and cons of any potential treatment, from recommending a particular treatment, or from providing specific advice—when doing so is consistent with the standard of medical judgment.  AB 2098 is analogous not to the governmental actions disapproved of in *NIFLA* and *Conant* but rather to those held permissible in *Pickup* and *Tingley*.

Under *Tingley* and *Pickup*, the applicable standard for reviewing the constitutionality of AB 2098's regulation of conduct is rational basis.  *Tingley*, 47 F.4th at 1077-78.  That standard requires only that AB 2098 "bear[] a rational relationship to a legitimate state interest." *Pickup*, 740 F.3d at 1231.  AB 2098 readily meets this standard.  As discussed in more detail below, *see infra* at pp. 16-

---

[4] *Conant* was decided in 2002, during the period in time when medical use of marijuana in California was legal but recreational use was not.

18, AB 2098 furthers the government's interest in public health and patient safety. The Legislature was concerned that misinformation and disinformation that could dissuade patients from receiving critical or necessary care to prevent COVID-19 (such as vaccinations) or to treat COVID-19 was on occasion being spread by medical professionals in the doctor-patient context. *E.g.*, RJN Ex. C, p. 3; Ex. D, pp. 4-5. Protecting public health and patient safety is a legitimate state interest. *See infra* at pp. 16-18. For recommendations that fall below the standard of care can harm patients individually and public health generally. Prohibiting doctors from providing inaccurate information in a way that renders their care below the requisite standard of care furthers the State's legitimate interest in patient safety and public health. AB 2098 is therefore constitutional as a reasonable regulation of professional conduct.

### 2. AB 2098 Is Permissible as a Regulation of the Care Provided by Medical Professionals

Even if AB 2098 is not viewed as a regulation of professional conduct, plaintiffs still cannot show a likelihood of success on their First Amendment claim. "The Supreme Court has recognized that laws regulating categories of speech belonging to a 'long . . . tradition' of restriction are subject to lesser scrutiny." *Tingley*, 47 F.4th at 1079 (quoting *NIFLA*, 138 S. Ct. at 2372). And there is indeed a long tradition of "regulation governing the practice of those who provide health care within state borders." *Id.* at 1080. Since the birth of modern medicine, states have imposed restrictions on who can practice medicine and on the care medical practitioners provide. *See id.* at 1080-81 (discussing, *inter alia*, *Collins v. Texas*, 223 U.S. 288 (1912), and *Lambert v. Yellowley*, 272 U.S. 581 (1926)). This has included restrictions on the provision of care that involves the speech of practitioners: "[C]enturies-old medical malpractice laws," for instance, "restrict treatment *and the speech* of health care providers." *Id.* at 1081 (emphasis added).

This history of regulation arises out of important concerns. "The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients." *Tingley*, 47 F.4th at 1083. "The work of physicians has life and death consequences for their patients." *Kenneally v. Medical Board*, 27 Cal. App. 4th 489, 500 (1994). Other professionals acting in their professional capacity, "even when involving the speech of professionals within the confines of a client relationship, do[] not run the same risk of harm." *Tingley*, 47 F.4th at 1083. After all, "the knowledge of patient and physician are not in parity," and a patient "has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process." *Truman v. Thomas*, 27 Cal. 3d 285, 291 (1980). And "[w]hen a health care provider acts or speaks about treatment with the authority of a state license, that license is an 'imprimatur of a certain level of competence.'" *Tingley*, 47 F.4th at 1083 (citation omitted). Regulating the care medical practitioners provide helps ensure the safety and health of patients—and because medical care frequently involves the provision of professional advice, effective protection for patients must encompass the ability to regulate such speech.

Plaintiffs claim that AB 2098 does not fall within the category of laws recognized as permissible under *Tingley* because it "has no nexus to any treatment." PI Mot. at 17. But the advice and treatment physicians provide—and the information conveyed in such advice and treatment—*is* patient care. *See, e.g.*, *Tingley*, 47 F.4th at 1083. It is that context of patient care, and that alone, that AB 2098 regulates. Nor does AB 2098 impose any "government-scripted physician-patient conversation." PI Mot. at 18. It does not tell doctors what they must say or require them to say anything at all. Rather, to the extent a provider chooses to discuss COVID-19, AB 2098 simply prohibits doing so in a manner that violates the standard of care. This has long been a requirement for doctors in order to protect their patients. A contention that California cannot require that much of its

1    medical practitioners would "endanger centuries-old medical malpractice laws that

2    restrict treatment and the speech of healthcare providers." *Tingley*, 47 F.4th at

3    1082.

4        AB 2098 falls within the category of regulation that *Tingley* recognized as

5    permissible, namely regulations of the provision of care by medical professionals

6    even when that regulation governs their speech.  It is therefore permissible under

7    the First Amendment without having to satisfy the demands of strict scrutiny.

8            ### 3.    AB 2098 Withstands Even Strict Scrutiny

9        Finally, even if the Court were to conclude that AB 2098 is a content-based

10   regulation that is subject to strict scrutiny, plaintiffs still cannot show a likelihood

11   of success on the merits.  To survive strict scrutiny, a statute must be narrowly

12   tailored to serve a compelling government interest.  *See, e.g.*, *Reed v. Town of*

13   *Gilbert*, 576 U.S. 155, 163 (2015).  AB 2098 meets this standard.

14           #### a.    AB 2098 Furthers a Compelling Government Interest

15       Plaintiffs contend that AB 2098 "serves no legitimate interest at all."  PI Mot.

16   at 19.  In fact, AB 2098 serves interests that are not only legitimate but compelling.

17       First, AB 2098 furthers the State's compelling interest in "protect[ing] the

18   public from negligent or incompetent physicians."  *Lewis v. Superior Court*, 3 Cal.

19   5th 561, 568 (2017).  States "unquestionably ha[ve] a 'compelling interest in

20   assuring safe health care for the public.'"  *Recht v. Morrisey*, 32 F.4th 398, 413 (4th

21   Cir. 2022) (citation omitted).  As the Legislature explained, "[p]hysicians and

22   healthcare professionals play a critical role in keeping communities healthy.  A

23   physician's recommendation and information sharing will educate and inform

24   decisions made by their patients."  RJN, Ex. D, p. 5; *see also* Nuovo Decl. ¶ 6.

25   Because medical decisions that patients make under doctor advice are by definition

26   matters of health—and frequently life and death—the State has a compelling

27   interest in ensuring the care provided is not substandard.  Like malpractice law and

28

1  other prohibitions on treatment below the standard of care, AB 2098 guards and

2  protects patients' health and safety.

3      Second, AB 2098 furthers the compelling interest of ensuring patient access to

4  accurate, complete, and truthful information about healthcare.  Misinformation

5  from a doctor during medical treatment presents a real danger of harm to a patient.

6  Nuovo Decl. ¶ 6; *cf. Truman*, 27 Cal. 3d at 293-94 (patient declined pap smear test

7  when doctor did not explain purpose of test and subsequently died of cervical

8  cancer).  In addition to furthering this interest generally, AB 2098 does so in a way

9  that also helps limit the spread and severity of the deadly COVID-19 pandemic.

10 The United States Supreme Court has recognized that "[s]temming the spread of

11 COVID-19 is unquestionably a compelling interest."  *Roman Catholic Diocese of*

12 *Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).  By the time of AB 2098's passage,

13 COVID-19 had "claimed the lives of over 6,000,000 people worldwide, including

14 nearly 90,000 Californians."  AB 2098, § 1(a).  Vaccines have played a crucial role

15 in helping stem the spread of COVID-19 and in limiting the severity of the disease.

16 *E.g.*, AB 2098, § 1(b) (citing data showing that "unvaccinated individuals are at a

17 risk of dying from COVID-19 that is 11 times greater than those who are fully

18 vaccinated"); RJN, Ex. B, p. 6.  However, as the Legislature found,

19 "misinformation and disinformation about COVID-19 vaccines"—including

20 misinformation from medical practitioners—have weakened public confidence and

21 placed lives at serious risk" by precluding patients from receiving such vaccines

22 due to their factually incorrect information.  AB 2098, § 1(d), (e); *see also* RJN, Ex.

23 B., p. 6; Ex. D, p. 4.  While ensuring that patients receive accurate information—as

24 AB 2098 does—is a compelling interest, it is doubly so here, insofar as AB 2098

25 could also help bolster COVID-19 vaccination rates and stem the spread and harm

26 of that disease.

27     Third, AB 2098 furthers "the State's compelling interest in regulating the

28 practice of professions within their boundaries."  *Goldfarb v. Virginia State Bar*,

421 U.S. 773, 792 (1975).  The Supreme Court has noted that among the professions, "[t]here is perhaps no profession more properly open to [state] regulation than that which embraces the practitioners of medicine," "dealing as its followers do with the lives and health of the people."  *Watson v. Maryland*, 218 U.S. 173, 176 (1910); *see also Tingley*, 47 F.4th at 1082 ("'[f]ew professions require more careful' scrutiny than 'that of medicine'" (citation omitted)).  AB 2098, acting in harmony with other similar and long-standing regulations, furthers this compelling interest.  It is critical that patients can trust the medical judgment, advice, and recommendations of their state-licensed medical providers.  Without such trust, patients may well avoid acting on medically appropriate advice and suffer serious, if not life-threatening, health consequences.  This is no less true in the COVID-19 arena than in other areas of health care.  By holding medical practitioners to the standard of care in providing truthful advice and recommendations about COVID-19 to their patients, AB 2098 helps ensure patient trust in their doctors and thereby furthers a compelling government interest.

### b.  AB 2098 Is Narrowly Tailored to Serve Those Compelling Interests

AB 2098 is narrowly tailored to further these compelling State interests.  "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Here, the Legislature's primary concern in enacting AB 2098 was to stop the provision of untruthful information about COVID-19 to patients in a way that renders medical treatment below the standard of care.  The Legislature recounted evidence of medical practitioners spreading such misinformation.  *See, e.g.*, RJN Ex. B, pp. 6-7; Ex. D, pp. 4-5.  It explained that doctors play a key role in guiding patient decisions about healthcare, making it particularly concerning when they violate the standard of care by failing to provide medically accurate information.  *See, e.g.*, RJN, Ex. B, pp. 6-7; Ex. D, pp. 4-5.  The Legislature acted to limit this

harm in the narrowest possible way: by clarifying that when doctors provide advice or treatment about COVID-19, they must still adhere to the standard of care.  AB 2098 leaves practitioners free to express themselves in innumerable other forums outside of patient care.  And within the context of patient care, it does not limit advice that meets the standard of care.  *See supra* at p. 13 (distinguishing AB 2098 from policy at issue in *Conant*).  It thus specifically targets the precise category of conduct or speech where the State's interest is highest and that poses the greatest risk of harm: conduct or speech by doctors that comes in the form of advice or treatment to patients within their care.[5]

Considering AB 2098's place within the larger system of medical regulation also reinforces its narrow tailoring.  As the legislative history notes, doctors are already subject to discipline for repeated negligent acts, gross negligence, or incompetence.  RJN, Ex. B, p. 8; *see also supra* at p. 3.  Thus, a physician who repeatedly provides treatment or guidance concerning COVID-19 that falls below the requisite standard of care—or a physician who does so only once in a manner constituting gross negligence or incompetence—already faces the possibility of discipline or liability.  All that AB 2098 does is clarify that, with respect to advice and treatment concerning COVID-19, a single instance of substandard care can suffice for discipline.  That clarification is narrowly tailored to further the State's compelling interests in public health and patient safety.

In response, plaintiffs again argue that AB 2098 is problematic because it lacks any "nexus to treatment."  PI Mot. at 20.  They say it is also underinclusive because it does not simply ban a particular treatment.  PI Mot. at 22.  As explained more thoroughly above, plaintiffs err in this interpretation of AB 2098.  The statute

---

[5] That AB 2098 is narrowly tailored is further illustrated by looking to the legislative history of the enactment.  As originally introduced, AB 2098 did not include a definition of "dissemination."  RJN, Ex. B, p. 12.  The statute was amended to include a definition of "disseminate" that clarified the statute was targeted at "communications made to a patient under [the provider's] care in the form of treatment or advice" and not to "statements made to the general public about COVID-19 through social media or at a public protest."  *Id.*

only addresses speech that comes in the form of treatment or advice—that is, speech used in rendering care—and it does speak to the kind of treatments (as well as advice) a physician can give their patients.  Predicated as they are on a misreading of the statute, these arguments are unavailing.

Plaintiffs further contend the statute is flawed in two other respects.  First, they complain that the State could simply use its own speech instead of requiring doctors provide adequate care.  But such an argument would presumably render unconstitutional *any* application of the standard-of-care requirement—whether in professional discipline or medical malpractice law—to dangerous and substandard medical advice to a patient.  When a doctor advises a patient to take a drug that would be dangerous to those in the patient's condition or fails to disclose a pertinent side effect of treatment, the State could perhaps devise a way to step into the gap and provide that information itself.  That has never, however, meant that the State cannot hold medical providers to the standard of care consistent with the First Amendment.

Nor is AB 2098 underinclusive because it only addresses physicians rather than all healthcare providers.  "A State need not address all aspects of a problem in one fell swoop," and the Supreme Court has "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of" the government's interests.  *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015).  Physicians and surgeons have their own medical licensing and regulatory scheme, and it made sense to build upon the existing requirements for the provision of care by such professionals in enacting AB 2098.  Moreover, other medical practitioners such as nurse practitioners and physician assistants act under the supervision of physicians and surgeons when providing medical care.  *See* Cal. Bus. & Prof. Code § 3502(a)(1) (physician assistant may only perform services rendered under the supervision of a physician); *id.* § 2836.1 (nurse practitioners function pursuant to standardized procedures developed and approved by

1   supervising physician).  Ensuring that supervisors meet the standard of care is a

2   way to ensure that patients receive adequate care from all health professionals.

3   **C.  Plaintiffs Are Unlikely to Succeed on Their Void for Vagueness
        Claim**

4

5   Plaintiffs further argue that AB 2098 is unconstitutional under the Fourteenth

6   Amendment because it is void for vagueness.  A statute is impermissibly vague

7   when it "fails to provide a reasonable opportunity to know what conduct is

8   prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement."

9   *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted).  But "[d]ue

10  process does not require 'impossible standards of clarity.''  *Id.* (quoting *Kolender v.*

11  *Lawson*, 461 U.S. 352, 361 (1983)).  All that is required is for the statute "to give a

12  person of ordinary intelligence a reasonable opportunity to know what is

13  prohibited."  *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013)

14  (citation omitted).  And where a statute "regulates licensed . . . health providers,

15  who constitute 'a select group of persons having specialized knowledge,' the

16  standard for clarity is lower."  *Pickup*, 740 F.4th at 1234 (citation omitted).

17  AB 2098 is not unconstitutionally vague.  It defines as unprofessional conduct

18  a physician "disseminat[ing] misinformation or disinformation related to COVID-

19  19."  AB 2098, § 2(a).  The statutory definitions of the relevant terms provide

20  adequate context and guidance for a practitioner of ordinary intelligence to know

21  what is prohibited.  In AB 2098, "dissemination" is defined as "the conveyance of

22  information from the licensee to a patient under the licensee's care in the form of

23  treatment or advice."  AB 2098, § 2(b)(3).  This clarifies that the type of behavior

24  implicated by AB 2098 involves: 1) conveying information, 2) in the form of

25  treatment or advice, 3) to a patient under the practitioner's care.  A practitioner of

26  ordinary intelligence can distinguish between the situations covered by this

27  provision (e.g., providing advice to one's patient about whether to receive the

28  COVID-19 vaccines) from those that are not (e.g., posting on Twitter about the

1    State's directives on whether to require masks in schools).

2        AB 2098 in turn defines "misinformation" as "false information that is

3    contradicted by contemporary scientific consensus contrary to the standard of care."

4    AB 2098, § 2(b)(4).  Plaintiffs object that the definition is unclear because the

5    phrase "contrary to the standard of care" might modify "contemporary scientific

6    consensus" rather than "false information."  PI Mot. at 25.  But no reasonable

7    reader could come to that interpretation.  The "standard of care" is a term of art

8    meaning the reasonable degree of skill, knowledge, and care in diagnosis and

9    treatment ordinarily possessed and exercised by practitioners under similar

10   circumstances at or about the time in question.  *Flowers*, 8 Cal. 4th at 997-98.  It

11   would be nonsensical to think that the "scientific consensus" would be "contrary to

12   the standard of care."[6]  Nor is the phrase "contrary to the standard of care"

13   unconstitutionally vague.  The term is not only familiar to medical practitioners but

14   is used pervasively the legal and medical regulatory systems.  *E.g.*, CACI 501 (a

15   medical practitioner who fails to use the standard of care is negligent); *Avivi v.*

16   *Centro Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463, 4701 (2008) (describing

17   standard of care in medical malpractice suit); *Trowbridge v. United States*, 703 F.

18   Supp. 2d 1129, 1146 (D. Idaho 2010) (discussing factual findings as to standard of

19   care in medical malpractice suit).  Indeed, California's medical licensing system

20   holds licensees to the standard of care with respect to all the care they provide.  *See*

21   *supra* at p. 3.

22       The phrase "contradicted by contemporary scientific consensus" is similarly

23   not vague.  There are issues open to debate within the scientific and medical

24

25       [6] To the extent the Court believes there is a lack of clarity on this point,
     defendants contend the Court should adopt the narrower construction of the
     statute's reading.  *See, e.g.*, *Doe v. Harris*, 772 F.3d 563, 578 (9th Cir. 2014) (court
26   may adopt narrowing construction of statute in vagueness challenge).  Such a
     reading of the statutory text is consistent with the legislative history, which
27   indicates that the definition of "misinformation" was amended expressly to connect
     it to the standard of care.  RJN, Ex. D, p. 10.  Requiring that any false information
28   be contrary to the standard of care as a distinct element carries out that purpose.

communities, but that does not mean there are not objectively provable facts on which the scientific community has a consensus: that apples contain sugar, that measles is caused by a virus, that Down syndrome is caused by a chromosomal abnormality, etc.  To the extent there are instances where the scientific consensus is less clear—just as it can be difficult at times to prove what the relevant standard of care is—that does not make the statute unduly vague.  In a disciplinary hearing, the burden of proof would be on the Board to establish all elements of a charge of disseminating misinformation, and where that does not happen, no discipline can occur.  *Ettinger v. Board of Med. Quality Assurance*, 135 Cal. App. 3d 853, 856 (1982).  In any event, there is no danger of this term leading to confusion about whether doctors should provide certain information.  Misinformation can lead to discipline under the statute not only if it is contradicted by the scientific consensus *but also* if it is contrary to the standard of care—and the plaintiffs should not be providing information below the standard of care regardless of AB 2098's applicability.

Plaintiffs' contrary arguments are again unpersuasive.  They once more contend that the law is unclear as to whether it applies to public speech unconnected to care of a specific patient (it does not) or has any link to treatment (it does).  Rather, AB 2098 speaks clearly on these issues.  An ordinary physician would understand that AB 2098's prohibition on advice or treatment to a patient does not to encompass her speech on social media or in casual conversations not connected to providing care to a patient.

Plaintiffs also parse and dissect the statute, contending for instance that it is vague because it references "misleading information" as well as "false information."  PI Mot. at 26.  But as the Supreme Court has stated, "while '[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question,' because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language."

1   *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (citation omitted) (alterations in

2   original).  The "Supreme Court has held that 'speculation about possible vagueness

3   in hypothetical situations not before the Court will not support a facial attack on a

4   statute when it is surely valid in the vast majority of its intended applications.'"

5   *Pickup*, 740 F.3d at 1234 (quoting *Hill*, 530 U.S. at 733).[7]  All that the Fourteenth

6   Amendment requires is that it be "clear what the [statute] as a whole prohibits."

7   *Hill*, 530 U.S. at 733 (citation omitted).  AB 2098 does so.  Plaintiffs therefore have

8   not established a likelihood of success on their Fourteenth Amendment claim either.

9   **II.   PLAINTIFFS HAVE NOT DEMONSTRATED THAT AN INJUNCTION IS**
      **NECESSARY TO PREVENT IRREPARABLE HARM**

10

11         Beyond their failure to demonstrate a success on the merits, plaintiffs have not

12   shown that they will suffer irreparable harm in the absence of an injunction.  Their

13   motion does not point to a specific irreparable harm they contend they will suffer if

14   AB 2098 goes into effect.  *See* PI Mot. at 27.  They say that the burden of AB 2098

15   would fall on them because they might lose their livelihoods and destroy their

16   careers, PI at 27, but such speculative economic harms are not ordinarily considered

17   irreparable.  *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675-76

18   (9th Cir. 1988) ("Subjective apprehensions and unsupported predictions of revenue

19   loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate

20   threat of irreparable harm.").  And plaintiffs may raise their constitutional

21   challenges to the Act's requirements as a defense in any disciplinary proceeding

22   and related court proceedings.  *See Shea v. Board of Med. Quality Assurance*, 81

23   Cal. App. 3d 564, 576 (1978).  Plaintiffs thus have an adequate forum to raise these

24   challenges without suffering any economic harm until their claims have been

25   litigated.

26         [7] While plaintiffs contend they are making an as-applied challenge to the
     statute, they do not point in their complaint or declarations to specific statements or

27   examples of care they wish to provide a patient that they contend AB 2098 will
     prohibit.  Consequently, there is nothing to apply the statute to in the court's

28   analysis and their challenge is better treated as a facial one.

Furthermore, as discussed above, AB 2098 simply makes explicit the Board's authority to take action against a single act of substandard care with respect to COVID-19.  Under existing law, the Board already had the ability to initiate disciplinary proceedings for one act of gross negligence, repeated negligent acts, or incompetence.  And AB 2098 does not even apply to public statements, which is what plaintiffs' declarations focus on.  Nor is there any reason for concern that patients will not receive "candid medical advice" due to AB 2098.  PI Mot. at 27.  AB 2098 preserves plaintiffs' ability to provide their patients with advice and treatment consistent with the standard of care.  Plaintiffs are not harmed, irreparably or otherwise, by being required to conform the care they provide to the medical standard of care.

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH AGAINST GRANTING AN INJUNCTION

Where, as here, the government is the opposing party, the last two factors of the preliminary injunction analysis—the balance of equities and public interest—merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  To analyze these factors, the Court "'balance[s] the competing claims of injury and consider the effect of granting or withholding the requested relief,'" paying "particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (citation omitted).

Here, the State has a strong interest in enforcing AB 2098's obligations to protect the public and would suffer irreparable harm if enjoined from doing so.  *Maryland v. King*, 133 S. Ct. 1, 3 (2013) ("[A]nytime a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (internal quotation marks omitted).  In addition, an injunction here would undermine the State's long tradition of regulating physician conduct.  *Tingley*, 47 F.4th at 1079.  California has an indisputable and substantial public interest in ensuring the effective regulation and operation of medical practice

1   to ensure the health and safety of patients and the public.  That is especially true

2   here, where AB 2098 serves to ensure that patients receive accurate and medically

3   appropriate information and that doctors do not provide patients with substandard

4   care.  And since such care can involve vaccinations against COVID-19 that have

5   played a critical role in reducing the severity and spread of the disease, an

6   injunction could also undermine the public health.

7        On the other hand, although plaintiffs allege deprivations of their

8   constitutional rights, any actual burden on those rights that might exist (and

9   defendants contend there is none) is incidental and exceedingly minimal.  State law

10  already defines as unprofessional conduct incompetence, a single instance of gross

11  negligence, or repeated negligent acts—regulations not challenged by plaintiffs in

12  this case.  Cal. Bus. & Prof. Code § 2234(b), (c), (d).  All AB 2098 does is clarify

13  that a single instance of negligence with respect to the treatment and care provided

14  to patients that conveys information about COVID-19 can constitute unprofessional

15  conduct.  Any incremental impact on speech—particularly speech that comes in the

16  form of advice or treatment below the standard of care—is far outweighed by the

17  State's interest in ensuring that doctors provide adequate care for the protection and

18  safety of their patients and the public.

19  ///

20  ///

21  ///

22

23

24

25

26

27

28

26

1

**CONCLUSION**

2

This Court should deny Plaintiffs' motion for a preliminary injunction.

3

4

Dated:  October 27, 2022                    Respectfully submitted,

5

                                            ROB BONTA
                                            Attorney General of California

6

                                            ANYA M. BINSACCA
                                            EDWARD KIM

7

                                            Supervising Deputy Attorneys
                                            General

8

                                            CHRISTINA SEIN GOTT
                                            Deputy Attorney General

9

10

                                            */s/ Kristin Liska*

11

                                            KRISTIN A. LISKA
                                            Deputy Attorney General

12

                                            *Attorneys for Defendants*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name: ***McDonald, Mark, et al. v. Kristina D. Lawson, et al.***

Case No.    **8:22−cv−01805−FWS−ADS**

I hereby certify that on <u>October 27, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF JAMES NUOVO, M.D. IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (with EXHIBIT 1)**

**DECLARATION OF WILLIAM PRASIFKA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**REQUEST FOR JUDICIAL NOTICE (with EXHIBITS A-F)**

I am employed by the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made.  I am over the age of 18 years and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.

Participants in the case who are registered CM/ECF users will be served electronically by the CM/ECF system.

I further certify that participants in this case who are not registered CM/ECF users, will be served by U.S. Mail.  On <u>October 27, 2022</u>, I placed true copies thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Emanuel McCray**
**2700 Caples Street**
**P.O. Box 3134**
**Vancouver, WA 98668**
*Intervenor In Pro Se*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>October 27, 2022</u>, at San Francisco, California.

| | |
|---|---|
| Vanessa Jordan | *Vanessa Jordan* |
| Declarant | Signature |