Robert H. Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996

Daniel R. Suhr (*Pro Hac Vice filed*)
dsuhr@libertyjusticecenter.org
Reilly Stephens (*Pro Hac Vice*)
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK MCDONALD AND JEFF BARKE,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTINA D. LAWSON, *in her official capacity as President of the Medical Board of California*; RANDY W. HAWKINS, *in his official capacity as Vice President of the Medical Board of California*; LAURIE ROSE LUBIANO, *in her official capacity as Secretary of the Medical Board of California*; MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, ASIF MAHMOOD, NICOLE A. JEONG, RICHARD E. THORP, VELING TSAI, and ESERICK WATKINS, *in their official capacities as members of the Medical Board of California*; and ROBERT BONTA, *in his official capacity at Attorney General of California*,<br><br>Defendants. | Case No. 8:22-cv-01805-FWS-ADS<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>DATE: November 17, 2022<br>TIME: 10:00 A.M.<br>JUDGE: Fred W. Slaughter<br>CTRM: 10D |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 2

INTRODUCTION ............................................................................................................... 3

LEGAL STANDARD .......................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

    I.     Plaintiffs have standing to challenge AB 2098. ................................................. 4

    II.    The Plaintiffs are likely to succeed on the merits of their claims that AB 2098 abridges their right to speak and is void for vagueness. .......................... 7

    III.   The other preliminary injunction factors favor granting Plaintiffs' Motion. ............................................................................................................ 13

CONCLUSION .................................................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Regents v. Southworth*, 529 U.S. 217 (2000) .............................................. 10

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ........................................... *passim*

*Gore v. Board of Med. Quality Assurance,* 110 Cal. App. 3d 184 (1980) ............... 6

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010) ..................................................... 7

*Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ........... 7, 11, 12

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) ...................................................... 8

*Reger v. A.I. Dupont Hosp. for Children of the Nemours Found.*, 259 Fed. Appx. 499 (3d Cir. 2008) .......................................................................... 10

*Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741 (9th Cir. 2012) ................................................................................................................ 4

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011) ............................ 4

*Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022) .............................................. 8, 9

*Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019) .............................. 8

*Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) .................. 8

**Statutes**

21 U.S.C. § 812(b)(1) ................................................................................................ 9

**Other Authorities**

"Governor Newsom to End the COVID-19 State of Emergency," Press Release (Oct. 17, 2022), https://www.gov.ca.gov/2022/10/17/governor-newsom-to-end-the-covid-19-state-of-emergency/ .............................................................. 11

Covid-19 pandemic is over in the US - Joe Biden," BBC.com (Sept. 20, 2022), https://www.bbc.com/news/world-us-canada-62959089 ................................. 11

## INTRODUCTION

Defendant California Medical Board Members and the California Attorney General (collectively, "the Board" or "the State") argue that AB 2098 ("the Act") is not a speech restriction but a standard professional regulation of conduct. Yet the word "conduct" only appears in the act as the term being defined to mean "speech": the Act makes it "unprofessional conduct" to "disseminate," which is defined as "the conveyance of information." Not the administering of a drug, not even the writing of a prescription, simply communicating a single piece of information that the Board believes to be incorrect is, as described in the Board's own Opposition (Dkt. 50) ("Resp."), now the legal equivalent of *gross negligence* if it at all relates to COVID.

Plaintiffs Dr. Mark McDonald and Dr. Jeff Barke submit this Reply in support of their Motion for Preliminary Injunction. *See* Dkt. 35 ("PI Memo."). This Court should enjoin the Act while this case proceeds, because the chilling effect on Plaintiffs' right to speak is real and substantial, constitutes irreparable injury, and the protection of such First Amendment rights is always in the public interest.

## LEGAL STANDARD

Plaintiffs disagree with the Defendants' description of the legal burden for a preliminary injunction. The Defendants assert that to secure such relief, the "Plaintiffs, as the movants here, bear the burden of proving each of these elements by a clear showing." Resp. 6. This mischaracterizes the proper test. For a First Amendment claim such as this, the Plaintiffs must only raise a colorable First Amendment claim, in which case the burden then rests *on the government* to defend its law. "When seeking a preliminary injunction 'in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the

restriction." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).

Plaintiffs also dispute the Defendants' notion they must make a "clear showing" of their likelihood of success on the merits. In the Ninth Circuit, if a plaintiff shows "serious questions going to the merits," then a preliminary injunction may still issue if the "balance of hardships tips sharply in the plaintiff's favor." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014).

## ARGUMENT

### I. Plaintiffs have standing to challenge AB 2098.

The Board's first argument is that Plaintiffs' lack standing because they "have not alleged a 'concrete plan' to violate the standard of care or to intentionally mislead patients." Resp. 7. But that is not the test for standing. Plaintiffs have stated their past, present, and ongoing medical advice to the public and their patients concerns COVID-19, the topic covered by this law. They do not concede that their medical advice violates the standard of care or misleads anyone, nor must they. Rather, they contend, quite reasonably, that they are chilled from continuing to provide this advice to their patients because there is a credible threat of enforcement against them because the Defendants would classify their advice as a violation of the standard of care.

Thus, of course "plaintiffs themselves agree they have the duty to provide 'medically sound advice." Resp. 7. But that does not mean "[s]uch care would not violate AB 2098." Resp. 7-8. First, Plaintiffs wouldn't describe "medically sound advice" as "care" in this context. But more importantly, because Plaintiffs take different views than the Board of what the established medical evidence advises regarding COVID, their view of "medically sound advice" is different from the Defendant's view. From Defendants' perspective, their advice would be outside the standard of care. Because Defendants intend to enforce that view, Plaintiffs have standing to bring a pre-enforcement challenge.

At best, the Board's standing argument is that the Plaintiffs must plead some specific intent to advise *patients* of their views, as opposed to simply the general public. Resp. 8. But Plaintiffs' submissions includes facts sufficient to meet that test. For instance, the Plaintiffs have "advocated publicly and *privately* about [their] objections to federal and state COVID-19 policies." Compl. ¶¶ 43 (McDonald), 63 (Barke) (emphasis added). They each "feel[] it is their professional duty to *continue* to provide [their] patients with medically sound advice . . . , but if subject to AB 2098 [they] will be forced to choose between providing [their] best medical judgment and censoring that judgment to comply with the law. *Id.* ¶¶ 51 (McDonald), 65 (Barke) (emphasis added). Their sworn declarations include substantially similar statements. *See* McDonald Decl., Dkt. 35-1 at ¶ 26, Barke Decl., Dkt. 35-2 at ¶ 19. One cannot "continue" to offer advice to patients one has not ever offered in the first place. And the State adduces no evidence to show Drs. McDonald and Barke do not or would not have a reason to provide information on COVID-19 to their patients, or to doubt the veracity of their submissions to this Court.

The Board next argues that Plaintiffs "have not shown the conduct they wish to engage in was previously permissible but no longer would be under AB 2098." Resp. 8. Essentially, since violations of a standard of care could already be the basis for disciplinary action against a doctor, AB 2098 should make no difference to them. Even if AB 2098 simply codified the Board's preexisting interpretation, that does not mean the Plaintiffs do not have standing. Indeed, it reinforces the credibility of the threat of enforcement that the Board has been directed by the Legislature to make this a priority given the Legislature's decision to codify the Board's prior practice, and lower the standard the Board must prove to take disciplinary action. AB 2098 "ma[d]e explicit the Board's authority to take action against a single act of substandard care with respect to COVID-19." Resp. 25. So the threat of enforcement is now even more real, because a single act of COVID advice can cost a plaintiff his license, whereas before several such acts were necessary. *See* Resp. 3. Also, to state the obvious, Plaintiffs filed a lawsuit because they believe this law will apply to them,

i.e., that they will have to change the advice they give patients in order to avoid losing their licenses.

AB 2098 treats *any* disagreement regarding the Board's view science of COVID, including even a *single, isolated statement*, as the equivalent of gross negligence. Such a single statement is now, by law, "an extreme departure from the standard of care." Resp. 3 (quoting *Gore v. Board of Med. Quality Assurance,* 110 Cal. App. 3d 184, 196 (1980)). How are plaintiffs to navigate such a regime? Many things that are now the mainstream scientific consensus were rejected by authorities at one stage or another of the pandemic including the utility of mask wearing, *see* PI Memo. at 3, and the merits of closing schools, *Id.* at 4. The official position of the public health authorities was that the vaccine developed by Johnson & Johnson was safe and effective; now the official CDC guidance warns of potentially serious risks not presented by the other available vaccines. *See id.* at 5. A doctor who advised his patients in early 2021 that the Johnson & Johnson vaccine appeared more dangerous than other alternatives would have violated the Act, and been subject to sanction. Under this law, every doctor in California takes a serious risk if he does anything except quote official guidance verbatim.

The Board's last point is that any chilling effect here is "subjective" and therefore not actual or imminent injury. Resp. 9. But there is nothing subjective here: Plaintiffs must now be concerned that any statement they make to a patient could be used against them as evidence of gross negligence. In the case of Dr. McDonald in particular, there is no basis for speculation: he is currently responding to a Board investigation of a complaint against him for *publicly* advocating "controversial" ideas on *Twitter*. *See* Compl. at ¶¶ 45-50. Though filed anonymously, the complainant did claim to be a patient of Dr. McDonald, *id.* at ¶ 45, which further indicates he gives this advice to his patients. And it shows the Board's commitment to enforcing its standards against "misinformation"—the new law is no hollow threat creating a "subjective chill"—Plaintiffs have a very real and credible fear of enforcement given the Board's ongoing investigation of Dr. McDonald for similar speech.

Plaintiffs also have an understandable hesitation about describing the particulars of their past interactions with patients. The Board's position in this case is that AB 2098 simply codified the Board's own pre-existing interpretation of the standard of care, and clarified that even a single act constituted gross negligence. *See* Resp. 25. If Plaintiffs provide detailed sworn statements as to their past advice given to patients, they would be providing a roadmap to prosecuting them under the what the Board described as the previous standard, with no *ex post facto* protection. Plaintiffs' would prefer to decline this invitation to be hoisted on their own affidavits. What they have already said is certainly enough to establish their standing.

Finally, the Defendants entirely ignore the Plaintiffs' void-for-vagueness claim in their standing analysis. The entire point of Plaintiffs' second claim is that it is impossible for a doctor to know exactly what the Board will define as the "scientific consensus." In other words, it is hard to allege with sufficient specifics to suit the State what medical advice Plaintiffs will offer their patients when they have no way of knowing what the Board will decide is within or outside the "scientific consensus." "In the First Amendment context, a fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (cleaned up). Here, because Plaintiffs' intention to continue their past speech to their patients regarding COVID-19 "arguably falls within the statute's reach," especially given their vagueness claim, and because the Board has shown its enthusiasm for vigorous enforcement of its "misinformation" standards with its action against Dr. McDonald, Plaintiffs clearly have standing.

**II.    The Plaintiffs are likely to succeed on the merits of their claims that AB 2098 abridges their right to speak and is void for vagueness.**

The Board's arguments on the merits begin with the flawed premise that speech by professionals is subject to some special rational basis standard. *See* Resp. 9-14. But the Supreme Court expressly rejected the Ninth Circuit's professional speech doctrine. *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (*NIFLA*). And there

are multiple reasons to think more than rational basis applies here. Far from mere rational basis, "professional speech may be entitled to the strongest protection our Constitution has to offer." *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). Plus, this law is content-based (it only applies to speech about one particular topic, COVID-19) and viewpoint-based (it only bars speech about that topic that contradicts the government's definition of the current scientific consensus, even as there are multiple other viewpoints that dissent from the government's definition of what the science shows and whether it's a consensus). In both senses, it is presumptively unconstitutional and subject to strict scrutiny. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019).

Defendants attempt to work their way around *NIFLA* by dubbing certain speech they wish to suppress "conduct," Resp. 9, but calling speech itself conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *See Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (en banc) (cleaned up).

Of course, *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), held that *NIFLA* had left open a narrow remainder of the Ninth Circuit's professional doctrine as articulated in *Pickup v. Brown*, 740 F.3d 1208, 1221 (9th Cir. 2014). But the conversion therapy bans in *Pickup* and *Tingley* addressed a particular *treatment strategy*—techniques to change a minor's sexual orientation—whereas AB 2098 outlaws providing patients "information" that the Board believes they should not be provided. This makes *Tingley* obviously distinguishable. The Board is wrong to say, "AB 2098 similarly regulates the kind of care that a physician can provide." Resp. 11. AB 2098 does not regulate care at all—it does not prevent a doctor from prescribing ivermectin or hydroxychloroquine for COVID. It regulates doctors' speech about ivermectin or hydroxychloroquine (we assume; it's so vague that we can't say for certain whether those two drugs are in or out of the standard of care). This is why *Tingley* is so obviously distinguishable—in *Tingley*, the care was delivered via speech (i.e., verbal counseling therapy). This is why the Defendants are right when they say, "The fact that such care 'is performed through speech alone' made no difference" in

*Tingley*—in that case, care delivered as speech is still care, even if it is also speech. Resp. 11. Here, however, there is no speech component to the actual treatment of COVID-19. This is why all the Defendants' other examples of "treatment through speech" fail—in the examples, words are a necessary part of the treatment. *See* Resp. 12. Unlike with conversion therapy or nutrition advice, words have no effect on a patient's COVID; one cannot verbally counsel away a virus.

That distinction makes this case much closer to *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), in which the government failed in its defense of a rule that a doctor merely *recommending* marijuana to a patient was a basis to revoke a medical license. In *Conant* the Ninth Circuit "distinguished prohibiting doctors from treating patients with marijuana—which the government could do—from prohibiting doctors from simply recommending marijuana." *Tingley*, 47 F.4th at 1072. AB 2098 does not outlaw *treating* patients with, say, ivermectin; it outlaws *recommending* to patients that some studies have found that drug effective to treat COVID, in the same manner a doctor in *Conant* might recommend to a patient that some studies have found marijuana effective at treating glaucoma. The Defendants' own brief says, "AB 2098 thus circumscribes the care a physician recommends or provides to their patients for a specific health issue." Resp. 11. *Accord id.* at 13. If AB 2098 restricts what a doctor can verbally recommend to a patient, it clearly violates the holding of *Conant*.

According to the Board, *Conant* only protected medical information that complies with the standard of care. Resp. 13. But that is hardly so—one will search in vain in *Conant* for any mention of the standard of care. That's also hard to credit when the federal government says marijuana has "no currently accepted medical use in treatment in the United States" and "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1) (definition of a Schedule I drug). The people of California obviously disagree with Congress on that point and believe there are legitimate medical uses for marijuana, which disagreement they enacted into state law. Fair enough—this debate just illustrates Plaintiffs' point that doctors' speech to

patients cannot be limited to a government's definition of what it believes to be the standard of care. Often the "standard of care" for a particular disease includes room for different or alternative views or multiple appropriate approaches. *Reger v. A.I. Dupont Hosp. for Children of the Nemours Found.*, 259 Fed. Appx. 499, 502 (3d Cir. 2008). *See Conant*, 309 F.3d at 640 (Kozinski, J., concurring) ("a legitimate and growing division of informed opinion on this issue."). And sometimes a doctor may question an official definition of a medical standard, as California questions Congress's medical judgment about medical marijuana. The government may establish that a single medical treatment is the official appropriate standard of care, and it may punish doctors who deviate from that standard. But it may not punish doctors for discussing with their patients the doctors' view that the official treatment is in fact not the best or only treatment.

Plus, one should not lose sight of *Conant*'s concern for a robust public policy debate. Marijuana regulation is obviously a subject of intense debate in public policy circles. The district court in *Conant*, which was affirmed by the Ninth Circuit, wanted to protect the patient's right to receive the recommendation and take non-medical action: "the patient upon receiving the recommendation could petition the government to change the law. By chilling doctors' ability to recommend marijuana to a patient, the district court held that the prohibition compromises a patient's meaningful participation in public discourse." *Conant*, 309 F.3d at 634-35. In the same way, on a topic as charged as the government's response to COVID-19, the government's decision to censor minority views limits public debate. This law is viewpoint discrimination: it establishes one official viewpoint on a contested topic (whatever the Board defines as the contemporary scientific consensus) and uses the power of the state to punish all who dare share a different viewpoint out loud to their patients. That violates the First Amendment's fundamental command: "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000).

The Board asserts that even if its law does burden Plaintiffs' First Amendment rights, it is nevertheless justified by the Government's interests. But the Board's description of its

interests would permit it to enact any regulation of physician speech it desired—clearly *Conant* and *Wollschlaeger* were wrongly decided if we applied the Board's definition of its own interests.

The Board's description of its interests in fighting the COVID pandemic also fails to account for the stage we are in. The President of the United States has declared the pandemic is over[1], and the Governor of California has announced his intention to end the emergency declaration.[2] Though the government may have had a compelling interest in COVID-19 regulation in the past, that interest is certainly different today, and the Board cannot rely on precedents from a previous phase to justify its current laws.

Besides, the Act is in no way tailored narrowly to those interests. Take protection of the public from negligent or incompetent physicians. Resp. 16. AB 2098 does not impose a standard of negligence or incompetence—instead, it relies on a standard of contemporary scientific consensus, with which disagreement could be widespread and reasonable. If the California legislature had wanted to limit AB 2098 to a negligence standard, it could have—but instead, it made the "dissemination" of "information" a strict liability offense.

The importance of ensuring patients have access to accurate, complete, and truthful information does not require policing the speech of individual doctors. If the state wants to ensure the general public has access to what it believes is accurate information, it can set up a website; it can even run an ad campaign. But it cannot commandeer the speech of others to repeat its message. Those are essentially the facts of *NIFLA*, in which the state required pregnancy centers to post the State's message regarding abortion on their premises. *See* 138 S. Ct. at 2369. California's argument in *NIFLA* was that their state interest in making sure patients had accurate information about abortion allowed them to control the speech of medical professionals. *Id.* at 2375 ("California asserts a single interest

---

[1] "Covid-19 pandemic is over in the US - Joe Biden," BBC.com (Sept. 20, 2022), https://www.bbc.com/news/world-us-canada-62959089.

[2] "Governor Newsom to End the COVID-19 State of Emergency," Press Release (Oct. 17, 2022), https://www.gov.ca.gov/2022/10/17/governor-newsom-to-end-the-covid-19-state-of-emergency/.

to justify the licensed notice: providing low-income women with information about state-sponsored services."). Like in *NIFLA*, too, here the State is seeking to use its power to shape the marketplace of ideas, to suppress one viewpoint in favor of its preferred viewpoint. *See NIFLA*, 138 S.Ct. at 2379-80 (Kennedy, J., concurring) ("This law is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression."). That "is a matter of serious constitutional concern." *Id*. And we should not lose sight of the fact that California's supposed desire to provide information arose in the context of medical treatment; the state could not force non-abortion clinics to post government information about alternative medical options. If California could not constitutionally force pro-life pregnancy centers to provide the government's preferred medical information, how can California force doctors to only provide the government's preferred medical information?

Regarding vagueness, the Board objects that the scientific consensus can be objective that "apples contain sugar, that measles is caused by a virus, that Down syndrome is caused by a chromosomal abnormality, etc." But Down syndrome was first identified in 1862, and apples and measles have been known to humanity since antiquity. COVID is currently less than 3 years old; Plaintiffs submit a greater range of uncertainty is warranted when experience is short. The appropriate medical response to COVID is a topic on which "there is a genuine difference of expert opinion on the subject, with significant scientific and anecdotal evidence supporting both points of view." *Conant*, 309 F.3d at 643 (Kozinski, J., concurring). How is any doctor to know what constitutes "the contemporary scientific consensus" when that consensus is constantly changing and evolving, there are a variety of studies and reports, and a genuine difference of expert opinions?

The Board's response is also cold comfort: we can charge you with violating the law, and if we don't prove (to ourselves) that your advice violates the scientific consensus, then we won't take your license away in the end. Resp. 23. Of course, the government could use such an excuse to defeat any pre-enforcement void-for-vagueness challenge: if we don't prove our case, the jury won't convict and you can go free. But that is not the legal

standard: the question is whether a doctor of ordinary intelligence would know what the Board defines as "the contemporary scientific consensus as to the standard of care." And in this instance, when the so-called scientific consensus is dynamic and constantly evolving, a doctor of ordinary intelligence cannot be expected to know what is "in or out."

### III. The other preliminary injunction factors favor granting Plaintiffs' Motion.

The Board claims Plaintiffs can claim no irreparable harm because the loss of their professions and livelihood could be remedied by money damages. Plaintiffs' doubt the Board means to waive sovereign immunity from damages in such an event, but even if the Board were to pay Plaintiffs' for their lost income, the reputational harm of being stripped of one's medical licenses remains acute. And that says nothing of the core question of the right to speak, which is so fundamental that even a temporary abridgment of that right is irreparable. *See* PI Memo. at 27. Nor does it take account of the patients' right to receive their doctors' speech. *See Conant*, 309 F.3d at 640 (Kozinski, J., concurring) ("Those immediately and directly affected by the federal government's policy are the patients, who will be denied information crucial to their well-being."). This also means that the balance of equities and public interest favor plaintiff, as the enforcement of First Amendment rights is always equitable and in the public interest. *Id*. And because the Plaintiffs have raised at least "serious questions" going to the merits, they believe an injunction should issue because this balance of harms tips sharply in their favor. One can hardly name a more important right to protect than free speech, and the effects of the government's policy on the marketplace of ideas for medical innovation affects the plaintiffs' patients, patients across California, and ultimately patients across the nation as doctors decline the risk associated with questioning the State's preferred view on a scientific question.

### CONCLUSION

"The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. Only doctor-patient conversations that include discussions of [COVID-19] trigger the policy. Moreover, the policy does not merely prohibit

the discussion of [COVID-19]; it condemns expression of a particular viewpoint, i.e., that [contrary to the Board's view of the contemporary scientific consensus]. Such condemnation of particular views is especially troubling in the First Amendment context." *Conant*, 309 F.3d at 637. So too here. For the reasons stated above, and in Plaintiffs' earlier Memorandum, the Motion for Preliminary Injunction should be granted.

Dated: November 3, 2022

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr (*Pro Hac Vice filed*)
dsuhr@libertyjusticecenter.org
Reilly Stephens (*Pro Hac Vice*)
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280

Robert H. Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: 951) 600-2733
Facsimile: (951) 600-4996

*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2022, I electronically filed the forgoing Amicus Brief with the Clerk of the Court for the United States Court of District Court for the Central District of California using the CM/ECF system. Defendants in this case have counsel who have appeared and will be served by ECF. Intervenor Emmanuel McCray is proceeding pro se, and is being served by email the evening of November 3, 2022 and will receive physical service by mail at the below address.

Emanuel McCray
2700 Caples Street
P.O. Box 3134
Vancouver, WA 98668

                                                    s/ Daniel R. Suhr
                                                    November 3, 2022