1  Robert H. Tyler, Esq. CA Bar No. 179572
   btyler@faith-freedom.com
2  Mariah Gondeiro, Esq. CA Bar No. 323683
   mgondeiro@faith-freedom.com
3  ADVOCATES FOR FAITH & FREEDOM
4  25026 Las Brisas Road
   Murrieta, California 92562
5  Telephone: (951) 600-2733
   Facsimile: (951) 600-4996
6
7  Daniel R. Suhr (*Pro Hac Vice*)
   dsuhr@libertyjusticecenter.org
8  Reilly Stephens (*Pro Hac Vice*)
   rstephens@libertyjusticecenter.org
9  Liberty Justice Center
   440 N. Wells Street, Suite 200
10 Chicago, Illinois 60604
   Phone: 312-637-2280
11 *Attorneys for Plaintiffs*
12
13                UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 MARK MCDONALD AND JEFF BARKE,

15        Plaintiffs,                      Case No. 8:22-cv-01805-FWS-ADS

16 v.

17
   KRISTINA D. LAWSON, *in her official capacity as*   **FIRST AMENDED COMPLAINT SEEKING**
18 *President of the Medical Board of California*;      **DECLARATORY AND INJUNCTIVE RELIEF**
   RANDY W. HAWKINS, *in his official capacity as*      **FOR VIOLATION OF FIRST AMENDMENT**
19 *Vice President of the Medical Board of California*;  **RIGHTS**
   LAURIE ROSE LUBIANO, *in her official capacity as*
20 *Secretary of the Medical Board of California*;
   MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN
21 BROOKS, JAMES M. HEALZER, ASIF MAHMOOD,
   NICOLE A. JEONG, RICHARD E. THORP, VELING
22 TSAI, and ESERICK WATKINS, *in their official*
   *capacities as members of the Medical Board of*
23 *California*; and ROBERT BONTA, *in his official*
   *capacity at Attorney General of California*,
24
25        Defendants.
26
27
28
      Case No.                              1
   FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION
   OF FIRST AMENDMENT RIGHTS

**INTRODUCTION**

1.     Plaintiffs Mark McDonald, M.D. and Jeff Barke, M.D., physicians licensed in the State of California, bring this challenge to the recently enacted Assembly Bill (AB) 2098, which chills the protected speech of medical professionals on the basis of viewpoint.

2.     AB 2098 declares that it will be deemed "unprofessional conduct" for doctors to advise their patients of any view that deviates from the official position of the State regarding COVID-19. It directs the Medical Board of California ("the Board") to punish any doctor who "disseminates" "misinformation," defined as anything that is not consistent with what the Board deems to be the official scientific consensus. This imposition of official government-approved orthodoxy cannot survive First Amendment scrutiny, and is at odds with the scientific method itself.

3.     Disagreement is integral to the progress of medical science, a value that cannot be served by using the power of the state to punish those who dissent from the official line. This is particularly objectionable in the context of a new disease like COVID-19, about which consensus opinions and official guidance have regularly adjusted as new information is learned.

4.     At the beginning of the pandemic, public health authorities insisted that the public not wear masks, arguing they would provide little benefit and should be reserved for front-line medical professionals—that was soon replaced with broadly mandated mask wearing for much of the population. Schools were closed in the face of the fear that the disease would spread among children too young to adhere to quarantine procedures—but it turned out that the young were at the least risk, and that such closures may well have been harmful to their development.

5.     Reasonable minds disagreed then, and continue to disagree now, about any number of such topics, but the search for truth cannot be furthered by a government edict imposing orthodoxy from above, punishing those who disagree with the loss of their profession and their livelihood. Plaintiffs therefore ask that this court enjoin enforcement of AB 2098, and leave these important matters to the marketplace of ideas.

**PARTIES**

6.     Plaintiff Mark McDonald, M.D., is a resident of the State of California and a physician who is licensed to practice in the state.

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

1    7.    Plaintiff Jeff Barke, M.D., is also a resident of the State of California and a physician

2    licensed to practice in the state.

3    8.    Defendants Kristina D. Lawson, Randy W. Hawkins, Laurie Rose Lubiano, Michelle

4    Anne Bholat, David E. Ryu, Ryan Brooks, James M. Healzer, Asif Mahmood, Nicole A. Jeong, Richard

5    E. Thorp, Veling Tsai, and Eserick Watkins are the President, Vice President, Secretary, and Members of

6    the Medical Board of California, the state licensing authority that regulates the practice of medicine in

7    the state, sued in their official capacities. The mailing address for the Board is 2005 Evergreen Street,

8    Suite 1200 Sacramento, California 95815 in Sacramento County.

9    9.    Defendant Attorney General Robert Bonta (the "Attorney General") is sued in his official

10   capacity as the representative of the State of California charged with enforcement of state laws. His

11   address for service of process is 1300 "I" Street, Sacramento, California 95814 in Sacramento County.

12                                    **JURISDICTION AND VENUE**

13   10.    This case raises claims arising under the First and Fourteenth Amendments of the U.S.

14   Constitution, 42 U.S.C. § 1983, and 28 U.S.C. § 2201(a). The Court has subject-matter jurisdiction under

15   28 U.S.C. § 1331 and 28 U.S.C. § 1343.

16   11.    Venue is proper because Plaintiffs live and practice in, and a substantial portion of the

17   events giving rise to the claims occurred in, the Central District of California. 28 U.S.C. § 1391(b)(2).

18                                             **FACTS**

19   **AB 2098**

20   12.    On August 30, 2022, the California State Assembly approved the final version of AB

21   2098[1] ("the Act"), which the State Senate had passed the previous day. Governor Newsom signed the bill

22   into law on September 30, 2022.

23   13.    AB 2098 adds a new Section 2270 to the State's Business and Professions Code, entitled

24   "Physicians and surgeons: unprofessional conduct."

25   14.    Section 1 of the Act, outlining the legislature's findings, asserts *inter alia* that "[t]he

26   spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence

27

28   ---
     [1] *Available at*
     https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=202120220AB2098.

Case No.                                                3

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION
OF FIRST AMENDMENT RIGHTS

1 | and placed lives at serious risk" and that "[m]ajor news outlets have reported that some of the most
2 | dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health
3 | care professionals."

4 |       15.     Section 1 likewise incorporates a recent statement by the Federation of State Medical
5 | Boards "warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation
6 | or disinformation risk losing their medical license, and that physicians have a duty to provide their
7 | patients with accurate, science-based information."

8 |       16.     Section 2 of the Act is the substantive provision, which makes it "unprofessional conduct"
9 | for any California physician to make any statement to his or her patients that the Board considers
10 | "misinformation" about COVID-19:

> 2270. (a) It shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.
>
> (b) For purposes of this section, the following definitions shall apply:
>
> (1) "Board" means the Medical Board of California or the Osteopathic Medical Board of California, as applicable.
>
> (2) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.
>
> (3) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.
>
> (4) "Misinformation" means false information that is contradicted by contemporary scientific consensus contrary to the standard of care.
>
> (5) "Physician and surgeon" means a person licensed by the Medical Board of California or the Osteopathic Medical Board of California under Chapter 5 (commencing with Section 2000).
>
> (c) Section 2314 shall not apply to this section.[2]

      17.     Section 3 of the Act specifies that each of its provisions are severable.

---

[2] Cal. Bus. & Prof. Code § 2314 makes violations of this chapter of the code a misdemeanor offense. Section 2(c) of the Act prevents AB 2098 from creating criminal liability.

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

18.     The Act therefore declares it "unprofessional conduct" for a doctor to "disseminate"—that is, speak—"misinformation," as judged by the State of California, to his or her patients regarding COVID-19.

19.     AB 2098 intrudes into the privacy of the doctor-patient relationship, replacing the medical judgment of the government for that of the licensed professional, and chilling the speech of those who dissent from the official view.

20.     AB 2098's codification of an official "scientific consensus" is at odds with the progress of science itself, which requires that conventional views be challenged by new theories, and that dissenters air their views for comment and criticism.

21.     It is also at odds with the responsible practice of medicine, which requires that doctors employ individualized professional judgment as to the best course of treatment for each individual patient, rather than following official guidance to the letter in all cases.

22.     AB 2098 attempts to redefine the established understanding of standards of care, which require particularized assessment of medical decision-making in the individual context at issue, rather than the imposition of approved opinions that must be agreed with in all circumstances.

23.     The goal of AB 2098 is to chill speech—in particular the speech of doctors who make a different assessment of the available evidence than the State of California.

24.     Recognizing the profound defects with the Act, in signing the bill on September 30, 2022, Governor Newsom attached a statement in which he articulated a narrowing construction he claimed would render the bill constitutional:

> I am signing this bill because it is narrowly tailored to apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care while interacting directly with a patient under their care.

> To be clear, this bill does not apply to any speech outside of discussions directly related to COVID-19 treatment within a direct physician patient relationship. I am concerned about the chilling effect other potential laws may have on physicians and surgeons who need to be able to effectively talk to their patients about the risks and benefits of treatments for a disease that appeared in just the last few years. However, I am confident that discussing emerging ideas or treatments including the subsequent risks and benefits does not constitute misinformation or disinformation under this bill's criteria.

Case No.                                    5

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

25.     Plaintiffs share Governor Newsom's "concern[] about the chilling effect" "laws may have on physicians and surgeons," but the Governor's attempt to rewrite AB 2098 cannot overcome what the law in fact says by its terms.

26.     The Governor is not the enforcement authority responsible for determining how AB 2098 should be applied—enforcement powers reside in the Board and Attorney General Bonta, and therefore the Governor's desired narrowing construction is simply wishful thinking.

27.     And it would not matter if the Governor had any such authority, because an unconstitutional speech restriction cannot be saved by the announcement that it will be enforced in a narrow manner. *United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996) ("California has failed to show that this new policy represents an authoritative and binding construction of [the statute] rather than a mere enforcement strategy, which would not be binding on the courts.").

28.     Despite the Governor's assurances, AB 2098 does not "apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care."

29.     Malicious intent is not a required element in the Act—rather, it appears only in the definition of "disinformation," which is not the only speech the law covers.

30.     Nor does the Act require "clear[] deviat[ion] from the required standard of care." Instead, the act defines "Misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care," with no limitation on the clarity of the deviation or how well established the standard of care need be.

31.     To the contrary, the Governor's attempt to provide a narrowing construction all but concedes the Act, as written, is not narrowly tailored to any government interest sufficient to survive First Amendment scrutiny.

**Dr. McDonald**

32.     Dr. Mark McDonald, M.D., is a physician licensed by the Medical Board of California who is board-certified in both adult and child and adolescent psychiatry.

33.     Dr. McDonald received an undergraduate degree from the University of California, Berkeley before beginning medical training at the Medical College of Wisconsin. After graduating from

Case No.                                                6

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

1    medical school in 2007, he completed his general psychiatry residency training at the University of

2    Cincinnati, and child and adolescent psychiatry fellowship training at Harbor-UCLA Medical Center. He

3    currently maintains a private psychiatry practice in the Los Angeles area, where most of his patients are

4    children suffering from various mental health problems.

5           34.    Dr. McDonald has never been disciplined by any medical regulatory authority, had his

6    medical license suspended, or had a complaint against him sustained for unprofessional conduct.

7           35.    Dr. McDonald is up to date on all of his continuing medical education requirements.

8           36.    Dr. McDonald regularly reviews journals in his field and consult with colleagues to learn

9    the latest in medical science and research.

10          37.    Dr. McDonald's practice is focused on adult and adolescent psychiatry. Over the course of

11   the past two years, he has regularly counseled patients dealing with issues stemming from the COVID-19

12   pandemic and the social response to that pandemic. His clients have sought his counsel on a variety of

13   mental health issues stemming from the pandemic, such as loneliness and social isolation.

14          38.    Because he is a doctor, patients have asked him for his opinion on masking, vaccines, and

15   government and employer policies like shut-downs or work-from-home. He has provided medically

16   accurate information that questions the efficacy of masks, discusses the negative aspects of the vaccines,

17   and disagrees with policies that in his view did tremendous personal and economic harm. When patients

18   ask him, as they often do, as their doctor, for his medical opinion on topics like vaccines, he gives them

19   his views based on his understanding of the science and research. Much of the information and opinion

20   he provides in response to those patient questions contradicts the government's preferred position as

21   expressed by the CDC or State of California.

22          39.    Though his practice is focused on adult and adolescent psychiatry, he is a medical doctor

23   qualified and licensed to provide general care to his patients. When patients see him for psychiatry, but

24   also have substantial general care needs, his usual practice is to refer them to their family general practice

25   doctor. However, in those instances where a patient presents very common medical issues and he feels

26   confident addressing them based on his experience and knowledge, he does so for the patient's

27   convenience. Fewer than twenty times over the course of the pandemic, a patient sought medical

28   assistance with a case of COVID-19. In those instances, because he has experience and knowledge and

Case No.                                    7
FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION
OF FIRST AMENDMENT RIGHTS

because the patient's symptoms were mild, he prescribed or advised ivermectin or hydroxychloroquine to treat the patient. In other instances, where patients are concerned COVID-19, he recommended a course of Vitamin D and other natural supplements to minimize any negative outcomes from the disease.

40.     In those instances where he has prescribed a treatment or given medical advice, he has done so in line with protocols developed by well-respected peers based on scientific research, particularly those of Dr. Peter A. McCullough and Dr. Pierre Kory.

41.     He believes that the care he provided was always consistent with the standard of care. He provided his patients with accurate, up-to-date information based on scientific research. He provided his patients with information necessary to comply with his informed-consent obligations. But he did not hide from his patients information and advice that was contrary to the official received wisdom when he believed that wisdom was incorrect or not best for that individual patient.

42.     He fully intends to continue providing information about masking, treatment, diagnosis, and vaccination that is in line with his best medical advice, formulated based on his research and experience. Patients continue to come to him with requests for medical advice, information, and treatment for COVID-19, and will do so for the foreseeable future. AB 2098 jeopardizes his medical license because the medical advice he gives has been contrary to the government's version of the scientific consensus, and he intends to continue giving that advice in order to best serve his patients.

43.     He is also concerned about how to continue practicing under AB 2098 because of the vagueness of the government's standard. The scientific consensus is constantly changing and evolving. It is impossible for him to know with sufficient certainty which aspects of his best medical judgment concerning COVID will be deemed contrary to the official scientific consensus by the government as he continues to advise patients who come to him with COVID questions.

44.     Over the course of the pandemic, Dr. McDonald became increasingly concerned about the public-health response to COVID-19, and the way in which he feared that official public-health guidance held the potential to cause harm.

45.     These concerns caused Dr. McDonald to become outspoken, as both a citizen and a medical professional, about the flaws he sees in the public-health response to the COVID-19 pandemic.

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

46.     In particular, his expertise in adolescent mental health prompted concern about the potential harm to children that school closures and mandatory mask-wearing policies could have on young people. He objected that isolating children, and requiring them to wear masks, was not justified by the available scientific evidence, particularly since it is widely agreed that otherwise healthy children were at very low risk of either contracting or spreading COVID-19.

47.     Dr. McDonald likewise objected to the broader use of mandatory masking for the adult population, pointing to a lack of evidence that otherwise-healthy adults would benefit from such face coverings.

48.     Dr. McDonald has also supported the use of medications such as ivermectin and hydroxychloroquine as options to treat COVID-19, pre-existing drugs long approved as safe and effective by the Food and Drug Administration. While the use of such medications to treat COVID-19 is controversial, a number of studies have found positive results using them to treat the disease.

49.     Dr. McDonald also raised concerns about the new vaccines developed to combat COVID-19, pointing to a lack of evidence that these brand-new drugs had been proven sufficiently safe and effective to be recommended, and in many cases mandated, for essentially the entire American public.

50.     In particular, Dr. McDonald objected to administering these new vaccines to children, despite limited evidence that they would be safe and effective for this population, arguing that since children were already at low risk of the disease, there was little benefit as compared with the known and unknown potential harms from vaccination.

51.     While these topics remain subjects of controversy, a number of Dr. McDonald's concerns have proved prescient—for instance, there is now considerable evidence that quarantine policies proved detrimental to both the education and mental health of children. *See, e.g.*, Sarah Mervosh, *The Pandemic Erased Two Decades of Progress in Math and Reading*, N.Y. Times, Sep. 1, 2022;[3] Claire Cain Miller & Bianca Pallaro, *362 School Counselors on the Pandemic's Effect on Children: 'Anxiety Is Filling Our Kids,'* N.Y. Times, May 29, 2022.[4]

---

[3] https://www.nytimes.com/2022/09/01/us/national-test-scores-math-reading-pandemic.html.

[4] https://www.nytimes.com/interactive/2022/05/29/upshot/pandemic-school-counselors.html.

Case No. 9

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

52. Dr. McDonald has advocated publicly and privately about these and other objections to federal and state COVID-19 policies, including on social media, in various media interviews, and in his own published writing.

53. Dr. McDonald's advocacy on these issues has made him a subject of controversy.

54. It has also attracted the attention of the Medical Board of California. In December 2021, Dr. McDonald received a letter from the Board informing him of a complaint filed against him by "your patient, N/A." According to the Board, the anonymous complainant alleged "[McDonald's] posts on Twitter/Facebook about masks were flagged for spreading misinformation about Covid and using derogatory terms for disabled people. Alleges [McDonald] spreading misinformation about Covid."

55. Dr. McDonald responded by letter that he had never treated a patient named "N/A," and denied that he had offered medical opinions to the public that included inaccurate information.

56. Under traditional Board practice, the fact that the complaint was not made by a named patient of Dr. McDonald would have ended the matter, as the purpose of such complaints is to protect patients personally subjected to unprofessional conduct. However, the Board did not close the matter, instead responding in January 2022 with a request for "[a] response to the allegation that you [McDonald] are promoting the use of Ivermectin to cure COVID on Twitter."

57. Dr. McDonald responded to this inquiry by letter, stating that it was his practice to advocate for medical treatments that have the strongest empirical evidence to support their efficacy and safety. His response then linked to a database of studies that supported the use of various medications to treat COVID-19, including ivermectin, vitamin D, zinc, hydroxychloroquine, and aspirin.

58. Rather than closing the matter, the Board appears to be proceeding with an investigation based on the anonymous complaint, with an investigator emailing Dr. McDonald on August 30 requesting an interview, which took place in November.

59. The Board's unprecedent pursuit of Dr. McDonald based on an anonymous complaint about his social media activity demonstrates the intent of the Board to use the power granted to them by the State of California to punish doctors like Dr. McDonald for their speech.

60. As a medical professional, Dr. McDonald feels it is his professional duty to continue to provide his patients with medically sound advice in his counseling sessions, but if subject to AB 2098 he

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

will be forced to choose between providing his best medical judgment and censoring that judgment to comply with the law, because of his well-founded fear that the Board will use this new authority to threaten his medical license.

**Dr. Barke**

61.     Dr. Jeff Barke, M.D., is a physician licensed by the Medical Board of California who is board-certified in family practice.

62.     Dr. Barke received an undergraduate degree from the University of Southern California before beginning medical training at the University of California, Irvine. After graduating from medical school in 1990, he completed his residency in family practice, also at UC Irvine. He currently maintains a private concierge medical practice in the Newport Beach area.

63.     Dr. Barke has never been disciplined by any medical regulatory authority, had his medical license suspended, or had a complaint against him sustained for unprofessional conduct.

64.     Dr. Barke remains up-to-date on all continuing medical education requirements.

65.     In addition to CME classes, he stays up to date with the latest in medical research and best practices by reading many traditional sources of medical information including JAMA (the Journal of the American Medical Association), AFP (American Family Physicians), and NEJM (New England Journal of Medicine) to name a few. He also consults some non-traditional holistic and natural medicine sources as well. His goal is to stay current with both traditional Western medical thinking as well as naturopathic medical practice so he can provide the most comprehensive care possible to his patients.

66.     He is board certified in family practice.

67.     He previously served as a consulting physician expert for the California Medical Board, who would turn to him for insight and expertise on the appropriate standard of care for license investigations brought against general practice doctors.

68.     His medical practice in Newport Beach serves several hundred clients, who turn to him for his best medical advice on a range of health issues.

69.     During the course of the COVID-19 pandemic, many of his patients turned to him to test for, diagnose, treat, and prevent COVID-19. He provided scores of patients with his best medical advice on issues including testing, treatment, masking, and vaccination.

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

70.     The COVID treatment protocol he uses most often in his own practice was developed by Dr. Pierre Kory, M.D., M.P.H., who is a pulmonary and critical care specialist. He treated hundreds of patients with Covid-19 in all risk categories with great success using variations of the Kory protocol. The early treatment protocol includes medications and supplements in various doses involving: Ivermectin, fluvoxamine, aspirin, vitamin D, quercetin, zinc, monoclonal antibodies, and steroids. These are presented in a sequenced multi-drug strategy depending on the patient's age, severity of symptoms and other factors. He also consulted protocols developed by Dr. Vladimir Zelenko and by Dr. Brian Tyson, who has treated more than 10,000 COVID patients with an almost perfect record.

71.     As time and medical science progressed, he recently added a consideration in his treatment regime based on a recommendation of Dr. Peter A. McCullough. He favors early use of a nose/throat irrigation strategy to reduce the Covid viral load, again based on scientific studies.

72.     In appropriate instances, following established protocols based on extensive scientific research, he advised or prescribed ivermectin and hydroxychloroquine to treat COVID-19. In one case he called in a prescription for ivermectin for a patient who had recently tested positive for Covid and was presenting mild symptoms. He had to explain to the patient's pharmacist that the prescription was in line with appropriate protocols, and she agreed to dispense it.

73.     There is also growing evidence that a patient's low level of vitamin D correlates with a bad outcome for COVID-19. As a result, he is now routinely recommending to his patients supplements such as Vitamin D, Zinc, Quercetin, and Melatonin at appropriate dosages.

74.     When his patients have asked him about preventing COVID-19 through masking, he provided medically accurate information about masking. He pointed them to countless studies to bolster the point that masks do not prevent respiratory viral illnesses and in the case of young children can even be harmful to them.

75.     When his patients have asked him about preventing COVID-19 through vaccination, he has provided medically accurate information about vaccination. He tailors his medical advice to the medical needs of the patient, including age, other medical conditions, and likelihood of exposure. He also includes information about natural immunity as an alternative to vaccination or boosters.

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

76.     At many points during the pandemic, the recommendations, information, and treatment that he provided his patients ran contrary to what the U.S. Centers for Disease Control and other official bodies were pushing on the American people.

77.     He believes that the care he provided was always consistent with the standard of care. He provided his patients with accurate, up-to-date information based on scientific research. He provided his patients with information necessary to comply with his informed-consent obligations. But he did not hide from his patients information and advice that was contrary to the official received wisdom when he believed that wisdom was incorrect or not best for that individual patient.

78.     He fully intends to continue providing information about masking, treatment, diagnosis, and vaccination that is in line with his best medical advice, formulated based on my reading and experience. Patients are continuing to come to him with requests for medical advice, information, and treatment, for COVID-19, and will do so for the foreseeable future.

79.     AB 2098 jeopardizes his medical license because much of the medical advice he gives is contrary to the government's version of the scientific consensus.

80.     He is also concerned about how to continue practicing under AB 2098 because of the vagueness of the government's standard. The scientific consensus is constantly changing and evolving. It is impossible for him to know with sufficient certainty what of his best medical advice concerning COVID will be deemed contrary to the so-called scientific consensus by the government as he continues to treat patients dealing with COVID questions.

81.     Like Dr. McDonald, over the course of the pandemic, Dr. Barke became increasingly concerned about the public-health response to COVID-19, and the way in which he feared that official public-health guidance held the potential to cause harm.

82.     These concerns caused Dr. Barke to become outspoken, as both a citizen and a medical professional, about the flaws he sees in the public-health response to the COVID-19 pandemic.

83.     Dr. Barke objected that isolating children, and requiring them to wear masks, was not justified by the available scientific evidence, particularly since it is widely agreed that otherwise healthy children were at very low risk of either contracting or spreading COVID-19.

Case No.                                                    13

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

84.     Dr. Barke likewise objected to the broader use of mandatory masking for the adult population, pointing to a lack of evidence that otherwise-healthy adults would benefit from such face coverings.

85.     Dr. Barke has also supported the use of medications such as ivermectin and hydroxychloroquine as options to treat COVID-19, pre-existing drugs long approved as safe and effective by the Food and Drug Administration. While the use of such medications to treat COVID-19 is controversial, a number of studies have found positive results using them to treat the disease.

86.     Dr. Barke also raised concerns about the new vaccines developed to combat COVID-19, pointing to a lack of evidence that these brand-new drugs had been proven sufficiently safe and effective to be recommended, and in many cases mandated, for essentially the entire American public.

87.     In particular, Dr. Barke objected to administering these new vaccines to children, despite limited evidence that they would be safe and effective for this population, arguing that since children were already at low risk of the disease, there was little benefit as compared with the known and unknown potential harms from vaccination.

88.     Again, while these topics remain subjects of controversy, a number of Dr. Barke's concerns have proved prescient—for instance, there is now considerable evidence that quarantine policies proved detrimental to both the education and mental health of children. *See, supra,* ¶ 42.

89.     Dr. Barke has advocated publicly and privately about these and other objections to federal and state COVID-19 policies, including on social media, in various media interviews, and in his own published writing.

90.     Dr. Barke's advocacy on these issues has made him a subject of controversy.

91.     As a medical professional, Dr. Barke feels it is his professional duty to continue to provide his patients with medically sound advice to his patients, but if subject to AB 2098 he will be forced to choose between providing his best medical judgment and censoring that judgment to comply with the law, because of his well-founded fear that the Board will use this new authority to threaten his medical license.

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

**COUNT I**
**AB 2098 CONSTIUTES CONTENT AND VIEWPOINT DISCRIMINATION**
**IN VIOLATION OF THE FIRST AMENDMENT**

92.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

93.     The rights to free speech and freedom of association in the First Amendment have been incorporated to and made enforceable against the states through the Fourteenth Amendment guarantee of Due Process. *NAACP v. Alabama*, 357 U.S. 449 (1958); *Gitlow v. New York*, 268 U.S. 652 (1925).

94.     42 U.S.C. § 1983 provides a cause of action against any person who, under color of law of any state, subjects any person within the jurisdiction of the United States to a deprivation of any rights, privileges, or immunities secured by the Constitution.

95.     28 U.S.C. § 2201(a) allows a court of the United States, as a remedy, to declare the rights and other legal relations of interested parties.

96.     AB 2098 imposes a government mandate to espouse only those ideas that the State of California deems acceptable. This "on its face burdens disfavored speech by disfavored speakers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011).

97.     No other professionals, even other medical professionals such as nurses, are covered. No speech about other diseases, no matter how serious, is covered. And speakers who parrot the contemporary "consensus" may continue speaking; only those who may dissent are silenced. There can be no question that "official suppression of ideas is afoot." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 390 (1992).

98.     "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

99.     "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Case No.                                              15

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

100.   AB 2098 is not a traditional regulation of the conduct of medical professionals. Although the Act tries to disguise itself as a conduct regulation by defining "dissemination" to mean "the conveyance of information" "to a patient" "in the form of treatment or advice," information is not a "treatment" for COVID-19.

101.   Rather, the law directly and specifically burdens speech, and discriminates against that speech based on both content and viewpoint.

102.   The fact that some doctors' views are at odds with the official views of government health authorities does not undermine the right of doctors to express them; instead "minority views are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

103.   The fact that doctors belong to a regulated profession does not undermine their right to speak their views. As the Supreme Court recently held, "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018). "To the contrary, professional speech may be entitled to 'the strongest protection our Constitution has to offer.'" *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

104.   AB 2098 therefore constitutes content and viewpoint discrimination in violation of the First Amendment.

**COUNT II**
**AB 2098 IS UNCONSTIUTIONALLY VOID FOR VAGUENESS**
**UNDER THE FOURTEENTH AMENDMENT**

105.   The allegations contained in all preceding paragraphs are incorporated herein by reference.

106.   A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

107.   Though civil laws are sometimes permitted a greater "degree of vagueness," if "the law interferes with the right of free speech or of association"—as here—"a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982).

Case No.                                              16

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

108.    "[W]here First Amendment freedoms are at stake, a "great[] degree of specificity and clarity of laws is required." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2020).

109.    AB 2098 does not define its terms with any specificity and therefore does not give regulated physicians like Plaintiffs adequate notice of what will run afoul of the law.

110.    The statute defines "misinformation" ambiguously as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." This definition is ambiguous even on the most basic level of grammar, as literally it applies to information that is contradicted by a consensus that is itself contrary to the standard of care.

111.    Even beyond the linguistic challenges, the statute leaves to the caprice of the Board what it will or will not decide is misinformation: it does not provide notice of when information is sufficiently mainstream to be considered a scientific consensus, how that consensus is to be established, how that supposed consensus will be disseminated such that every licensed doctor in the state will be on notice of it, or how far one may deviate from that consensus without being subject to the censorship of the Board.

112.    AB 2098 therefore imposes an unconstitutionally vague restriction on the speech of doctors like Plaintiffs, and should be enjoined on that basis.

**PRAYER FOR RELIEF**

Plaintiffs respectfully requests that this Court:

   a.    Declare that AB 2098 unconstitutionally discriminates against speech on the basis of viewpoint;

   b.    Declare that AB 2098 is unconstitutionally vague;

   c.    Enjoin Defendants from enforcing AB 2098 against Plaintiffs and physicians like them who wish to communicate their best medical judgment to their patients without interference from Defendants;

   d.    Award Plaintiffs their costs and attorneys' fees under 42 U.S.C. § 1988; and

   e.    Award Plaintiffs any further relief to which they may be entitled and such other relief as this Court may deem just and proper.

Case No.                                                              17

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF FIRST AMENDMENT RIGHTS

1 | Dated: December 7, 2022

2 |                                        Respectfully submitted,

3 |

4 |                                        /s/ Daniel R. Suhr
                                          Daniel R. Suhr (*Pro Hac Vice*)
                                          dsuhr@libertyjusticecenter.org
5 |                                        Reilly Stephens (*Pro Hac Vice*)
                                          rstephens@libertyjusticecenter.org
6 |                                        Liberty Justice Center
                                          440 N. Wells Street, Suite 200
7 |                                        Chicago, Illinois 60604
                                          Phone: 312-637-2280
8 |

9 |                                        Robert H. Tyler, Esq. CA Bar No. 179572
                                          btyler@faith-freedom.com
10 |                                       Mariah Gondeiro, Esq. CA Bar No. 323683
                                          mgondeiro@faith-freedom.com
11 |                                       ADVOCATES FOR FAITH & FREEDOM
                                          25026 Las Brisas Road
12 |                                       Murrieta, California 92562
                                          Telephone: (951) 600-2733
13 |                                       Facsimile: (951) 600-4996

14 |

15 |                                       *Attorneys for Plaintiffs*

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

Case No.                                    18

FIRST AMENDED COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION
OF FIRST AMENDMENT RIGHTS