1  Robert H. Tyler, Esq. CA Bar No. 179572
   btyler@faith-freedom.com
2  Mariah Gondeiro, Esq. CA Bar No. 323683
   mgondeiro@faith-freedom.com
3  ADVOCATES FOR FAITH & FREEDOM
4  25026 Las Brisas Road
   Murrieta, California 92562
5  Telephone: (951) 600-2733
   Facsimile: (951) 600-4996
6
7  Daniel R. Suhr (*Pro Hac Vice*)
   dsuhr@libertyjusticecenter.org
8  Reilly Stephens (*Pro Hac Vice*)
   rstephens@libertyjusticecenter.org
9  Liberty Justice Center
   440 N. Wells Street, Suite 200
10 Chicago, Illinois 60604
   Phone: 312-637-2280
11 *Attorneys for Plaintiffs*
12
                    **UNITED STATES DISTRICT COURT**
13            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

14 MARK MCDONALD AND JEFF BARKE,

15              Plaintiffs,                    Case No. 8:22-cv-01805-FWS-ADS

16 v.

17
   KRISTINA D. LAWSON, *in her official capacity as*    **PLAINTIFFS' SECOND MOTION AND**
18 *President of the Medical Board of California*;        **MEMORANDUM IN SUPPORT OF MOTION**
   RANDY W. HAWKINS, *in his official capacity as*        **FOR PRELIMINARY INJUNCTION**
19 *Vice President of the Medical Board of California*;
   LAURIE ROSE LUBIANO, *in her official capacity as*
20 *Secretary of the Medical Board of California*;
   MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN               DATE: December 15, 2022
21 BROOKS, JAMES M. HEALZER, ASIF MAHMOOD,                TIME: 10:00 A.M.
   NICOLE A. JEONG, RICHARD E. THORP, VELING             JUDGE: Hon. Fred W. Slaughter
22 TSAI, and ESERICK WATKINS, *in their official*         CTRM: 10D
   *capacities as members of the Medical Board of*
23 *California*; and ROBERT BONTA, *in his official*
   *capacity at Attorney General of California*,
24
25              Defendants.
26
27
28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................2

MOTION..............................................................................................................6

INTRODUCTION .................................................................................................6

STATEMENT OF THE CASE..............................................................................8

       A.     COVID-19 and Changing Medical Responses .......................................8

       B.     The Physician Censorship Law....................................................11

       C.     Plaintiffs .......................................................................................13

LEGAL STANDARD...........................................................................................14

ARGUMENT ......................................................................................................15

I.     The Physician Censorship Law violates the First Amendment. .........................15

       A.     The Physician Censorship Law is a content and viewpoint-based restriction on speech.......................................................15

       B.     The Physician Censorship Law is not subject to lesser scrutiny because it regulates physician speech. ........................................17

       C.     The Physician Censorship Law flunks heightened scrutiny. ................................21

II.    The Physician Censorship Law is void for vagueness.......................................26

III.   The other factors support a preliminary injunction...........................................29

CONCLUSION....................................................................................................29

CERTIFICATE OF SERVICE .............................................................................31

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749 (9th Cir. 2019).................14, 29

*Ashcroft v. ACLU*, 535 U.S. 564 (2002) .............................................................................................6

*Ashcroft v. ACLU*, 542 U.S. 656, 660-61 (2004) .............................................................................21

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217 (2000) ................................15

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).....................................................................................22

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011)...............................................................21, 24

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022) ...........16

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ...............................................................................21

*Cohen v. California*, 403 U.S. 15 (1971) .........................................................................................19

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ..................................................................... *passim*

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........................................................20

*Edge v. City of Everett*, 929 F.3d 657 (9th Cir. 2020) ...................................................................27

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020) .................................................22

*Fla. Bar v. Went For It, Inc.*, 515 U.S. 618 (1995)..........................................................................17

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ....................................................................................23

*Fulton v. City of Philadelphia, Pa.*, 141 S. Ct. 1868 (2021).........................................................22

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ..............................................................7, 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995)....................21

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) .........................................................................20

*Kashem v. Barr*, 941 F.3d 358 (9th Cir. 2019) ...............................................................................26

*McCullen v. Coakley*, 573 U.S. 464 (2014) ...............................................................................16, 22

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*") ..............17, 18, 19, 24

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062 (9th Cir. 2020) ...............16

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)...............................................................6, 21

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015)...........................................................16, 17, 21, 25

*Reno v. ACLU*, 521 U.S. 844 (1997)................................................................................................27

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .......22

ii

1  *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47 (2006) ................................15

2  *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959 (9th Cir. 2002) ...........................................14

3  *Snyder v. Phelps*, 562 U.S. 443 (2011) .....................................................................................23

4  *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ............................................................ *passim*

5  *Stanley v. Georgia*, 394 U.S. 557 (1969) ...................................................................................18

6  *Tandon v. Newsom*, 141 S. Ct. 1294 (2021) ...............................................................................25

7  *Texas v. Johnson*, 491 U.S. 397 (1989) .................................................................................6, 22

8  *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) ............................................................25

9  *Tingley v. Ferguson*, No. 21-35815, 2022 WL 4076121 (9th Cir. Sept. 6, 2022) ...............17, 20

10  *United States v. Alvarez*, 567 U.S. 709 (2012) ...........................................................21, 22, 25, 29

11  *United States v. O'Brien*, 391 U.S. 367 (1968) ..........................................................................25

12  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) ................................................24

13  *United States v. Stevens*, 559 U.S. 460 (2010) ..........................................................................23

14  *United States v. Swisher*, 811 F.3d 299 (9th Cir. 2016) ............................................................21

15  *United States v. Williams*, 553 U.S. 285 (2008) ........................................................................26

16  *United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) ............................................................26

17  *Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019) ...........................16, 21, 24, 25

18  *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009) ..............24, 25

19  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ..........................27

20  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).............................................15, 16

21  *Ward v. Thompson*, No. 22-16473, 2022 U.S. App. LEXIS 30270 (9th Cir. Oct. 22, 2022) ..................14

22  *Whitney v. California*, 274 U.S. 357 (1927) ..............................................................................25

23  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................................................14

24  *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017)...................................20

25  *Wooley v. Maynard*, 430 U.S. 705 (1977) .................................................................................15

26  **Statutes**

27  Cal. Bus. & Prof. Code § 2270 ........................................................................................ *passim*

28

PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**Other Authorities**

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* (2016) ...................................................................................................21

Alexandra Ellerbeck, *Some doctors spreading coronavirus misinformation are being punished*, The Wash. Post (Dec. 6, 2021), https://tinyurl.com/4jkpt94y............................24

Assembly Floor Analysis, Concurrence in Senate Amendments to AB 2098 (Aug. 30, 2022), https://tinyurl.com/bdftnaek ...................................................................................11

Bridget Balch, *Vaccines Work Well Against The Delta Variant. Here's Why You Should Wear A Mask Anyway*, Ass'n of Am. Med. Colls (Aug. 3, 2021), https://tinyurl.com/5n7mnkps ............................................................................................9

California Medical Association (@CMAdocs), Twitter (May 11, 2022, 2:10 PM), https://tinyurl.com/dw8v9hb4 .............................................................................................11

Committee on Business & Professions, Cal. State Assembly, Summary & Analysis of AB 2098 (Apr. 15, 2022), https://tinyurl.com/bdftnaek...................................................12

Dan Diamond, *Suddenly, Public Health Officials Say Social Justice Matters More Than Social Distancing*, Politico (June 4, 2020), https://tinyurl.com/34cue3mn .....................9

Deborah Netburn, *To wear a mask or not? Experts Answer Coronavirus Protection Questions*, Los Angeles Times (Mar. 24, 2020) ....................................................................8

Diana Herrera-Perez et al., *A Comprehensive Review of Randomized Clinical Trials in Three Medical Journals Reveals 396 Medical Reversals*, in Meta-Research, A Collection of Articles (Peter A. Rodgers ed., 2019) ............................................................21

Dr. M. Joshua Hendrix et al., *Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy — Springfield, Missouri*, May 2020, CDC (July 17, 2020), https://tinyurl.com/mwwhjhe5 ...................8

Eugene Volokh, *Speech As Conduct*, 90 Cornell L. Rev. 1277 (2005) ....................................20

Fauci On How His Thinking Has Evolved On Masks, Asymptomatic Transmission, Wash. Post (July 24, 2020), https://tinyurl.com/ypkbrhf4 .................................................................8

*FDA Issues Emergency Use Authorization for Third Covid-19 Vaccine*, FDA (Feb. 27, 2021), https://tinyurl.com/289h2rn3 ....................................................................................10

*Feb. 10-11 Meeting Minutes*, Med. Bd. of Cal. (Feb. 10, 2022), https://tinyurl.com/46pejy3w .............................................................................................11

*Guidance for Local Health Jurisdictions on Isolation and Quarantine of the General Public*, Cal. Dep't Of Pub. Health (June 9, 2022), https://tinyurl.com/jh7xpxyb .............10

Jen Christensen & Deidre McPhillips, *'Reassuring' Data Suggests Johnson & Johnson Vaccine May Still Have Role To Play Against Covid-19*, CNN (Mar. 20, 2022), https://tinyurl.com/25ysj96v ..............................................................................................10

Jeremy B. White, *Newsom Closes All Orange County Beaches. Local Officials Call It An 'Act Of Retribution'*, Politico (Apr. 30, 2020), https://tinyurl.com/drhxzpny .......................9

PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*Joint CDC and FDA Statement on Johnson & Johnson Covid-19 Vaccine*, FDA (Apr. 13, 2021), https://tinyurl.com/zx9t7xmt ..................................................................10

Karina Zaiets et al., *Comparing the Covid-19 vaccines*, USA Today (Apr. 13, 2021), https://tinyurl.com/4x95ux4c ..................................................................10

Kathy Katella, *You Got the J&J Vaccine: Should You Get the booster?*, Yale Med. (July 20, 2022), https://tinyurl.com/9fuptc79 ..................................................................10

Laurel Wamsley & Selena Simmons-Duffin, T*he Science Behind a 14-Day Quarantine After Possible Covid Exposure*, NPR (Apr. 1, 2020), https://tinyurl.com/24j9k843 ..........................10

Letter from William Prasifka to Hon. Evan Low, Md. Bd. of Cal. (June 1, 2022), https://tinyurl.com/tyuhk7mf ..................................................................12, 28

Lois Beckett, *California Governor Promises Changes To Lockdown As Protests Sweep State*, The Guardian (May 1, 2020) (cleaned up), https://tinyurl.com/5ddczv89 ...................9

Michael Powell, *Are Protests Dangerous? What Experts Say Might Depend on Who's Protesting What*, N.Y. Times (July 6, 2020), https://tinyurl.com/38vhjw68.............................9

*Overview of COVID-19 Vaccines*, CDC (Sept. 2, 2022), https://tinyurl.com/58thyn94 .........................10

Paul Karp & Lisa Cox, *Coronavirus: People Not Complying With New Australian Self-Isolation Rules Could Face Fines*, The Guardian (Mar. 15, 2020), https://tinyurl.com/3yemprus ..................................................................10

Senate Rules Committee, Office of Senate Floor Analyses, Third Reading AB 2098 (Aug. 13, 2022), https://tinyurl.com/bdftnaek ..................................................................13, 23

*Spreading Covid-19 Vaccine Misinformation May Put Medical License at Risk*, Fed'n of State Med. Bds. (July 29, 2021), https://tinyurl.com/57jxf2rn ..........................11

Steven Lee Myers, *California Approves Bill to Punish Doctors Who Spread False Information*, N.Y. Times (Aug. 29, 2022) ..................................................................12

Vinay Prasad & Adam Cifu, *Medical Reversal: Why We Must Raise the Bar Before Adopting New Technologies*, 84 Yale J. Biology & Med. 471, 472 (2011) ...........................21

Yuxin Wang et al., *How Effective Is A Mask In Preventing COVID-19 Infection?*, Nat'l. Libr. of Pub. Med. (Jan. 5, 2021)..................................................................8

**MOTION**

Under Federal Rule of Civil Procedure 65, Plaintiffs move this Court to preliminarily enjoin Defendants' enforcement of California Assembly Bill No. 2098, to be codified at Cal. Bus. & Prof. Code § 2270 (the "Physician Censorship Law"), both facially and as applied to Plaintiffs. The Physician Censorship Law is a content-based restriction on Plaintiffs' speech in violation of their First Amendment rights. It is also void for vagueness, as crucial terms in the law have no discernable meaning. It should be enjoined.

**INTRODUCTION**

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). But that is exactly what the Physician Censorship Law does. That law threatens the license and livelihood of a physician or surgeon who, in the State's view, "disseminate[s] misinformation or disinformation related to COVID-19." § 2 (to be codified at Cal. Bus. & Prof. Code § 2270). What it prevents is pure speech: "the conveyance of information." *Id*. And the information apparently banned is anything that contradicts the "contemporary scientific consensus," whatever that might mean. *Id*.

The Physician Censorship Law therefore "on its face burdens disfavored speech by disfavored speakers." *Sorrell v. IMS Health Inc*., 564 U.S. 552, 564 (2011). No other professionals, even medical professionals, are covered. No speech about other diseases, no matter how serious, is covered. And speakers that parrot the contemporary "consensus" may continue speaking; only those who may dissent are silenced. There can be no question that "official suppression of ideas is afoot*." R.A.V. v. City of St. Paul, Minn*., 505 U.S. 377, 390 (1992).

Because the Physician Censorship Law is a content- and viewpoint-based regulation of speech, it is subject to the strictest scrutiny under the First Amendment. Though the law tries to disguise itself as a conduct regulation by defining "dissemination" to mean "the conveyance of information" "to a patient"

"in the form of treatment or advice," information is not a "treatment" for COVID-19. Thus, "the conduct triggering coverage under the statute consists of communicating a message," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010), and the law requires no nexus with any COVID-19 treatment. Such pure professional speech is "entitled to the strongest protection our Constitution has to offer." *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002) (cleaned up).

"Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects." *Sorrell*, 564 U.S. at 577. But suppressing speech that the government considers harmful is never a legitimate government interest. And because the Physician Censorship Law leaves unregulated wide swaths of identical speech—including the public speech on which the law's findings focus—the State cannot show that the law promotes a compelling government interest or is narrowly tailored to such an interest. The State could not satisfy even intermediate scrutiny, for the entire point of the law is to suppress expression. And the State cannot show that it has a significant interest in forcing Plaintiffs specifically to mouth its preferred viewpoint.

Besides violating the First Amendment, the Physician Censorship Law is void for vagueness under the Fourteenth Amendment's Due Process Clause. It leaves critical terms undefined, and its definitions further muddy the waters. For instance, the law defines "misinformation" as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." Beyond the incomprehensible reference to a "consensus contrary to the standard of care," the text leaves unclear the definition of and relation between "false information" and "contemporary scientific consensus." How are ever-changing scientific hypotheses determined to be "false," and how are courts to determine the "contemporary" (when?) "consensus" (who?)? The law leaves the physician in the dark on all these points, further limiting speech protected by the First Amendment and inhibiting the patient's receipt of candid medical advice.

The State's efforts to limit physician speech to parroting officially sanctioned views contradict the First Amendment and its protection of the search for truth. Sometimes the majoritarian consensus might be right. Sometimes, as with lobotomies, eugenic sterilizations, and sanitizing groceries to guard against COVID-19, it will be wrong. But the First Amendment protects speech for its own sake, even if the State thinks it is right or wrong, good or bad. That is the point. The State is not the arbiter of truth.

PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Because the Plaintiffs are likely to succeed on their First Amendment and Due Process claims, the other preliminary injunction factors necessarily favor relief. The Court should enjoin the Defendants' enforcement of the Physician Censorship Law.

### STATEMENT OF THE CASE

**A. COVID-19 and Changing Medical Responses**

From the start, the medical "consensus" response to COVID-19 has been variable, disputed, and evolving. Examples abound. For instance, in March 2020, "[t]he Centers for Disease Control and Prevention's advice [wa]s unequivocal: Healthy people who do not work in the healthcare sector and are not taking care of an infected person at home do not need to wear masks" to protect themselves against COVID. Deborah Netburn, *To wear a mask or not? Experts Answer Coronavirus Protection Questions*, Los Angeles Times (Mar. 24, 2020), https://tinyurl.com/ywbdewxn. A doctor telling adults outside the medical field to wear a mask—say, an N95 at a large indoor gathering—would have gone against this advice. But in July 2020, the CDC published a study *supporting* the use of masks and recommended workplace mask usage and daily symptom monitoring, and indeed masks would be a core strategy for reducing the spread of COVID. *See* Dr. M. Joshua Hendrix et al., *Absence of Apparent Transmission of SARS-CoV-2 from Two Stylists After Exposure at a Hair Salon with a Universal Face Covering Policy — Springfield, Missouri*, May 2020, CDC (July 17, 2020), https://tinyurl.com/mwwhjhe5; *see also* Fauci On How His Thinking Has Evolved On Masks, Asymptomatic Transmission, Wash. Post (July 24, 2020), https://tinyurl.com/ypkbrhf4. N95 masks are now recognized by all official authorities as the gold standard, preventing 95% of incoming COVID transmission. *See* Yuxin Wang et al., *How Effective Is A Mask In Preventing COVID-19 Infection?*, Nat'l. Libr. of Pub. Med. (Jan. 5, 2021), https://tinyurl.com/yvhtd4vh ("[W]e absolutely should be wearing masks consistently. So that was one of the things I guess you could have said that, back then, was a mistake."). In May 2021, the CDC determined "that people who were fully vaccinated against COVID-19 could go into most public places without a mask"; two months later, the CDC "walked back its recommendations" because "data suggest that fully vaccinated people infected with the delta variant may be able to transmit the virus to others." Bridget Balch, *Vaccines Work Well Against The Delta Variant. Here's Why You Should Wear A Mask*

PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*Anyway*, Ass'n of Am. Med. Colls (Aug. 3, 2021), https://tinyurl.com/5n7mnkps. In announcing the change, Dr. Anthony Fauci said that "[t]he data are clear" before qualifying: "the most recent data." *Id*.

"As the pandemic took hold, most epidemiologists"—echoed by public policymakers—said: "No students in classrooms, no in-person religious services, no visits to sick relatives in hospitals, no large public gatherings." Michael Powell, *Are Protests Dangerous? What Experts Say Might Depend on Who's Protesting What*, N.Y. Times (July 6, 2020), https://tinyurl.com/38vhjw68. Governor Newsom even closed beaches. Jeremy B. White, *Newsom Closes All Orange County Beaches. Local Officials Call It An 'Act Of Retribution'*, Politico (Apr. 30, 2020), https://tinyurl.com/drhxzpny ("The governor repeatedly chided outdoor recreators this week, warning that mass gatherings could undermine California's progress toward containing the coronavirus."). "[W]hen conservative anti-lockdown protesters gathered on state capitol steps," "epidemiologists scolded them and forecast surging infections." Powell, *supra*. Governor Newsom warned that "'[t]housands of people congregating together, not practicing social distancing or physical distancing' could undermine the current progress in preventing the spread of the virus." Lois Beckett, *California Governor Promises Changes To Lockdown As Protests Sweep State*, The Guardian (May 1, 2020) (cleaned up), https://tinyurl.com/5ddczv89. A doctor who conveyed an acceptance of large protests would have violated this apparent consensus.

But during protests following the death of George Floyd, "rather than decrying mass gatherings, more than 1,300 public health officials signed a May 30 letter of support, and many joined the protests." Powell, *supra*. Catherine Troisi, an infectious-disease epidemiologist at the University of Texas Health Science Center at Houston, said: "I certainly condemned the anti-lockdown protests at the time, and I'm not condemning the protests now, and I struggle with that I have a hard time articulating why that is OK." *Id*. (cleaned up). Nicholas A. Christakis, professor of social and natural science at Yale, said: "We allowed thousands of people to die alone. We buried people by Zoom. Now all of a sudden we are saying, never mind?" *Id*. "[T]he former dean of Harvard Medical School" "pointed out that the protesters were also engaging in behaviors, like loud singing in close proximity, which [the] CDC has repeatedly suggested could be linked to spreading the virus." Dan Diamond, *Suddenly, Public Health Officials Say Social Justice Matters More Than Social Distancing*, Politico (June 4, 2020), https://tinyurl.com/34cue3mn.

1    In early 2021, experts told the public that the Johnson & Johnson vaccine was safe and just as

2 effective as the other vaccines—despite studies showing that it was less effective. Karina Zaiets et al.,

3 *Comparing the Covid-19 vaccines*, USA Today (Apr. 13, 2021), https://tinyurl.com/4x95ux4c; *see FDA*

4 *Issues Emergency Use Authorization for Third Covid Vaccine*, FDA (Feb. 27, 2021),

5 https://tinyurl.com/289h2rn3. A doctor who endorsed getting a different vaccine would have been out of

6 line with the apparent medical consensus. Six weeks later, updated FDA and CDC guidance called for a

7 pause of the Johnson & Johnson vaccine. *See Joint CDC and FDA Statement on Johnson & Johnson*

8 *Covid-19 Vaccine*, FDA (Apr. 13, 2021), https://tinyurl.com/zx9t7xmt. "In December, the CDC changed

9 its recommendations to say shots made by Moderna and Pfizer/BioNTech are preferred." Jen Christensen

10 & Deidre McPhillips, *'Reassuring' Data Suggests Johnson & Johnson Vaccine May Still Have Role To*

11 *Play Against Covid-19*, CNN (Mar. 20, 2022), https://tinyurl.com/25ysj96v; *see Overview of COVID-19*

12 *Vaccines*, CDC (Sept. 2, 2022), https://tinyurl.com/58thyn94 (Because "[t]here is a plausible causal

13 relationship between J&J/Janssen COVID-19 vaccine and a rare and serious adverse event—blood clots

14 with low platelets, vaccination with COVID-19 vaccines other than J&J/Janssen vaccine is preferred.").

15 And the latest CDC guidance limits the use of the Johnson & Johnson vaccine because of "life-

16 threatening blood clots that have been associated with the vaccine." Kathy Katella, *You Got the J&J*

17 *Vaccine: Should You Get the booster?*, Yale Med. (July 20, 2022), https://tinyurl.com/9fuptc79.

18    In April 2020, the medical community came to an apparent consensus that quarantining for less than

19 fourteen days puts others at risk. *See* Laurel Wamsley & Selena Simmons-Duffin, T*he Science Behind a*

20 *14-Day Quarantine After Possible Covid Exposure*, NPR (Apr. 1, 2020), https://tinyurl.com/24j9k843.

21 Some countries even enforced this understanding through fines. *See, e.g.*, Paul Karp & Lisa Cox,

22 *Coronavirus: People Not Complying With New Australian Self-Isolation Rules Could Face Fines*, The

23 Guardian (Mar. 15, 2020), https://tinyurl.com/3yemprus. A doctor recommending a five-day quarantine

24 would have fallen far outside the then-conventional guidance. Fast forward two years, and that same

25 doctor would be giving standard advice. *See Guidance for Local Health Jurisdictions on Isolation and*

26 *Quarantine of the General Public*, Cal. Dep't Of Pub. Health (June 9, 2022),

27 https://tinyurl.com/jh7xpxyb.

28

**B.  The Physician Censorship Law**

On July 29, 2021, the Federation of State Medical Boards issued a press release saying that "Physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary action by state medical boards, including the suspension or revocation of their medical license." *Spreading Covid-19 Vaccine Misinformation May Put Medical License at Risk*, Fed'n of State Med. Bds. (July 29, 2021), https://tinyurl.com/57jxf2rn. The President of the Medical Board of California echoed this, saying that "it is the duty of the Board to protect the public from misinformation and disinformation by physicians" and noting a supposed "increase in the dissemination of health care related misinformation and disinformation on social media platforms, in the media, and online." *Feb. 10-11 Meeting Minutes*, Med. Bd. of Cal. (Feb. 10, 2022), https://tinyurl.com/46pejy3w. The California Medical Association agreed and sponsored Assembly Bill No. 2098, which would become the Physician Censorship Law. California Medical Association (@CMAdocs), Twitter (May 11, 2022, 2:10 PM), https://tinyurl.com/dw8v9hb4.

According to the bill's legislative findings, "[t]he spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence," and "some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals." Bill § 1(d), (e). The official analysis offered for the bill also focused on public dissemination, recounting one licensed doctor who "has engaged in multiple campaigns" publicly related to COVID, yet her "license remains active." Assembly Floor Analysis, Concurrence in Senate Amendments to AB 2098, at 4 (Aug. 30, 2022), https://tinyurl.com/bdftnaek. The legislative analysis highlighted "the dissemination of misinformation and disinformation" through "media coverage and the prevalence of social media." *Id.*

As introduced, the bill would have made it "unprofessional conduct for a physician and surgeon to disseminate or promote misinformation or disinformation related to COVID-19," and the Board would have had to "consider" several "factors prior to bringing a disciplinary action," including "[w]hether the licensee intended to mislead or acted with malicious intent," "[w]hether the misinformation or disinformation was demonstrated to have resulted in an individual declining opportunities for COVID-19 prevention or treatment that was not justified" and "[w]hether the misinformation or disinformation was contradicted by contemporary scientific consensus." Bill as Introduced § 2 (Feb. 14, 2022).

The California Medical Board, however, argued that the Board should "not have to prove patient harm" or "the intent of the licensee" "to impose discipline," and the legislature removed those requirements. Letter from William Prasifka to Hon. Evan Low, Md. Bd. of Cal., at 2 (June 1, 2022), https://tinyurl.com/tyuhk7mf. The Board also said that the reference to a "contemporary scientific consensus" was "unclear and may lead to legal challenges," and suggested adding "contrary to the standard of care" to the definition of "misinformation." *Id.* The legislature implemented all these amendments.

The Assembly Committee on Business and Professions noted a First Amendment concern with the bill: "A key factor in determining whether a statute like the one proposed in this bill violates the First Amendment is whether the law would in fact regulate professional *speech* as [sic] opposed professional *conduct*." Committee on Business & Professions, Cal. State Assembly, Summary & Analysis of AB 2098, at 11 (Apr. 15, 2022), https://tinyurl.com/bdftnaek. The committee noted that the U.S. Supreme Court recently "declined to recognize the Ninth Circuit's treatment of 'professional speech' as a separate category afforded less protection than other forms of speech." *Id.* at 12. The committee noted that the Board likely could not "take action against a physician for statements made to the general public about COVID-19 through social media or at a public protest" but thought that constitutional concerns would be lessened "if a physician were to be subjected to formal discipline for communications made to a patient under their care in the form of treatment or advice." *Id.* The committee did not explain how "communications" are a "form of treatment" for COVID. And even legal experts supporting the bill warned of its unconstitutionality. *See* Steven Lee Myers, *California Approves Bill to Punish Doctors Who Spread False Information*, N.Y. Times (Aug. 29, 2022) (quoting Stanford Law Professor Michelle M. Mello: "Initiatives like this will be challenged in court and will be hard to sustain. That doesn't mean it's not a good idea." (cleaned up)).

The bill has always covered only physicians and surgeons. The California Senate's Floor Analysis noted that the law "does not . . . include other healthcare professionals which have also been reported as spreading misinformation and disinformation," including "licensed doctors of chiropractic who were advertising that chiropractic care can help patients reduce their risk of COVID-19 infection." Senate Rules Committee, Office of Senate Floor Analyses, Third Reading AB 2098, at 4–5 (Aug. 13, 2022),

https://tinyurl.com/bdftnaek. The analysis found it "unclear why only one category of professional would be specified through statue designating their activities as unprofessional conduct." *Id.* at 5.

As enacted, the Physician Censorship Law provides that "[i]t shall constitute unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." Bill § 2 (to be codified at Cal. Bus. & Prof. Code § 2270). "'Disinformation' means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead." *Id.* "'Disseminate' means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." *Id.* "'Misinformation' means false information that is contradicted by contemporary scientific consensus contrary to the standard of care." *Id.*

On September 30, 2022, Governor Newsom signed the Act into law, attaching a statement that all but conceded that AB 2098 is unconstitutional as written. The Governor's statement attempted to invoke a narrowing construction of the Act, claiming "it is narrowly tailored to apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care while interacting directly with a patient under their care." Newsom went on to acknowledge that he was "concerned about the chilling effect other potential laws may have on physicians and surgeons who need to be able to effectively talk to their patients about the risks and benefits of treatments for a disease that appeared in just the last few years."

**C. Plaintiffs**

Plaintiffs Dr. Mark McDonald, M.D., and Dr. Jeff Barke, M.D, are licensed physicians. Dr. McDonald is board certified in both adult and adolescent psychiatry, and maintains a psychiatry practice in the Los Angeles area. Dr. Barke is board certified in family practice, and maintains a concierge medical practice in the Newport Beach area. As demonstrated in their declarations (attached as Exhibits A and B), during the past two years both Plaintiffs regularly provided their best medical advice to their patients regarding masking, testing, treatment, and vaccination for COVID-19. The information, recommendations, and prescriptions they provided were based on research and data and in line with protocols developed and published by other doctors. Though some of the topics covered require a

prescription (such as treatment by ivermectin), much of it is recommendations or advice concerning over-the-counter products like masks, vaccines, and natural supplements. The Plaintiffs' best medical advice often conflicts with the medical opinions coming from official organs like the State of California or the Centers for Disease Control. The Plaintiffs intend to continue providing their best medical advice to their patients, even when it is contrary to the preferred views of the government, but AB 2098 will put their licenses at risk for doing so. The Plaintiffs also stay up to date on current medical science and research by taking continuing medical education, reading journals, and talking with colleagues, but they do not understand what is or is not covered by a vague term like the "contemporary scientific consensus."

Dr. McDonald is now under investigation by the Medical Board of California for expressing his views on these matters of public concern on his own social media pages. Now that same board is being granted yet another power—to punish Plaintiffs for any ideas they might privately express to individual patients, based on their individual circumstances, if the State of California decides those are ideas they would prefer to censor.

## LEGAL STANDARD

A plaintiff is entitled to a preliminary injunction on showing that (1) he is "likely to succeed on the merits," (2) he is "likely to suffer irreparable harm," (3) "the balance of equities tips in his favor," and (4) the requested injunction "is in the public interest." *Am. Beverage Ass'n v. City and County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). But when First Amendment rights are at risk, the analysis essentially reduces to a single question: whether the plaintiff is likely to succeed on the merits. And even there, the question is more precisely whether the plaintiff has raised a serious question as to the merits. *Ward v. Thompson*, No. 22-16473, 2022 U.S. App. LEXIS 30270, at *2 (9th Cir. Oct. 22, 2022). This is because even the brief loss of First Amendment rights causes "irreparable injury" and tilts "the balance of hardships . . . sharply in [the plaintiff's] favor," and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Bev. Ass'n,* 916 F.3d at 758 (cleaned up); *see also Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles.").

**ARGUMENT**

Plaintiffs are likely to succeed on the merits of their First Amendment and Due Process claims, or at minimum have raised serious questions sufficient to justify an injunction. The Physician Censorship Law is a direct restriction of pure speech, untethered to any treatment. It discriminates based on content and viewpoint, is subject to strict scrutiny, and has no point other than suppression of expression. The law is also void for vagueness because it leaves crucial terms undefined, exacerbating its First Amendment problems.

**I.      The Physician Censorship Law violates the First Amendment.**

The First Amendment protects "the right to speak freely." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The general rule is that the government may not compel a person "to utter what is not in his mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). Put another way, the government violates a speaker's First Amendment rights by "interfer[ing] with the [speaker's] ability to communicate its own message." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64 (2006). Under the First Amendment, "minority views are treated with the same respect as are majority views." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000).

The Physician Censorship Law violates the First Amendment. On its face, it discriminates based on the speech's content and viewpoint. It is not a regulation of conduct because it covers only "the conveyance of information," untethered from any treatment or care. And it cannot pass any form of heightened scrutiny. Expression suppression is never a legitimate government interest, and the State's permission of identical speech in all other contexts—including by any other medical professionals—shows that its law is not connected with a significant interest and is not the most narrowly tailored means of addressing such an interest. If the State is concerned about COVID treatments, it could regulate those treatments. Instead, it has censored speech and deprived patients of candid medical advice. That is unconstitutional. The Plaintiffs are likely to succeed on the merits.

**A.  The Physician Censorship Law is a content and viewpoint-based restriction on speech.**

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 163; *see Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019) ("[A] law is content-based because it explicitly draws distinctions based on the message a speaker conveys."). One simple way of determining whether a restriction is content-based is by considering whether the law "requires authorities to examine the contents of the message to see if a violation has occurred." *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1073 (9th Cir. 2020) (cleaned up); *see McCullen v. Coakley*, 573 U.S. 464, 479 (2014); *see also City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) ("regulations that discriminate based on the . . . message expressed" "are content based" (cleaned up)).

"Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination." *Reed*, 576 U.S. at 168 (cleaned up). The Supreme Court has strongly condemned viewpoint discrimination: "Those who begin coercive elimination of dissent soon find themselves exterminating dissenters." *Barnette*, 319 U.S. at 641.

Here, the Physician Censorship Law is both content- and viewpoint-based. The law cannot be applied except by reference to the content of a physician's speech; on its face it regulates only certain speech about COVID-19. Unless a physician's speech parrots whatever the "contemporary scientific consensus" is, the physician risks loss of license and livelihood. The law implicates at least two other forms of content and viewpoint discrimination, too. It leaves supposed misinformation about other diseases—from the flu to smallpox—unregulated. And it apparently regulates only certain information about COVID: what the State considers to be "false" and/or "contradicted by contemporary scientific consensus." The law is a content- and viewpoint-based speech restriction.

The law's express purposes confirms that it discriminates based on content and viewpoint. According to the legislature's findings, the law's purpose is to stamp out what the State considers to be "inaccurate information." Bill § 1(e). Particularly "[g]iven the legislature's expressed statement of purpose, it is apparent that [the law] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint." *Sorrell*, 564 U.S. at 565.

Because California's law is content-based and viewpoint-based, it is "subject to strict scrutiny" and "presumptively unconstitutional." *Reed*, 576 U.S. at 163, 165. As shown below, it cannot survive such scrutiny.

**B. The Physician Censorship Law is not subject to lesser scrutiny because it regulates physician speech.**

The "dissemination of information [is] speech within the meaning of the First Amendment." *Sorrell*, 564 U.S. at 570. As the Supreme Court recently held, "[s]peech is not unprotected merely because it is uttered by 'professionals.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("*NIFLA*"). "To the contrary, professional speech may be entitled to 'the strongest protection our Constitution has to offer.'" *Conant*, 309 F.3d at 637 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

In *NIFLA*, the Supreme Court "abrogated" the Ninth Circuit's prior "determin[ation] that speech within the confines of a professional relationship" "categorically receives lesser scrutiny." *Tingley v. Ferguson*, No. 21-35815, 2022 WL 4076121, at *11 (9th Cir. Sept. 6, 2022). Thus, "professional speech within the confines of a professional relationship" no longer "receive[s] somewhat diminished protection under the First Amendment." *Id.* Rather than receive the "intermediate scrutiny" that such laws previously received in this circuit, content-based regulations of professional speech must now satisfy strict scrutiny. *Id.*; *see id.* at *12 ("There is no question that *NIFLA* abrogated the professional speech doctrine, and its treatment of all professional speech *per se* as being subject to intermediate scrutiny.").

In coming to this conclusion, the Supreme Court in *NIFLA* explained that "[a]s with other kinds of speech, regulating the content of professionals' speech poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." 138 S. Ct. at 2374 (cleaned up). "Doctors help patients make deeply personal decisions, and their candor is crucial." *Id.* (cleaned up). Yet "[t]hroughout history, governments have manipulated the content of doctor-patient discourse to increase state power and suppress minorities." *Id.* (cleaned up). "[D]uring the Cultural Revolution, Chinese physicians were dispatched to the countryside to convince peasants to use contraception"; "[i]n the 1930s, the Soviet government expedited completion of a construction project on the Siberian railroad by ordering doctors to both reject requests for medical leave from work and conceal

this government order from their patients"; and "[i]n Nazi Germany," "German physicians were taught that they owed a higher duty to the 'health of the Volk' than to the health of individual patients." *Id.* (cleaned up).

As the CEO of the American Medical Association recently testified about a different law, "[g]overnment manipulation of doctor-patient discourse has a dark past and should not be taken lightly." Declaration of Dr. James L. Madara, MD in Support of Plaintiffs' Motion for Preliminary Injunction ¶ 10, *Am. Med. Ass'n v. Stenehjem*, No. 1:19-cv-00125-DLH-CRH, ECF No. 6-5 (D.N.D. June 25, 2019). "The ability of physicians to have open, frank, and confidential communications with their patients is a fundamental tenet of high quality medical care." *Id.* ¶ 13. California's law "dangerously interferes with this collaborative effort and thus undermines the patient/physician relationship." *Id.* ¶ 14; *see id.* ¶ 20 (explaining that under the Code of Medical Ethics, "Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the physician's objective professional judgment."); *id.* ¶ 30 ("Informed consent" "is not an open-ended space for the government to script one-size-fits-all messages to groups of patients to further a political agenda.").

In short, "when the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail." *NIFLA*, 138 S. Ct. at 2374 (cleaned up). "Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields." *Id.* at 2374–75. "Doctors and nurses might disagree about" any number of medical issues, "and the people lose when the government is the one deciding which ideas should prevail." *Id.* at 2375. Indeed, "[a]n integral component of the practice of medicine is the communication between a doctor and a patient," and "[p]hysicians must be able to speak frankly and openly to patients." *Conant*, 309 F.3d at 636. To ban physicians "from communicating to patients sincere medical judgments would disable patients from understanding their own [health] situations" and even from fully "participat[ing]" in public "debate[s]." *Id.* at 634–35 (cleaned up). These infringements on patients' rights confirm the gravity of the law's First Amendment violation. *See Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and

ideas."). Because "[t]he government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications," it is subject to strict scrutiny. *Id.* at 637.

The Physician Censorship Law cannot be justified as a regulation of conduct. It regulates only "the conveyance of information." § 2270(b)(3). California has not identified "any separately identifiable conduct" that its law would punish. *Cohen v. California*, 403 U.S. 15, 18 (1971). The "only 'conduct' which the State [seeks] to punish" is "the fact of communication," in violation of the First Amendment. *Id.* at 16.

Though the law purports to limit itself to "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice," § 2270(b)(3), this obvious effort to evade the First Amendment fails. Even on its own terms, the relevant "conveyance of information" goes beyond "treatment" to include speech in the form of "advice." And the Ninth Circuit has squarely held that such "advice" is pure speech. As it explained in *Conant*, to "treat" a patient by *recommending* marijuana is merely to engage in "the dispensing of information"—protected speech. 309 F.3d at 635; *see id.* at 636 ("a doctor's recommendation does not itself constitute illegal conduct"). Here too, "the conduct triggering coverage under the statute consists of communicating a message." *Holder*, 561 U.S. at 28.

Nor can California show that "the conveyance of information" is a "treatment" for COVID-19. In that regard, this case is different from the Ninth Circuit's recent decision in *Tingley*, where speech given in "psychotherapy" could be regulated because "words" were used "to treat" the relevant condition. 2022 WL 4076121, at *19. Here, by contrast, the law has no nexus with any treatment. COVID-19 is impervious to words. The law bans a pure "conveyance of information," no matter if any COVID-19 treatment is even under consideration. A dermatologist would violate this law by off-handily saying they've personally decided not to take the vaccine—simply making conversation during an unrelated physical exam. Again, it is just like the unconstitutional law in *Conant*, which "prohibited doctors from recommending the use of marijuana to patients." *Id.* at *11. It is also like the unconstitutional law in *NIFLA*, which "was 'not tied to a procedure' and applied to all interactions a client has with a clinic, 'regardless of whether a medical procedure is ever sought, offered, or performed.'" *Id.* at *12 (quoting *NIFLA*, 138 S. Ct. at 2373).

For these same reasons, the Physician Censorship Law is not saved by the Ninth Circuit's recent determination that "substantive regulations on medical treatments" may give rise to "tolera[ble]" content-based "restriction[s] on speech." *Tingley*, 2022 WL 4076121, at *17–18. The Ninth Circuit in *Tingley* made clear that it was not creating a "broad" new category of speech exempt from the First Amendment, but a narrowly defined space for a state regulation that follows in "a long (if heretofore unrecognized) tradition of that type of regulation." *Id.* at *18. And the state regulations sometimes permitted by *Tingley* are limited to those that "regulate what medical treatments [the state's] licensed health care providers could practice." *Id.* As discussed, this law has no nexus to any treatment (or patient harm) and is instead a pure speech restriction. Unlike the "psychotherapy" in *Tingley*, "words" are not used "to treat" the relevant ailments here. *Id.* at *19. The State cannot show any long history of government-scripted physician-patient conversations.

More broadly, trying to evade the First Amendment by calling speech itself conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (en banc) (cleaned up). "When the government restricts professionals from speaking to their clients, it's restricting speech, not conduct," and "the impact on the speech is the purpose of the restriction, not just an incidental matter." Eugene Volokh, *Speech As Conduct*, 90 Cornell L. Rev. 1277, 1346 (2005).

Last, any attempt to recharacterize the law as a prohibition on false statements of *fact* would not save it. "The First Amendment recognizes no such thing as a 'false' idea." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 51 (1988). And as shown above, there is no reason to think (and ample reason to doubt) that the medical "consensus" at any time reflects scientific *fact*. "Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) (quoting Brief for American Association for the Advancement of Science et al. as Amici Curiae 7–8). Medical knowledge is no different.

Medical advice in particular always implicates a mix of fact and opinion, and many of the relevant issues—particularly involving a recent, ever-evolving virus with new vaccines—are not matters of established "fact." As shown above, the nature of science is that knowledge evolves and changes.

Case No.                                                      20

PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Medical "[r]eversal is not a rare occurrence." Vinay Prasad & Adam Cifu, *Medical Reversal: Why We Must Raise the Bar Before Adopting New Technologies*, 84 Yale J. Biology & Med. 471, 472 (2011) (collecting many examples); *see also* Diana Herrera-Perez et al., *A Comprehensive Review of Randomized Clinical Trials in Three Medical Journals Reveals 396 Medical Reversals*, in Meta-Research, A Collection of Articles (Peter A. Rodgers ed., 2019). Many once-"consensus" medical views, including the need for lobotomies and eugenic sterilizations, are no longer accepted. *See* Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 66 (2016) ("The most important elite advocating eugenic sterilization was the medical establishment," "with near unanimity"; "every article on the subject of eugenic sterilization published in a medical journal between 1899 and 1912 endorsed the practice"). In all events, even purportedly false "facts" are not outside the First Amendment's protection. *See United States v. Alvarez*, 567 U.S. 709, 722 (2012); *United States v. Swisher*, 811 F.3d 299, 317 (9th Cir. 2016). The "general rule that the speaker has the right to tailor the speech[] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995).

The Physician Censorship Law is a content-based restriction on the "conveyance of information." § 2270(b)(3). It is subject to strict scrutiny.

### C. The Physician Censorship Law flunks heightened scrutiny.

"The First Amendment requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys." *Sorrell*, 564 U.S. at 566. Because California's "law explicitly targets certain speech for regulation based on the topic of that speech," the Court "must apply strict scrutiny." *Victory Processing*, 937 F.3d at 1226. To survive strict scrutiny—"the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)— California must prove that the Physician Censorship Law "furthers a compelling interest and is narrowly tailored." *Reed*, 576 U.S. at 171 (cleaned up). The State bears the burden of establishing this both on the merits and to defeat a request for preliminary injunction. *Ashcroft v. ACLU*, 542 U.S. 656, 660-61, 666 (2004). The State must "specifically identify an 'actual problem'" and show that restricting "speech [is] actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (cleaned up). "Content-based regulations are presumptively invalid." *R.A.V.*, 505 U.S. at 382.

Case No.                                                                    21
PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Here, the State will be unable to show that its law is tied to a compelling government interest, or that it is narrowly tailored to any such interest

### 1. The Physician Censorship Law does not promote a compelling government interest.

To pass strict scrutiny, the State must first show that its law "plainly serves compelling state interests of the highest order" and is "unrelated to the suppression of expression." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). Second, in responding to an as-applied challenge under strict scrutiny, the State must show a compelling interest in enforcing the law against Plaintiffs specifically, rather than merely a general interest. *See Fulton v. City of Philadelphia, Pa.*, 141 S. Ct. 1868, 1881 (2021). "A law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020) (cleaned up).

The Physician Censorship Law fails strict scrutiny at the outset because it serves no legitimate interest at all, and instead is solely concerned with "the suppression of expression." *Jaycees*, 468 U.S. at 624. Arguments about informational harm are irrelevant as a matter of law, for censorship cannot be justified on the plea that bad ideas cause harm—unless that risk of harm rises to the high and immediate urgency defined by the "clear and present danger" test. *See Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam) (holding advocacy of armed resistance not sufficient to justify punishment for speech). That test is not implicated here. Indeed, the Physician Censorship Law does not require any showing of risk or harm at all, and a physician's license could be at risk even if her advice *helped* the patient.

It is just as clear that California does not have a legitimate interest in preventing the dissemination of ideas about personal, philosophical, scientific, and medical topics on the grounds that such ideas are (or believed by the State to be) false or contrary to the majority's view. The "bedrock principle underlying the First Amendment . . . is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414; *see, e.g.*, *McCullen*, 573 U.S. at 476 ("[T]he First Amendment's purpose" is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail."); *Alvarez*, 567 U.S. at 729 ("Truth needs

1   neither handcuffs nor a badge for its vindication."); *Snyder v. Phelps*, 562 U.S. 443, 458, (2011)

2   ("[S]peech cannot be restricted simply because it is upsetting or arouses contempt."); *Hurley*, 515 U.S. at

3   574 ("[T]he point of all speech protection . . . is to shield just those choices of content that in someone's

4   eyes are misguided, or even hurtful."); *Conant*, 309 F.3d at 637 (noting that the state lacks power to

5   paternalistically regulate speech between doctor and patient to prevent individuals from making "bad

6   decisions").

7       Even if some interest unrelated to speech suppression were at stake, the Physician Censorship Law is

8   vastly overbroad. Because it has no nexus to any treatment, it prohibits even simple conversation if that

9   conversation is directed toward a topic and viewpoint of which the State disapproves. The law is thus

10  sweepingly overbroad with respect to any legitimate governmental interest. *See United States v. Stevens*,

11  559 U.S. 460, 473 (2010) (a law is overbroad if "a substantial number of its applications are

12  unconstitutional, judged in relation to the statute's plainly legitimate sweep" (cleaned up)).

13      Further, the law is underinclusive with respect to its claimed goals. If a statute is underinclusive, this

14  negates the legitimacy of the law in at least two ways. First, the poor fit between the law and the alleged

15  harm "raises serious doubts about whether [the government] is, in fact, serving, with this statute, the

16  significant interests which [it] invokes" to justify the law. *Florida Star v. B.J.F.*, 491 U.S. 524, 540

17  (1989). Second, as discussed next, underinclusivity contradicts any claim that the law is "narrowly

18  tailored" to the harm it purports to address. *Brown*, 564 U.S. at 799–804.

19      The Physician Censorship Law is severely underinclusive as a means toward any legitimate

20  government purpose. According to the bill's findings, it purportedly seeks to "combat[] health

21  misinformation and curb[] the spread of falsehoods." Act § 1(g). Even if this were a legitimate basis for

22  governmental censorship, California permits all sorts of "health misinformation." The examples are

23  endless, but take one specifically raised by the California Senate's Floor Analysis, which noted that the

24  law only covers physicians and surgeons, and "does not . . . include other healthcare professionals which

25  have also been reported as spreading misinformation and disinformation," including "licensed doctors of

26  chiropractic who were advertising that chiropractic care can help patients reduce their risk of COVID-19

27  infection." Senate Rules Committee, Third Reading AB 2098, at 4–5. The analysis found it "unclear why

28  only one category of professional would be specified through statue designating their activities as

Case No.                                                             23
PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

unprofessional conduct." *Id.* at 5. After all, many patients today may not be seen by a physician, as opposed to a physician's assistant, nurse, or other practitioner. So the same information can be disseminated "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573. The law censors only the physician's or surgeon's speech, "leav[ing] consumers open to an unlimited proliferation of" the same information given by others. *Victory Processing*, 937 F.3d at 1229.

Finally, when the government invokes "abstract" interests, it "must demonstrate," at the very least, "that the recited harms are real, not merely conjectural, and that the [censorship] will in fact alleviate these harms in a direct and material way." *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009) (cleaned up); *see Brown*, 564 U.S. at 799 (government must "specifically identify an 'actual problem'"). It cannot do that. Its legislative examples, again, were about public speech, not doctor-patient conversations. The Medical Board of California told the legislature that "[o]ftentimes, complaints received by the Board pertaining to COVID-19 are made by a member of the public and not the patient of the physician." Letter, Md. Bd. of Cal., *supra*, at 2. (The Board also told the legislature that its law was hopelessly vague. *Id.* at 2; *see infra* Part II.) It is unclear whether the Medical Board has imposed punishment against *any* physician for supposed COVID misinformation to a patient. More broadly, one survey by the Federation of State Medical Boards, the umbrella organization for state medical boards, found that less than 20% of boards had taken any related actions. Alexandra Ellerbeck, *Some doctors spreading coronavirus misinformation are being punished*, The Wash. Post (Dec. 6, 2021), https://tinyurl.com/4jkpt94y.

The State will be unable to show that its law advances a compelling government interest, which is fatal to the analysis of a law that discriminates both on content and viewpoint.

### 2.   The Physician Censorship Law is not narrowly tailored.

A law subject to strict scrutiny is not "narrowly tailored" if the government's purported interests could have been served by a less restrictive alternative. The government bears the burden to prove that available alternatives would have been ineffective. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000). "Precision must be the touchstone when it comes to regulations of speech." *NIFLA*, 138 S. Ct. at 2376 (cleaned up). "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort. Yet here it seems to have been the first strategy the Government

thought to try." *Conant*, 309 F.3d at 637 (quoting *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002)).

First, as explained above, the law is underinclusive in many respects. "In light of this underinclusiveness," the State cannot meet "its burden to prove that its [law] is narrowly tailored." *Reed*, 576 U.S. at 172; *accord Victory Processing*, 937 F.3d at 1228.

Next, if California were concerned about harmful COVID treatments, it could have regulated those treatments (or harms) directly, rather than pretend that "the conveyance of information" is itself a COVID "treatment." § 2270(b)(3). Certainly governments—including California's—have not hesitated to impose various COVID-related mandates. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) ("This is the fifth time the Court has summarily rejected the Ninth Circuit's analysis of California's COVID restrictions on religious exercise."). Regulating *treatments* would be a more narrowly tailored way to promote any interest in medical care than regulating pure speech.

Or the government could have engaged in its own speech, pushing whatever COVID views it prefers via official channels. When speech that the government considers harmful is at issue, the "least restrictive alternative" is unlikely to involve censorship. "The remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth." *Alvarez*, 576 U.S. at 727. "[M]ore speech, not enforced silence" is the best response to perceived falsehoods or misguided ideas. *Whitney v. California*, 274 U.S. 357, 377 (1927); *see also Video Software Dealers Ass'n*, 556 F.3d at 965 (9th Cir. 2009) (California failed to show that an education campaign could not equally serve its asserted interest).

Given the existence of these less restrictive alternatives to California's content-based restriction on speech, the law is not narrowly tailored. For the same reasons, the law would fail even a lesser form of heightened scrutiny. Under the intermediate scrutiny applicable in certain contexts, "the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest." *Sorrell*, 564 U.S. at 572. And again, "the governmental interest" must be "unrelated to the suppression of free expression." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). But as explained above, the State's interests are all founded on speech suppression. And an underinclusive ban on information related to one medical issue from two types of providers is neither tied

to a substantial interest nor a closely drawn way of furthering such an interest. The Physician Censorship Law violates the First Amendment, and Plaintiffs are likely to succeed on the merits.

Indeed, Governor Newsom's signing statement, in which he felt the need to invoke his own narrowing construction, reenforces the lack of tailoring of the law as-written. Despite the Governor's insistence, the Physician Censorship Law does not "apply only to those egregious instances in which a licensee is acting with malicious intent or clearly deviating from the required standard of care." Under the statute, "Misinformation" means "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." There is no requirement for clear deviation from a standard of care, much less as standard for the required clarity of the deviation. And malicious intent is only a standard for "Disinformation," a separate category the act defines as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead." The Act is written in the disjunctive, regulating the "disseminat[ion]" of "misinformation *or* disinformation," (emphasis added) such that physicians are equally at risk no matter the nobility or malice of their intent.

And in any case the Governor's attempt at narrow tailoring has no substantive effect: the Governor is not the enforcement authority who will decide where and to whom to apply the Act, and even if he were the Ninth Circuit holds that an announced enforcement policy cannot save an unconstitutional statute through a narrowing construction. *United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996) ("California has failed to show that this new policy represents an authoritative and binding construction of [the statute] rather than a mere enforcement strategy, which would not be binding on the court."),

## II.     The Physician Censorship Law is void for vagueness.

The Physician Censorship Law suffers from another constitutional defect: it is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause. A law is unconstitutionally vague if it does not give "a person of ordinary intelligence fair notice of what is prohibited" or if it is "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Put another way, a law is void for vagueness if it "lack[s] any ascertainable standard for inclusion and exclusion." *Kashem v. Barr*, 941 F.3d 358, 374 (9th Cir. 2019) (internal quotation marks and citation omitted).

Though civil laws are sometimes permitted a greater "degree of vagueness," if "the law interferes with the right of free speech or of association"—as here—"a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498–99 (1982). Vague laws "raise[] special First Amendment concerns" because they empower the government to silence viewpoints with which it disagrees. *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997). So, "where First Amendment freedoms are at stake, a "great[] degree of specificity and clarity of laws is required." *Edge v. City of Everett*, 929 F.3d 657, 664 (9th Cir. 2020) (cleaned up). When "[d]efinitions of proscribed conduct . . . rest wholly or principally on the subjective viewpoint of a" government official, such laws "run the risk of unconstitutional murkiness." *Id.* at 666.

Here, ambiguity pervades the statute. First take the statutory definition of "misinformation": "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." § 2270(b)(4). Read literally, the definition is senseless, as it says that the covered information is contradicted by a consensus that is itself contrary to the standard of care. That alone suffices to make the statute void for vagueness, for it is incomprehensible.

Even if one guesses and adds words that the legislature did not ("false information that is contradicted by contemporary scientific consensus *and that is* contrary to the standard of care"), hopeless ambiguities remain. Is information false *because* it is "contradicted by contemporary scientific consensus" and (or?) "contrary to the standard of care"? Or is falsity a separate requirement? How does a court decide "falsity" in the context of scientific questions that are, and will always remain, matters of hypothesis and study? When is falsity determined: at the time of the statement, or given how the evidence has developed? What is a "scientific consensus," and how is a court to determine it? When is "contemporary": when the statement was made, or at another point? Whose "standard of care" matters? Does the information have to be *both* contradicted by consensus *and* contrary to the standard of care?

All these ambiguities are heightened by the statute's failure to impose an intent requirement as to "misinformation." *See Vill. of Hoffman Ests.*, 455 U.S. at 499 ("a scienter requirement may mitigate a law's vagueness"). That definition (unlike the definition of "disinformation") does not require any intent at all on the physician or surgeon's part, and it does not require that the "false information" be *knowingly* false. (The Medical Board specifically lobbied against any intent requirement here. *See* Letter, Md. Bd.

of Cal., *supra*, at 2 (intent "is not relevant").) These deficiencies exacerbate the law's vagueness problems.

To put these problems to a concrete example, take a physician who disregarded the consensus guidance not to wear masks and advised his patients that they needed to wear N95 masks to have the best protection from COVID. Was that advice false? When? Was it contradicted by a contemporary scientific consensus? Which consensus? When? Was it contrary to a standard of care? Was it all three? If it *was* all three, but is *now* none, does it matter? The statute answers none of these questions, all of which are crucial to understanding the law.

Yet the law raises still more impossible questions. It defines "disseminate" as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." § 2270(b)(3). But is it limited to a direct conveyance of information? What if the physician gives a public speech that a patient sees on the Internet? And what does "conveyance of information . . . in the form of treatment or advice" mean? As discussed, "conveyance of information" is not a treatment for COVID. The connection between "conveyance of information" and "treatment or advice" is unknowable. Indeed, the Medical Board specifically demanded that the legislature remove any suggestion that patient harm is required to impose discipline, *see* Letter, Md. Bd. of Cal., *supra,* at 1, further detaching the statute from any concrete application.

Finally, consider the Physician Censorship Law's umbrella prohibition, which forbids "disseminat[ing] misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines." § 2270(a). But "misinformation" and "disinformation" are both defined as limited to "false information," *id.* § 2270(b)(2), (4), so the statutory prohibition apparently includes a new category of "misleading information." The statute leaves this category undefined, and it is not susceptible to an apparent interpretation in this context. To return to the example, would a physician's advice to wear an N95 have been misleading? Who can know?

In sum, the Physician Censorship Law's vagueness exacerbates the First Amendment defects with its blanket prohibition on pure speech. Plaintiffs are likely to succeed on the merits.

PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**III.     The other factors support a preliminary injunction.**

Because Plaintiffs have "a colorable First Amendment claim," they have "demonstrated that [they] likely will suffer irreparable harm if the [law] takes effect." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019).

These harms are particularly severe here. A physician or surgeon "will derive no direct benefit from giving" information that they believe to be accurate and in accord with their patient's needs, "other than the satisfaction of doing their jobs well." *Conant*, 309 F.3d at 639 (Kozinski, J., concurring). "At the same time, the burden of the" Physician Censorship Law "falls directly and personally on the doctors: By speaking candidly to their patients . . . , they risk losing their license to write prescriptions, which would prevent them from functioning as doctors. In other words, they may destroy their careers and lose their livelihoods." *Id.* at 639–40. "This disparity between benefits and burdens matters because it makes doctors peculiarly vulnerable to intimidation; with little to gain and much to lose, only the most foolish or committed of doctors will defy the [State's] policy and continue to give patients candid" information. *Id.* at 640.

"Next, the fact that [the Plaintiffs] have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in [their] favor." *Am. Beverage Ass'n*, 916 F.3d at 758 (cleaned up). Finally, courts have "consistently recognized the significant public interest in upholding First Amendment principles." *Id.* "Indeed, it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (cleaned up). And "the harm to patients from being denied the right to receive candid medical advice" is "great[]." *Conant*, 309 F.3d at 643 (Kozinski, J., concurring).

**CONCLUSION**

For these reasons, the Court should enjoin the Defendants from enforcing the Physician Censorship Law. "[S]uppression of speech by the government can make exposure of falsity more difficult, not less so," and society's "right and civic duty to engage in open, dynamic, rational discourse" "are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Alvarez*, 567 U.S. at 728.

Dated: December 8, 2022

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr (*Pro Hac Vice*)
dsuhr@libertyjusticecenter.org
Reilly Stephens (*Pro Hac Vice*)
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60604
Phone: 312-637-2280

Robert H. Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: 951) 600-2733
Facsimile: (951) 600-4996

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2022, I electronically filed the forgoing Motion for Leave with the Clerk of the Court for the United States Court of District Court for the Central District of California using the CM/ECF system.

s/ Reilly Stephens
December 8, 2022

PLAINTIFFS' SECOND MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION