ROB BONTA
Attorney General of California
ANYA M. BINSACCA
EDWARD KIM
Supervising Deputy Attorneys General
CHRISTINA SEIN GOOT
KRISTIN A. LISKA
Deputy Attorneys General
State Bar No. 315994
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3916
  Fax:  (415) 703-5480
  E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARK McDONALD AND JEFF BARKE,**<br><br>Plaintiffs,<br><br>v.<br><br>**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; RANDY W. HAWKINS, in his official capacity as Vice President of the Medical Board of California; LAURIE ROSE LUBIANO, in her official capacity as Secretary of the Medical Board of California; MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, ASIF MAHMOOD, NICOLE A. JEONG, RICHARD E. THORP, VELING TSAI, and ESERICK WATKINS, in their official capacities as members of the Medical Board of California; and ROBERT BONTA, in his official capacity at Attorney General of California,**<br><br>Defendants. | Case No. 8:22-cv-01805-FWS-ADS<br><br>**OPPOSITION TO SECOND MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:          December 16, 2022<br>Time:          10:00 a.m.<br>Courtroom:   10D<br>Judge:         The Honorable Fred W. Slaughter<br>Trial Date:   Not scheduled<br>Action Filed: 10/04/2022 |

# TABLE OF CONTENTS

**Page**

Introduction .................................................................................................... 1

Factual and Procedural Background ................................................................ 2

    I.    Regulation of Medicine in California ................................................ 2

    II.   AB 2098 ............................................................................................ 4

    III.  Plaintiffs' Challenge to AB 2098 and Their Amended Complaint and Motion .................................................................................... 6

Legal Standard ............................................................................................... 7

Argument ....................................................................................................... 7

    I.    Plaintiffs Have Not Shown a Likelihood of Success on the Merits .............................................................................................. 7

        A.   Plaintiffs Lack Standing ......................................................... 7

        B.   Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim ..................................................................................... 11

            1.   AB 2098 Is a Permissible Regulation of Professional Conduct ............................................... 11

            2.   AB 2098 Is a Permissible Regulation of the Care Provided by Medical Professionals .............................. 16

            3.   AB 2098 Withstands Strict Scrutiny ............................ 18

                a.   AB 2098 Furthers a Compelling Government Interest ...................................................... 19

                b.   AB 2098 Is Narrowly Tailored to Serve Those Compelling Interests ............................... 21

        C.   Plaintiffs Are Unlikely to Succeed on Their Void for Vagueness Claim ................................................................ 24

    II.   The Remaining Factors Weigh Against Injunctive Relief ................. 28

Conclusion .................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Arce v. Douglas*
    793 F.3d 968 (9th Cir. 2015) ................................................................ 24

*Arnett v. Dal Cielo*
    14 Cal. 4th 4 (1996) .......................................................................... 2

*Avivi v. Centro Medico Urgente Med. Ctr.*
    159 Cal. App. 4th 463 (2008) .............................................................. 26

*Brown v. Colm*
    11 Cal. 3d, 639 (1974) ...................................................................... 4

*Collins v. Texas*
    223 U.S. 288 (1912) ......................................................................... 17

*Conant v. Walters*
    309 F.3d 629 (9th Cir. 2002) ................................................... 13, 14, 15

*Dent v. West Virginia*
    129 U.S. 114 (1889) ......................................................................... 17

*Doe v. Harris*
    772 F.3d 563 (9th Cir. 2014) .............................................................. 25

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014) ............................................................ 28

*Eastman v. State*
    10 N.E. 97 (Ind. 1887) ..................................................................... 17

*Ettinger v. Board of Med. Quality Assurance*
    135 Cal. App. 3d 853 (1982) .............................................................. 27

*Flowers v. Torrance Mem. Hosp. Med. Ctr.*
    8 Cal. 4th 992 (1994) ................................................................... 3, 26

*Frisby v. Schultz*
    487 U.S. 474 (1988) ......................................................................... 21

ii

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*Fuller v. Bd. of Med. Exam'rs*
  14 Cal. App. 2d 734 (1936) ................................................................... 2

5

6

*Garcia v. Google. Inc.*
  786 F.3d 733 (9th Cir. 2015) (en banc) ............................................... 7

7

8

*Goldfarb v. Virginia State Bar*
  421 U.S. 773 (1975) ............................................................................ 20

9

10

*Gore v. Board of Med. Quality Assurance*
  110 Cal. App. 3d 184 (1980) ................................................................ 3

11

*Hill v. Colorado*
  530 U.S. 703 (2000) ..................................................................... 27, 28

12

13

*Kearl v. Board of Med. Quality Assurance*
  189 Cal. App. 3d 1040 (1986) .............................................................. 3

14

15

*Kenneally v. Medical Board*
  27 Cal. App. 4th 489 (1994) ............................................................... 17

16

17

*Klein v. San Clemente*
  584 F.3d 1196 (9th Cir. 2009) .............................................................. 7

18

19

*Kolender v. Lawson*
  461 U.S. 352 (1983) ............................................................................ 24

20

21

*Laird v. Tatum*
  408 U.S. 1 (1972) ............................................................................... 10

22

*Lambert v. Yellowley*
  272 U.S. 581 (1926) ............................................................................ 17

23

24

*Lewis v. Superior Court*
  3 Cal. 5th 561 (2017) .......................................................................... 19

25

26

*Lopez v. Candaele*
  630 F.3d 775 (9th Cir. 2010) ................................................................ 9

27

28

*Maryland v. King*
  567 U.S. 1301 (2013) .......................................................................... 28

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Mazurek v. Armstrong*
520 U.S. 968 (1997) ............................................................... 7

*Nat'l Institute of Family & Life Advocates v. Becerra*
138 S. Ct. 2361 (2018) ....................................................... 11, 15, 16

*Olsen v. Idaho State Bd. of Med.*
363 F.3d 916 (9th Cir. 2004) .............................................. 10

*Pickup v. Brown*
740 F.3d 1208 (9th Cir. 2014) ............................................ *passim*

*Recht v. Morrisey*
32 F.4th 398 (4th Cir. 2022) ............................................... 19

*Reed v. Town of Gilbert*
576 U.S. 155 (2015) ........................................................... 19

*Roman Catholic Diocese of Brooklyn v. Cuomo*
141 S. Ct. 63 (2020) ........................................................... 20

*State ex rel. Powell v. State Med. Examining Bd.*
20 N.W. 238 (Minn. 1884) .................................................. 17

*Susan B. Anthony List v. Driehaus*
573 U.S. 149 (2014) ........................................................... 8

*Tingley v. Ferguson*
47 F.4th 1044 (9th Cir. 2022) ............................................. *passim*

*Town of Chester v. Laroe Estates, Inc.*
137 S. Ct. 1645 (2017) ....................................................... 8

*Trowbridge v. United States*
703 F. Supp. 2d 1129 (D. Idaho 2010) ................................ 26

*Truman v. Thomas*
27 Cal. 3d 285 (1980) ...................................................... 17, 19

*Tunkle v. Regents of the Univ. of California*
60 Cal. 2d 92 (1963) .......................................................... 4

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

*Valle del Sol, Inc. v. Whiting*
    732 F.3d 1006 (9th Cir. 2013) .......................................................... 24

*Watson v. Maryland*
    218 U.S. 173 (1910) ......................................................................... 20

*Williams-Yulee v. Florida Bar*
    575 U.S. 433 (2015) ......................................................................... 23

*Winter v. Natural Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ........................................................................ 7, 28

*Wollschlaeger v. Governor of Florida*
    848 F.3d 1293 (11th Cir. 2017) ........................................................ 14

STATUTES

Ala. Code § 34-24-360 ............................................................................ 12

California Business and Professions Code
    § 741(a)(1) ...................................................................................... 12
    § 741(a)(2) ...................................................................................... 12
    § 2001.1 ............................................................................................ 3
    § 2004 ............................................................................................... 2
    § 2220(a) ........................................................................................... 2
    § 2234 ............................................................................................... 3
    § 2234(b) ................................................................................... 3, 29
    § 2234(c) ................................................................................... 3, 29
    § 2234(d) .................................................................................. 3, 29
    § 2234(e) ........................................................................................... 3
    § 2234.1 ..................................................................................... 9, 12
    § 2236 ............................................................................................... 3
    § 2241.5(c)(5) ................................................................................. 12
    § 2241.5(c)(6) ................................................................................. 12
    § 2249(a) ........................................................................................... 3
    § 2250 ............................................................................................... 3
    § 2266 ............................................................................................... 3
    § 2836.1 .......................................................................................... 23
    § 3502(a)(1) .................................................................................... 23

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

1876 Cal. Stat., ch. 518

4
    § 1 ............................................................................................... 2
    § 10 ............................................................................................. 2

5

6

2022 Cal. Stat., ch. 938 (Assembly Bill 2098) ............................ *passim*

7
    § 1(a) .......................................................................................... 4
    § 1(b) .......................................................................................... 4

8
    § 1(d) ..................................................................................... 4, 20
    § 1(e) ..................................................................................... 5, 20

9
    § 1(f) .......................................................................................... 5

10
    § 2(a) .......................................................................... 5, 12, 15 25
    § 2(b)(2) ............................................................................... 6, 15

11
    § 2(b)(3) ........................................................................ 6, 12, 25

12
    § 2(b)(4) ..................................................................... 6, 8, 12, 25

13

Nev. Rev. Stat. § 630.304 ........................................................... 12

14

Or. Rev. Stat. § 677.190 .............................................................. 12

15

**CONSTITUTIONAL PROVISIONS**

16

United States Constitution

17
    Article III .................................................................................. 8

18
    First Amendment ............................................................... *passim*
    Fourteenth Amendment ...................................................... *passim*

19

**OTHER AUTHORITIES**

20

CACI 501 .................................................................................... 25

21

22

Robert Post, "Informed Consent to Abortion: A First Amendment
    Analysis of Compelled Speech Cases," 2007 U. Ill. L. Rev. 939,

23
    950-951 (2007) ................................................................. 12, 15

24

25

26

27

28

vi

**INTRODUCTION**

Assembly Bill (AB) 2098 is a limited but important statute.  The California Legislature enacted AB 2098 to address concerns about the spread of disinformation and misinformation about COVID-19 and COVID-19 vaccines by doctors, which has placed lives at serious risk.  AB 2098 applies *only* to medical treatment or advice within the doctor-patient relationship.  It leaves untouched any other speech by doctors, including private conversations with family or non-patient friends, social media posts, and publications.  And it does not impact any patient advice or treatment that contradicts mainstream opinion but still falls within the range of treatment that complies with the requisite standard of care.  The statute therefore fits well within the long history of regulating the practice of medicine while still leaving room for doctors to exercise their medical judgment and for medical research and development.

In October 2022, plaintiffs filed suit contending that AB 2098 violates their First Amendment rights and is unduly vague under the Fourteenth Amendment.  This Court properly denied their initial motion for a preliminary injunction and dismissed the complaint for lack of standing.  Subsequently, plaintiffs filed an amended complaint and second motion for a preliminary injunction predicated on the same alleged violations.  Despite their new allegations and revised declarations, plaintiffs still fail to meet their burden for injunctive relief.  First, plaintiffs have not shown a likelihood of succeeding in their suit.  They continue to lack standing because their amended complaint and declarations still fail to identify any particular advice, care, or treatment they want to provide to their patients that would be affected by AB 2098.  In any event, AB 2098 is permissible under the First Amendment as a regulation of physician-provided care, and is not impermissibly vague.  Nor have plaintiffs demonstrated any irreparable harm that would result from allowing AB 2098 to go into effect or that the equities and public interest

favor an injunction, since AB 2098 only protects patients from receiving inaccurate medical advice and substandard care.  This Court should again deny the motion.

<div align="center">

**FACTUAL AND PROCEDURAL BACKGROUND**

</div>

**I.    REGULATION OF MEDICINE IN CALIFORNIA**

California has long regulated the practice of medicine for the protection of the public.  *See, e.g.*, *Arnett v. Dal Cielo*, 14 Cal. 4th 4, 7 (1996).  Since at least 1876, California has regulated the practice of medicine by imposing licensing and training requirements on medical practitioners.  *See* 1876 Cal. Stats., ch. 518, p. 792, § 1.[1] The 1876 Act also permitted licenses to be refused or revoked for unprofessional conduct.  *Id.*, § 10.  Thus, "[s]ince the earliest days of regulation," the State has sought to "protect the public against incompetent, impaired, or negligent physicians, and, to that end," regulators have "been vested with the power to revoke medical licenses on grounds of unprofessional conduct."  *Arnett*, 14 Cal. 4th at 7. And since the earliest days, such unprofessional conduct has encompassed, in some circumstances, a practitioner's speech to patients.  *E.g.*, *Fuller v. Bd. of Med. Exam'rs*, 14 Cal. App. 2d 734, 740-41 (1936), *abrogated on other grounds* (upholding sanctions on physician who made false claims about his ability to treat hernias).

Today, the practice of medicine is regulated primarily by the Medical Board of California (Board), which regulates physicians and surgeons by issuing or denying licenses, imposing discipline for unprofessional conduct, and enforcing the Medical Practice Act (MPA).  Cal. Bus. & Prof. Code § 2004; *see also* Prasifka Decl. ¶ 2. The Board is required to investigate all complaints of professional misconduct "from the public, other licensees, from health care facilities or from the board [itself]," including anonymous complaints.  Cal. Bus. & Prof. Code § 2220(a). The Board must maintain confidentiality during its investigations.  *See* Prasifka Decl.

---

[1] The 1876 Act is included as Exhibit A to Defendants' Second Motion for Judicial Notice.

¶ 4.  In carrying out its duties, the Board's highest priority is protection of the public.  Cal. Bus. & Prof. Code § 2001.1.

California law provides that the Board "shall take action against any licensee who is charged with unprofessional conduct."  Cal. Bus. & Prof. Code § 2234. Section 2234 provides an illustrative list of examples of unprofessional conduct, including: "[t]he commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician and surgeon" and incompetence.  *Id*. § 2234(d), (e).  In addition to section 2234, other sections of law provide additional specific examples of unprofessional conduct, such as: failing to maintain adequate and accurate records, *id*. § 2266; failing to obtain proper informed consent prior to a sterilization procedure, *id*. § 2250; failing to provide a standardized summary describing in layperson's terms symptoms and methods of diagnoses for gynecological cancer, *id*. § 2249(a); and conviction of a crime substantially related to the practice of medicine, *id*. § 2236.

California law also considers "gross negligence," "repeated negligent acts," and "incompetence" to be unprofessional conduct.  Cal. Bus. & Prof. Code § 2234(b), (c), (d).  "Gross negligence" is defined as "the want of even scant care" or "an extreme departure from the standard of care," *Gore v. Board of Med. Quality Assurance*, 110 Cal. App. 3d 184, 196 (1980), while negligence is a "simple departure" from the current standard of care, Nuovo Decl. ¶ 4.  The "standard of care" for medical practitioners is that reasonable degree of skill, knowledge, and care in diagnosis and treatment ordinarily possessed and exercised by practitioners under similar circumstances at or about the time in question.  *See, e.g.*, *Flowers v. Torrance Mem. Hosp. Med. Ctr.*, 8 Cal. 4th 992, 997-98 (1994).  Typically, the standard of care is established through expert testimony.  *See id.* at 1001. Incompetence is defined as "an absence of qualification, ability or fitness to perform a prescribed duty or function.*" Kearl v. Board of Med. Quality Assurance*, 189 Cal. App. 3d 1040, 1054 (1986) (citation omitted).

3

The standard of care is determined by the medical standard prevailing in the community at the time the medical treatment is rendered. *See Brown v. Colm*, 11 Cal. 3d, 639, 644-47 (1974). Established law has long rejected the argument that physicians can be relieved of their obligation to comply with the current standard of care because the standard is evolving. *See Tunkle v. Regents of the Univ. of California*, 60 Cal. 2d 92, 104 (1963) (holding a patient's waiver of liability in exchange for admission to a charitable research hospital void as a matter of public policy despite hospital's claim that the standard of care in a research facility will evolve quickly). Rather, the medical community must be trusted "to treat our ailments and update their recommendations on the governing standard of care" as knowledge evolves. *Tingley v. Ferguson*, 47 F.4th 1044, 1081 (9th Cir. 2022).

## II.   AB 2098

AB 2098 was enacted against this long history of regulation and the more recent backdrop of the COVID-19 pandemic. As the Legislature found, "[t]he global spread of . . . COVID-19 ha[d] claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians," at the time of AB 2098's enactment. 2022 Cal. Stat., ch. 938 ("AB 2098"), § 1(a). Thankfully, COVID-19 vaccines have played a critical role in helping to stem the spread of the disease and prevent its severity: the Legislature cited data from the Federal Centers for Disease Control and Prevention showing that "unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated." AB 2098, § 1(b); *see also* Defendants' Second Request for Judicial Notice ("RJN"), Ex. B, p. 6. Yet, as the Legislature recounted, as of July 21, 2022, a quarter of those over age five were not vaccinated. RJN, Ex. E, p. 3. The Legislature cited research estimating that "2 million to 12 million people in the US were unvaccinated against COVID-19 because of misinformation or disinformation." RJN, Ex. E, p. 3; *see also* AB 2098, § 1(d); RJN, Ex. D, p. 4. Such misinformation includes myths, for instance, that the vaccines contain

4

1    microchips, would make a person magnetic, or would change someone's DNA.

2    RJN, Ex. D, p. 4.

3        The Legislature found it particularly concerning that some of this medically

4    inaccurate information came from physicians themselves.  The legislative findings

5    for AB 2098 note that "[m]ajor news outlets have reported that some of the most

6    dangerous propagators of inaccurate information regarding the COVID-19 vaccines

7    are licensed health care professionals."  AB 2098, § 1(e); *see also* RJN, Ex. D, pp.

8    4-5; Ex. B, p. 7.  This behavior, the Legislature noted, would run contrary to a

9    doctor's "duty to provide their patients with accurate, science-based information."

10   AB 2098, § 1(f).  In addition, as the Legislature explained, "[p]hysicians and

11   healthcare professionals play a critical role in keeping communities healthy," and

12   "[a] physician's recommendation and information sharing will educate and inform

13   decisions made by their patients."  RJN, Ex. D, p. 5.  For this reason, whether a

14   doctor provides accurate information "will ultimately impact patient's health."  *Id*.

15       As the Legislature noted, doctors already face sanctions for repeated instances

16   of negligence or for even a single instance of gross negligence.  *E.g.*, RJN, Ex. D, p.

17   6.  Some instances of spreading misinformation about COVID-19 would already

18   arguably fall within these existing provisions, the Legislature explained.  RJN, Ex.

19   B, p. 8.  The Legislature enacted AB 2098, however, to "confirm that in California,

20   physicians who disseminate COVID-19 misinformation or disinformation" to their

21   patients would be subject to formal discipline.  *Id*.

22       AB 2098 provides that "[i]t shall constitute unprofessional conduct for a

23   physician and surgeon to disseminate misinformation or disinformation related to

24   COVID-19, including false or misleading information regarding the nature and

25   risks of the virus, its prevention and treatment; and the development, safety, and

26   effectiveness of COVID-19 vaccines."  AB 2098, § 2(a) (to be codified at Cal. Bus.

27   & Prof. Code § 2270).  It defines "disseminate" as the "conveyance of information

28   from the licensee to a patient under the licensee's care in the form of treatment or

5

advice." AB 2098, § 2(b)(3).  "Misinformation" is defined as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care." AB 2098, § 2(b)(4).  And "disinformation" is defined as "misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead." AB 2098, § 2(b)(2).

### III.  PLAINTIFFS' CHALLENGE TO AB 2098 AND THEIR AMENDED COMPLAINT AND MOTION

Plaintiffs Jeff Barke and Mark McDonald are doctors licensed by the Board. Barke Decl. ¶ 2; McDonald Decl. ¶ 2.  Dr. Barke states that he operates a concierge medicine practice in Newport Beach, and Dr. McDonald states that he has a psychiatry practice in the Los Angeles area.  Barke Decl. ¶ 2; McDonald Decl. ¶ 2. Both plaintiffs allege that they have been "outspoken" about the "flaws [they] see in the public health response to the COVID-19 pandemic."  Barke Decl. ¶ 22; McDonald Decl. ¶ 16.  For instance, they each objected to now-rescinded policies requiring children to wear masks in schools or adults to generally wear masks. Barke Decl. ¶ 23; McDonald Decl. ¶ 22.  And each has "advocated publicly about these and other objections to federal and state COVID-19 policies, including on social media, in various media interviews, and in [their] own published writing." Barke Decl. ¶ 13, McDonald Decl. ¶ 13.

On October 4, 2022, plaintiffs filed suit against Attorney General Rob Bonta and the members of the Medical Board in their official capacities.  Compl. ¶¶ 8-9. They contend that AB 2098 violates their First Amendment rights because it "chills the protected speech of medical professionals."  *Id.* ¶ 1; *see also id.* ¶¶ 92-104. They also contend that AB 2098 is void for vagueness under the Fourteenth Amendment.  *Id.* ¶¶ 105-112.  Shortly afterwards, plaintiffs filed a motion for a preliminary injunction, seeking to enjoin AB 2098 in its entirety before the law goes into effect on January 1, 2023.  The Court denied the motion on November 21, 2022, following a hearing.  *See* ECF No. 66.  In its ruling, the Court concluded that

plaintiffs had failed to demonstrate standing to pursue their claims because they had not alleged a concrete plan to violate AB 2098.  In light of the lack of standing, the Court dismissed the action with leave to amend.  Plaintiffs subsequently filed an amended complaint on December 4, 2022, and the instant second motion for a preliminary injunction the next day.  Their new complaint and motion now allege that plaintiffs have treated patients with COVID-19, including providing advice about issues such as masking or prescribing the medications ivermectin and hydroxochloroquine.  Barke Decl. ¶¶ 10-11, 13, 15-16; McDonald Decl. ¶¶ 9-11.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Id.* at 20.  If a movant fails to establish a likelihood of success, the court generally need not consider the other factors.  *Garcia v. Google. Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).  Plaintiffs, as the movants here, bear the burden to prove each of these elements.  *Klein v. San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).  They must do so by a "clear showing." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (citation and emphasis omitted)).

## ARGUMENT

### I.   PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

#### A.   Plaintiffs Lack Standing

Notwithstanding their new allegations, plaintiffs still lack standing.  In order

for this Court to have jurisdiction to analyze the merits of this case, plaintiffs must demonstrate standing under Article III of the Constitution. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). Standing requires: (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Id.* Plaintiffs bear the burden of establishing all three elements. *Id.*

To demonstrate injury, a plaintiff must make a clear showing of injury-in-fact that is actual and concrete, not conjectural or hypothetical. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). For pre-enforcement review, the threat of enforcement must be sufficiently imminent to satisfy this requirement. *Id*. at 159. Neither the mere existence of a proscriptive statute, nor a generalized threat of prosecution suffices. *Tingley*, 47 F.4th at 1067. When determining whether a plaintiff has sufficiently alleged a realistic threat of imminent prosecution, the Ninth Circuit looks to three factors: 1) "whether the plaintiff has articulated a 'concrete plan' to violate the law in question," 2) "whether the enforcing authorities have 'communicated a specific warning or threat to initiate proceedings,'" and 3) "whether there is a 'history of past prosecution or enforcement under the challenged statute.'" *Id.* (citation omitted).

Plaintiffs have failed to establish standing under these factors. First and foremost, plaintiffs continue to fail to allege a concrete plan to violate AB 2098. While both plaintiffs now indicate they have provided advice and treatment for patients with COVID-19 or to patients concerning COVID-19, they contend their care has always been in compliance with the standard of care. Barke Decl. ¶ 18; McDonald Decl. ¶ 12. But advice or treatment that is in accordance with the standard of care does not violate AB 2098. That statute solely prescribes advice or treatment to a patient that is false, contradicted by contemporary scientific consensus, and contrary to the standard of care. AB 2098, § 2(b)(4). Plaintiffs do not allege they have offered or intend to offer treatment or advice below the

1    standard of care.  Nor do they allege that they have concerns that what treatment or

2    advice they have previously offered or intend to offer in the future might not be

3    within the standard of care or explain why they would have such concerns.  After

4    all, simply because a doctor's advice does not align with the mainstream opinion

5    does not mean it automatically falls outside the standard of care.  Indeed, state law

6    recognizes that there is a place for doctors to provide alternative medicine or novel

7    treatments in a manner that accords with the standard of care.  *See, e.g.*, Cal. Bus. &

8    Prof. Code § 2234.1 (permitting doctor's use of alternative or complimentary

9    medicine under certain circumstances); Prasifka Decl. ¶ 12 (describing Right to Try

10   Law, which permits doctors to use non-standard treatments in appropriate

11   circumstances).  Nor does the fact that some of plaintiffs' past advice fell outside

12   the mainstream mean that their future advice will as well.  Plaintiffs still fail to

13   identify particular advice, treatment, or care that they wish to provide in the future

14   that might fall within the scope of AB 2098.  They therefore still fail to allege a

15   concrete plan to engage in conduct within the statute's scope.

16        As this Court recognized in its prior ruling, the other two factors similarly

17   weigh against standing.  As to the second factor—whether there is a threat of

18   enforcement—the Ninth Circuit has recognized that there is little risk of

19   enforcement where, as here, the challenged law "by its terms is not applicable to the

20   plaintiffs," or "the enforcing authority expressly interpreted the challenged law as

21   not applying to the plaintiffs' activities.  *Lopez v. Candaele*, 630 F.3d 775, 778 (9th

22   Cir. 2010).  Nor have plaintiffs pointed to any indication that the *Board* or other

23   relevant *government actors* intend to enforce AB 2098 against them.

24        Finally, the third factor—the history of enforcement—admittedly "carries

25   'little weight' when the challenged law is 'relatively new' and the record contains

26   little information as to its enforcement."  *Tingley*, 47 F.4th at 1069.  That said, the

27   "sparse enforcement history" here still "weighs against standing."  *Id.*  Particularly

28   given the lack of allegations that plaintiffs intend to engage in conduct within the

1    scope of AB 2098, they have failed to demonstrate an actual injury sufficient for

2    standing.

3         Plaintiffs' allegations are further insufficient to establish standing because

4    they have not shown that they wish to engage in conduct previously permissible,

5    but now impermissible under AB 2098.  Without AB 2098, it was already

6    unprofessional conduct for a doctor to engage in an act of gross negligence,

7    multiple acts of negligence, or incompetence.  *See supra* at p. 3.  AB 2098's sole

8    change is to make a single incident of ordinary negligence (i.e., treatment below the

9    standard of care) unprofessional conduct when such conduct falls within the scope

10   of AB 2098 (i.e., via a doctor disseminating disinformation or misinformation about

11   COVID-19 to a patient).  Plaintiffs do not maintain, however, that they intend to

12   give a single piece of advice contrary to the standard of care to a single patient—

13   and their declarations are silent on precisely what advice they intend to provide to

14   their patients—such that previously-permitted conduct would now be impermissible

15   under AB 2098.  Plaintiffs therefore have not shown any harm to them *from AB*

16   *2098*.  In addition to undermining any showing of an actual injury, this further

17   undermines a showing of traceability and redressability.

18        Finally, plaintiffs' bald assertion of a chilling effect caused by AB 2098

19   cannot fill the gap in showing an actual or imminent injury.  *See, e.g.*, *Laird v.*

20   *Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an

21   adequate substitute for a claim of specific present objective harm or a threat of

22   specific future harm[.]") (citation omitted).  In sum, plaintiffs have no likelihood of

23   succeeding because they lack standing.[2]

24

25

26        ───────────────
          [2] Even if Plaintiffs were to allege that the Board filed a disciplinary action
27   against them for violating AB 2098, this would still not establish a cognizable
     injury because the Medical Board Defendants are entitled to absolute immunity for
     their quasi-judicial acts relating to a licensee's disciplinary proceedings. *Olsen v.*
28   *Idaho State Bd. of Med.*, 363 F.3d 916, 922-26 (9th Cir. 2004).

**B.    Plaintiffs Are Unlikely to Succeed on Their Free Speech Claim**

Plaintiffs argue that AB 2098 is unconstitutional because it is a viewpoint-based restriction on speech that does not survive strict scrutiny.  Plaintiffs' Second Mot. for Prelim. Inj. ("PI Mot.") at 15, 20.  However, states may regulate the conduct and care provided by medical professionals—even if that regulation involves restrictions on speech—without running afoul of the First Amendment. AB 2098 is such a permissible regulation.  First, AB 2098 is constitutional as a regulation of professional conduct.  Second, even if AB 2098 were considered a regulation of speech rather than professional conduct, it is constitutional as a regulation of the medical care provided by doctors.  Finally, should strict scrutiny apply, AB 2098 would be constitutional even under that standard.

**1.    AB 2098 Is a Permissible Regulation of Professional Conduct**

Although speech by professionals is protected by the First Amendment, states may still "regulate professional conduct, even though that conduct incidentally involves speech." *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018).  Regulations of medical practitioners' professional conduct that also touch upon their speech are widespread and longstanding.  They include, for instance, "state regulation of malpractice" and informed consent requirements. *Tingley*, 47 F.4th at 1074.  "[D]octors are routinely held liable for giving negligent advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care." *Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2014), *abrogated on other grounds by NIFLA*, 128 S. Ct. 2361.  For instance, "[d]octors commit malpractice for failing to inform patients in a timely way of an accurate diagnosis, for failing to give patients proper instructions, for failing to ask patients necessary questions, or for failing to refer a patient to an appropriate specialist."  Robert Post, "Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician

Speech," 2007 U. Ill. L. Rev. 939, 950-951 (2007) (compiling cases).  A doctor similarly "may not counsel a patient to rely on quack medicine.  The First Amendment would not prohibit the doctor's loss of license for doing so." *Pickup*, 740 F.3d at 1228 (citation omitted).  California is no different from other states in generally regulating the professional conduct of medical practitioners in ways that implicate their speech but govern the medical care they provide their patients.  *See, e.g.*, Cal. Bus. & Prof. Code § 741(a)(1), (2) (requiring disclosures when prescribing certain high doses of opioids); *id.* § 2234.1 (requiring disclosures for complementary or alternative medicine); *id.* § 2241.5(c)(5), (6) (requiring providers prescribing opiates to create certain records); *see also supra* at pp. 3-4.[3]

AB 2098 fits into this longstanding tradition.  It makes it unprofessional conduct for a physician to "disseminate misinformation or disinformation related to COVID-19." AB 2098, § 2(a).  But this provision does not address physician speech in the abstract; the definitions of "disseminate" and "misinformation" make clear that the prohibition is directed at the *care* that a physician provides her patient.  The statute defines "disseminate" as "the conveyance of information from [a practitioner] *to a patient under the [practitioner's] care* in the *form of treatment or advice*." *Id.* § 2(b)(3) (emphasis added).  It defines "misinformation" as "false information that is contradicted by contemporary scientific consensus *contrary to the standard of care*." *Id.* § 2(b)(4) (emphasis added).  AB 2098 thus circumscribes the *care* a physician recommends or provides *to their patients* for a *specific health issue*.  By regulating the care that physicians provide, AB 2098 is a regulation of professional conduct and the speech incident to such conduct.

---

[3] *See, e.g.*, Ala. Code § 34-24-360 (doctor may be sanctioned for untruthful statements concerning qualifications or effect of proposed treatment); Nev. Rev. Stat. § 630.304 (doctor may be sanctioned for discouraging second opinion); Or. Rev. Stat. § 677.190 (doctor may be sanctioned for representing an incurable disease can be cured or for making false or misleading statements about the efficacy of a drug or treatment).

12

AB 2098 is thus analogous to statutes upheld by the Ninth Circuit in *Tingley*
and *Pickup* as permissible regulations of professional conduct even though the
statutes also impacted physician speech.  In those cases, the Ninth Circuit addressed
the validity of state statutes prohibiting conversion therapy—that is, efforts to
change a person's sexual orientation—performed on minors.  *See Tingley*, 47 F.4th
at 1071-72.  Both statutes regulated professional conduct, the Ninth Circuit
concluded, because they regulated the kind of care a practitioner could provide their
patients.  The fact that such care was "performed through speech alone" made no
difference.  *Pickup*, 740 F.3d at 1230; *see also Tingley*, 47 F.4th at 1077-79.

AB 2098 similarly regulates the kind of care that a physician can provide.  As
under the statutes in *Tingley* and *Pickup*, providers remain free under AB 2098 to
generally discuss different treatment options for COVID-19, weigh the pros and
cons of a patient obtaining a vaccine for COVID-19, provide patients with
information that will ensure they receive informed consent, or advise a specific
treatment for COVID-19.  They also remain free to engage in public debate, share
opinions with family members, or post online on social media; they face no
restrictions under AB 2098 on their ability to express their views on COVID-19
outside the context of treating a patient.  All they must do is act competently within
the standards of their profession when they *treat* a patient.  Just as with the statutes
banning conversion therapy, this is a regulation of the care a physician gives and
thus a regulation of professional conduct.

The Ninth Circuit decision in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002),
is consistent with this view of physician conduct.  Plaintiffs claim that *Conant*
uniformly held that states cannot regulate advice from doctors because it is "pure
speech."  PI Mot. at 19.  This is an overreading of the decision in *Conant*.
Whatever that case says about whether physician speech is generally protectable, it
does not hold that states cannot permissibly regulate the *spoken components* of
professional *conduct*.  The policy that the Ninth Circuit disproved of in *Conant*

1    involved the federal government investigating a physician "solely on the basis of a

2    recommendation of marijuana within a bona fide doctor-patient relationship."

3    *Conant*, 309 F.3d at 636.  The problem with this policy was that it sanctioned

4    "doctors who recommend medical marijuana to patients after complying with

5    accepted medical procedures" and who were "acting in their professional role in

6    conformity with the standards of the state where they are licensed to practice

7    medicine."  *Id.* at 647 (Kozinski, J., concurring).  This was distinct from the

8    situation where the state sanctioned a doctor who "recommend[ed] marijuana

9    without examining the patient, without conducting tests, without considering the

10   patient's medical history or without otherwise following standard medical

11   procedures."  *Id*; *cf. Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1317

12   (11th Cir. 2017) (striking down statute that prohibited doctors from asking certain

13   questions even when consistent with the standard of care and when there was no

14   evidence the prohibited questions were "medically inappropriate, ethically

15   problematic, or potentially ineffective").

16        Thus, AB 2098 is clearly distinguishable from the policy at issue in *Conant.*

17   Unlike the challenged policy in *Conant*, AB 2098 does not preclude a physician

18   from asking questions to gather information about potential COVID-19 treatment or

19   advice, from discussing the pros and cons of any potential treatment, from

20   recommending a particular treatment, or from providing specific advice—when

21   doing so is consistent with the standard of care.  It thus minimizes the intrusion into

22   the doctor-patient relationship by solely restricting treatment and advice that falls

23   below that standard.  And by generally preserving speech on COVID-19 related

24   subjects when the advice or treatment given is *not* below the standard of care, AB

25   2098 targets professional *conduct*.  It is analogous not to the governmental

26

27

28

14

1  regulation disapproved of in *Conant* but rather to those held permissible in *Pickup*

2  and *Tingley*.[4]

3      Plaintiffs argue, however, that AB 2098 cannot be a conduct regulation

4  because it "regulates only 'the conveyance of information' untethered from any

5  treatment or care."  PI Mot. at 15.  But as explained above, AB 2098 covers the

6  "conveyance of information" only 1) "to a patient under the licensee's care" and 2)

7  "in the form of treatment or advice."  AB 2098, § 2(a), (b)(2).  It does not

8  encompass a doctor saying in casual conversation not material to providing care

9  that the doctor did or did not choose to receive the COVID-19 vaccine (*cf.* PI Mot.

10  at 19), does or does not wear a mask in public, or agrees or disagrees with a

11  particular state policy regarding COVID-19.  In none of these situations is the

12  doctor providing care to a patient.  Plaintiffs thus err in contending that AB 2098

13  has no nexus to treatment; rather, its reach is expressly tied to doctor's provision of

14  care to a patient.

15      More broadly, plaintiffs' attempt to erect an unbreachable barrier between

16  "conveying information" and "treatment" is simply untenable.  "Most medical

17  treatments require speech."  *Tingley*, 47 F.4th at 1073.  In many situations, the

18  regulation of a doctor's speech "is theoretically and practically inseparable from the

19  regulation of medicine."  Post, *supra*, at 751.  That is the case, for instance, when

20  an endocrinologist advises a diabetic about which foods to eat, a neurologist

21  advises a migraine sufferer about potential migraine triggers to avoid, or a general

22  practitioner advises a patient with back pain to perform particular stretches.  In

23  these situations, as in innumerable others, the care and treatment a physician

24  provides comes in the form of speech.  And when the two are intertwined,

25

26      [4] Nor is AB 2098 invalid under *NIFLA*, as plaintiffs contend.  PI Mot. at 23.

27  In *NIFLA*, the Supreme Court found it significant that the challenged statute
required clinics to post a notice regardless of whether a clinic provided any care, let

28  alone the care referenced in the notice, to a patient.  138 S. Ct. at 2373.  In stark
contrast, AB 2098 *is* tied to the provision of medical care.

regulating the provision of care—and thus physician conduct—involves regulating the speech of practitioners.

Under *Tingley* and *Pickup*, the applicable standard for reviewing the constitutionality of AB 2098's regulation of conduct is rational basis. *Tingley*, 47 F.4th at 1077. That standard requires only that AB 2098 "bear[] a rational relationship to a legitimate state interest." *Pickup*, 740 F.3d at 1231. AB 2098 readily meets this standard. As discussed in more detail below, *see infra* at pp. 19-20, AB 2098 furthers the government's legitimate interests in public health and patient safety. The Legislature was concerned that physicians were spreading misinformation and disinformation to patients that could dissuade patients from receiving critical or necessary care to prevent COVID-19 (such as vaccinations) or to treat COVID-19. *E.g.*, RJN Ex. C, p. 3; Ex. D, pp. 4-5. Protecting public health and patient safety certainly is a legitimate state interest; indeed, it is a compelling interest. *See infra* at pp. 19-20. Recommendations that fall below the standard of care can harm patients individually and public health generally. Prohibiting doctors from providing inaccurate information in a way that renders their care below the requisite standard of care furthers the State's legitimate interest in patient safety and public health. AB 2098 is therefore constitutional as a reasonable regulation of professional conduct.

### 2. AB 2098 Is a Permissible Regulation of the Care Provided by Medical Professionals

Even if the Court were to conclude that AB 2098 is not a regulation of professional conduct, plaintiffs still do not show a likelihood of success on their First Amendment claim. "The Supreme Court has recognized that laws regulating categories of speech belonging to a 'long . . . tradition' of restriction are subject to lesser scrutiny." *Tingley*, 47 F.4th at 1079 (quoting *NIFLA*, 138 S. Ct. at 2372). And there is indeed a long tradition of "regulation governing the practice of those who provide health care within state borders." *Id.* at 1080. Since the birth of

modern medicine, states have imposed restrictions on who can practice medicine and on the care medical practitioners provide.  *See id.* at 1080-81 (discussing, *inter alia*, *Collins v. Texas*, 223 U.S. 288 (1912), and *Lambert v. Yellowley*, 272 U.S. 581 (1926)); *see also, e.g.*, *State ex rel. Powell v. State Med. Examining Bd.*, 20 N.W. 238, 240 (Minn. 1884) (statutes imposing requirements on the right to practice medicine "have been very common").  This has included restrictions on the provision of care that involves the speech of practitioners: "[C]enturies-old medical malpractice laws," for instance, "restrict treatment *and the speech* of health care providers."  *Tingley*, 47 F.4th at 1082 (emphasis added); *see also, e.g.*, *Eastman v. State*, 10 N.E. 97, 97 (Ind. 1887) ("For centuries the law has required physicians to possess and exercise skill and learning, for it has mulcted in damages those who pretend to be physicians and surgeons, but have neither learning nor skill.").

This history of regulation arises out of important concerns.  "The health professions differ from other licensed professions because they *treat* other humans, and their treatment can result in physical and psychological harm to their patients."  *Tingley*, 47 F.4th at 1083.  "The work of physicians has life and death consequences for their patients."  *Kennealy v. Medical Board*, 27 Cal. App. 4th 489, 500 (1994).  While the doctor-patient relationship requires candor, such candor must be counterbalanced by a patient's ability to trust that their doctor is providing them with *competent and adequate care*.  After all, "the knowledge of patient and physician are not in parity," and a patient "has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process."  *Truman v. Thomas*, 27 Cal. 3d 285, 291 (1980) (citation omitted).  While "[e]very one may have occasion to consult" a doctor, "comparatively few can judge of the qualifications of learning and skill which he possesses."  *Dent v. West Virginia*, 129 U.S. 114, 122 (1889).  Rather, "[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he possess the requisite qualifications."  *Id.* at 122-123.  Thus, "[w]hen

a health care provider acts or speaks about treatment with the authority of a state license, that license is an 'imprimatur of a certain level of competence.'" *Tingley*, 47 F.4th at 1083 (citation omitted).  Patients need to know that their doctors can be trusted, and regulating the care that medical professionals provide plays a key role in not only protecting health and safety but also in assuring the trust necessary for the doctor-patient relationship to work.  Because medical care frequently involves the provision of professional advice, effective protection for patients must encompass the ability to regulate such speech.

Plaintiffs claim that AB 2098 does not fall within the category of laws recognized as permissible under *Tingley* because it "has no nexus to any treatment." PI Mot. at 20.  But the advice and treatment physicians provide—and the information conveyed in such advice and treatment—*is* patient care.  *See, e.g.*, *Tingley*, 47 F.4th at 1082-83; *see also supra* at pp. 12, 14.  It is that context of patient care, and that alone, that AB 2098 regulates.  Nor does AB 2098 require physicians to "parrot[] officially sanctioned views."  PI Mot. at 7.  It does not tell doctors what specifically they must say or even require them to say anything at all. Rather, to the extent a provider chooses to discuss COVID-19, AB 2098 simply prohibits doing so in a manner that violates the standard of care.  This has long been a requirement for doctors in order to protect their patients.  A contention that California cannot require that much of its medical practitioners would "endanger centuries-old medical malpractice laws that restrict treatment and the speech of healthcare providers."  *Tingley*, 47 F.4th at 1082.

AB 2098 falls within the category of regulation that *Tingley* recognized as permissible, namely regulations of the provision of care by medical professionals even when that regulation governs their speech.  It is therefore permissible under the First Amendment without having to satisfy the demands of strict scrutiny.

### 3.   AB 2098 Withstands Strict Scrutiny

Finally, even if the Court were to conclude that AB 2098 is subject to strict

1    scrutiny, plaintiffs still cannot show a likelihood of success on the merits.  To

2    survive strict scrutiny, a statute must be narrowly tailored to serve a compelling

3    government interest.  *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

4    AB 2098 meets this standard.

5                                    **a.    AB 2098 Furthers a Compelling Government Interest**

6            Plaintiffs contend that AB 2098 serves no legitimate interest, but the statute

7    serves several interests that are not only legitimate, but compelling.  First, AB 2098

8    furthers the State's compelling interest in "protect[ing] patients from negligent or

9    incompetent physicians."  *Lewis v. Superior Court*, 3 Cal. 5th 561, 572 (2017).

10   States "unquestionably ha[ve] a 'compelling interest in assuring safe health care for

11   the public.'"  *Recht v. Morrisey*, 32 F.4th 398, 413 (4th Cir. 2022) (citation

12   omitted).  As the Legislature explained, "[p]hysicians and healthcare professionals

13   play a critical role in keeping communities healthy.  A physician's recommendation

14   and information sharing will educate and inform decisions made by their patients."

15   RJN, Ex. D, p. 5; *see also* Nuovo Decl. ¶ 6.  Because medical decisions that

16   patients make under doctor advice are by definition matters of health—and

17   frequently life and death—the State has a compelling interest in ensuring the care

18   provided is not substandard.  This is equally true with respect to COVID-19, where

19   interventions like vaccinations have helped to protect health and save lives.  *See*

20   *supra* at pp. 4-5.  Like malpractice law and other prohibitions on treatment below

21   the standard of care, AB 2098 guards and protects patients' health and safety.

22           Second, AB 2098 furthers the compelling interest of ensuring patient access to

23   accurate, complete, and truthful information about healthcare.  Misinformation

24   from a doctor during medical treatment presents a real danger of harm to a patient.

25   Nuovo Decl. ¶ 6; *cf. Truman*, 27 Cal. 3d at 293-94 (patient declined pap smear test

26   due to advice below the standard of care and subsequently died of cervical cancer).

27   In addition to furthering this interest generally, AB 2098 does so in a way that also

28   helps limit the spread and severity of the deadly COVID-19 pandemic.  The

1    Supreme Court has recognized that "[s]temming the spread of COVID-19 is

2    unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v.*

3    *Cuomo*, 141 S. Ct. 63, 67 (2020). Vaccines have played a crucial role in helping

4    stem the spread of COVID-19 and limiting the severity of the disease. *See supra* at

5    pp. 4-5. However, as the Legislature found, "misinformation and disinformation

6    about COVID-19 vaccines"—including misinformation from medical

7    practitioners—have "placed lives at serious risk" by precluding patients from

8    receiving such vaccines due to factually incorrect information. AB 2098, § 1(d),

9    (e); *see also* RJN, Ex. B., p. 6; Ex. D, p. 4. While ensuring that patients receive

10   accurate information—as AB 2098 does—is a compelling interest, it is doubly so

11   here, insofar as AB 2098 could also help bolster COVID-19 vaccination rates and

12   stem the spread and harm of that disease.

13        Third, AB 2098 furthers the State's "compelling interest in regulating the

14   practice of professions within their boundaries." *Goldfarb v. Virginia State Bar*,

15   421 U.S. 773, 792 (1975). The Supreme Court has noted that among the

16   professions, "[t]here is perhaps no profession more properly open to [state]

17   regulation than that which embraces the practitioners of medicine," "dealing as its

18   followers do with the lives and health of the people." *Watson v. Maryland*, 218

19   U.S. 173, 176 (1910); *see also Tingley*, 47 F.4th at 1082-83 ("'[f]ew professions

20   require more careful' scrutiny than 'that of medicine'" (citation omitted)). AB

21   2098, acting in harmony with other similar and long-standing regulations, furthers

22   this compelling interest. It is critical that patients can trust the medical judgment,

23   advice, and recommendations of their state-licensed medical providers. Without

24   such trust, patients may well avoid acting on medically appropriate advice and

25   suffer serious, if not life-threatening, health consequences. This is no less true in

26   the COVID-19 arena than in other areas of health care. By holding medical

27   practitioners to the standard of care in providing medically accurate advice and

28

1  recommendations about COVID-19 to their patients, AB 2098 helps ensure patient

2  trust in their doctors and thereby furthers a compelling government interest.

3  **b.  AB 2098 Is Narrowly Tailored to Serve Those Compelling Interests**

4

5  Finally, AB 2098 meets the requirements for narrow tailoring.  "A statute is

6  narrowly tailored if it targets and eliminates no more than the exact source of the

7  'evil' it seeks to remedy."  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).  Here, the

8  Legislature's primary concern in enacting AB 2098 was to stop doctors from

9  conveying to patients medically inaccurate information about COVID-19 that is

10  below the standard of care.  The Legislature recounted evidence of medical

11  practitioners spreading such medically inaccurate information.  *See, e.g.*, RJN Ex.

12  B, pp. 6-7; Ex. D, pp. 4-5 (e,g., vaccines contain microchips or make people

13  magnetic).  It explained that doctors play a key role in guiding patient decisions

14  about healthcare, making it particularly concerning when they violate the standard

15  of care by failing to provide medically accurate information.  *See, e.g.*, RJN, Ex. B,

16  pp. 6-7; Ex. D, pp. 4-5.

17  The Legislature acted to limit this harm in the narrowest possible way: by

18  clarifying that when doctors provide advice or treatment about COVID-19, they

19  must do so consistently with the standard of care.  AB 2098 leaves practitioners free

20  to express themselves in innumerable other forums outside of patient care.  And

21  within the context of patient care, it does not limit advice that meets the standard of

22  care.  *See supra* at p. 13-14 (distinguishing AB 2098 from policy at issue in

23  *Conant*).  It thus specifically targets the precise category of conduct or speech

24  where the State's interest is highest and that poses the greatest risk of harm:

25  conduct or speech by doctors that comes in the form of advice or treatment to

26  patients within their care.[5]

27  _____

28  [5] That AB 2098 is narrowly tailored is further illustrated by looking to the legislative history of the enactment.  As originally introduced, AB 2098 did not

1    Considering AB 2098's place within the larger system of medical regulation
2    also reinforces its narrow tailoring.  As the legislative history notes, doctors are
3    already subject to discipline for repeated negligent acts, gross negligence, or
4    incompetence.  RJN, Ex. B, p. 8; *see also supra* at p. 3.  Thus, a physician who
5    repeatedly provides treatment or guidance concerning COVID-19 that falls below
6    the requisite standard of care—or a physician who does so only once in a manner
7    constituting gross negligence or incompetence—already faces the possibility of
8    discipline or liability.  All that AB 2098 does is clarify that, with respect to advice
9    and treatment concerning COVID-19, a single instance of substandard care can
10   suffice for discipline.  That clarification is narrowly tailored to further the State's
11   compelling interests in public health and patient safety.

12       In response, plaintiffs again argue that AB 2098 is problematic because it
13   lacks any "nexus to treatment."  PI Mot. at 20.  They say it is also underinclusive
14   because it does not simply ban a particular treatment.  PI Mot. at 25.  As explained
15   more thoroughly above, plaintiffs err in this interpretation of AB 2098.  The statute
16   only addresses speech that comes in the form of treatment or advice—that is,
17   speech used in rendering care—and it does speak to the kind of treatments (as well
18   as advice) a physician can give their patients.  Predicated as they are on a
19   misreading of the statute, these arguments are unavailing.

20       Plaintiffs further contend the statute is not narrowly tailored because the State
21   could simply use its own speech instead of requiring doctors provide adequate care.
22   The argument is unconvincing on its own terms.  Federal and state entities were
23   already engaging in extensive public information campaigns about COVID, but the
24   Legislature found that in-private misinformation from physicians was nonetheless
25   resulting in serious health consequences to patients.  And such an argument would

26   include a definition of "dissemination."  RJN, Ex. B, p. 12.  The statute was
27   amended to include a definition of "disseminate" that clarified the statute was
     targeted at "communications made to a patient under [the provider's] care in the
     form of treatment or advice" and not to "statements made to the general public
28   about COVID-19 through social media or at a public protest."  *Id.*

presumably render unconstitutional *any* application of the standard-of-care requirement—whether in professional discipline or medical malpractice law—to dangerous and substandard medical advice to a patient.  A similar argument could be made that the State should devise a way to somehow detect and step in to provide information directly to any patient who has been advised by a doctor to take a drug that would be dangerous to those in the patient's condition or from whom the doctor has withheld information about a pertinent side effect of treatment.  No court has ever held that such dubious arguments mean that the First Amendment prohibits States from holding medical providers to the standard of care.

Nor is AB 2098 underinclusive, as plaintiffs contend (at 23), because it only addresses physicians rather than all healthcare providers or because it does not cover advice or treatment for *every* disease.  "A State need not address all aspects of a problem in one fell swoop," and the Supreme Court has "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of" the government's interests.  *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015).  Strict scrutiny does not require the state to address misinformation about *any* health issue as long as its approach to addressing the problem it has chosen to focus on—misinformation and disinformation from medical providers concerning COVID-19—is narrowly tailored.  As to plaintiffs' other argument, physicians and surgeons have their own medical licensing and regulatory scheme, and it made sense to build upon the existing requirements for the provision of care by such professionals in enacting AB 2098.  Moreover, other medical practitioners such as nurse practitioners and physician assistants act under the supervision of physicians and surgeons when providing medical care.  *See* Cal. Bus. & Prof. Code § 3502(a)(1) (physician assistant may only perform services rendered under the supervision of a physician); *id.* § 2836.1 (nurse practitioners function pursuant to standardized procedures developed and approved by

1    supervising physician).  Ensuring that supervisors meet the standard of care is a

2    way to ensure that patients receive adequate care from all health professionals.

3         Finally, plaintiffs contend the statute is not properly tailored because it only

4    addresses advice and treatment given to patients, while the legislative history cites

5    examples of public speech.  PI Mot. at 23.  In other words, plaintiffs appear to be

6    arguing that because the Legislature focused on a *narrower category of speech* than

7    the examples it provided, the statute is not sufficiently tailored.  This argument is

8    mistaken.  For one, it was reasonable for the Legislature to infer that if medical

9    providers were willing to *publicly share* misinformation or disinformation, there

10   was a risk they would choose to do so *in private as well*.  And, that the Legislature

11   choose a narrower restriction on speech by only sanctioning medically inaccurate

12   and substandard advice or treatment to patients emphasizes why the statute *is*

13   narrowly tailored; the Legislature targeted the narrow swath of speech posing the

14   greatest risk to patient health and safety.  That is precisely what is required for

15   narrow tailoring.

16   **C.   Plaintiffs Are Unlikely to Succeed on Their Void for Vagueness
         Claim**

17

18        Plaintiffs further argue that AB 2098 is unconstitutional under the Fourteenth

19   Amendment because it is void for vagueness.  A statute is impermissibly vague

20   when it "fails to provide a reasonable opportunity to know what conduct is

21   prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement."

22   *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citation omitted).  But "[d]ue

23   process does not require 'impossible standards of clarity'."  *Id.* (quoting *Kolender*

24   *v. Lawson*, 461 U.S. 352, 361 (1983)).  All that is required is for the statute "to give

25   a person of ordinary intelligence a reasonable opportunity to know what is

26   prohibited."  *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013)

27   (citation omitted).  And where a statute "regulates licensed . . . health providers,

28

1    who constitute 'a select group of persons having specialized knowledge,' the

2    standard for clarity is lower." *Pickup*, 740 F.4th at 1234 (citation omitted).

3         AB 2098 meets this standard.  It defines as unprofessional conduct a physician

4    "disseminat[ing] misinformation or disinformation related to COVID-19."  AB

5    2098, § 2(a).  The statutory definitions of the relevant terms provide adequate

6    context and guidance for a practitioner of ordinary intelligence to know what is

7    prohibited.  Under AB 2098, "dissemination" is defined as "the conveyance of

8    information from the licensee to a patient under the licensee's care in the form of

9    treatment or advice."  AB 2098, § 2(b)(3).  This clarifies that the type of behavior

10   implicated by AB 2098 involves: 1) conveying information, 2) in the form of

11   treatment or advice, 3) to a patient under the practitioner's care.  A practitioner of

12   ordinary intelligence can distinguish between the situations covered by this

13   provision (e.g., providing advice to one's patient about whether to receive the

14   COVID-19 vaccines) from those that are not (e.g., publishing a journal in a

15   scientific article about the effectiveness of the COVID-19 vaccines).

16        AB 2098 in turn defines "misinformation" as "false information that is

17   contradicted by contemporary scientific consensus contrary to the standard of care."

18   AB 2098, § 2(b)(4).  This language imposes at least two requirements for conduct

19   to fall within the scope of AB 2098: that it is 1) contradicted by the contemporary

20   scientific consensus *and* 2) contrary to the standard of care.[6]  This second

21   requirement, in particular, is far from unduly vague.  The term "standard of care" is

22   not only familiar to medical practitioners but is used pervasively in the legal and

23   medical regulatory systems.  *E.g.*, CACI 501 (jury instruction stating that a medical

24

25        [6] To the extent the Court believes there is a lack of clarity on this point,
     defendants contend the Court should adopt the narrower construction of the
26   statute's reading.  *See, e.g.*, *Doe v. Harris*, 772 F.3d 563, 578 (9th Cir. 2014) (court
     may adopt narrowing construction of statute in vagueness challenge).  Such a
27   reading of the statutory text is consistent with the legislative history, which
     indicates that the definition of "misinformation" was amended expressly to connect
28   it to the standard of care.  RJN, Ex. D, p. 10.  Requiring that any false information
     be contrary to the standard of care as a distinct element carries out that purpose.

1   practitioner who fails to use the standard of care is negligent); *Avivi v. Centro*

2   *Medico Urgente Med. Ctr.*, 159 Cal. App. 4th 463, 469-70 (2008) (describing

3   standard of care in medical malpractice suit); *Trowbridge v. United States*, 703 F.

4   Supp. 2d 1129, 1137-40 (D. Idaho 2010) (discussing factual findings as to standard

5   of care in medical malpractice suit).  Indeed, California's medical licensing system

6   holds licensees to the standard of care with respect to *all* the care they provide.  *See*

7   *supra* at p. 3.  No reasonable medical practitioner would be unsure what it means to

8   provide advice or treatment that is "contrary to the standard of care."

9       Plaintiffs object that the definition is unclear, however, because the phrase

10   "contrary to the standard of care" might modify "contemporary scientific

11   consensus" rather than "false information."  PI Mot. at 27.  But no reasonable

12   reader could come to that interpretation.  The "standard of care" is a term of art

13   meaning the reasonable degree of skill, knowledge, and care in diagnosis and

14   treatment ordinarily possessed and exercised by practitioners under similar

15   circumstances at or about the time in question.  *Flowers*, 8 Cal. 4th at 997-98.  It

16   would be nonsensical to think that the "scientific consensus" would be "contrary to

17   the standard of care."

18       Rather, the phrase "contradicted by contemporary scientific consensus" is not

19   unduly vague.  There may be issues open to debate within the scientific and medical

20   communities, but that does not mean there are not objectively provable facts on

21   which the scientific community has a consensus: that apples contain sugar, that

22   measles is caused by a virus, that Down syndrome is caused by a chromosomal

23   abnormality, etc.  To the extent there are instances where the scientific consensus is

24   less clear—just as it can be difficult at times to prove what the relevant standard of

25   care is—that does not make the statute unduly vague.  And when a scientific

26   consensus does not exist, that makes the statute *inapplicable by its own terms*, not

27   vague.  Furthermore, in a disciplinary hearing, the burden of proof would be on the

28   Board to establish all elements of a charge of disseminating misinformation, and

1  where that does not happen, no discipline can occur. *Ettinger v. Board of Med.*

2  *Quality Assurance*, 135 Cal. App. 3d 853, 856 (1982). In any event, there is no

3  danger of this term leading to confusion about whether doctors should provide

4  certain information. Under the statute, misinformation can lead to discipline under

5  the statute if it is not only contradicted by the scientific consensus *but also* contrary

6  to the standard of care. Thus, plaintiffs and all medical practitioners know that if

7  their treatment and advice falls within the standard of care, they are not in violation

8  of AB 2098.

9  　　Plaintiffs' contrary arguments are again unpersuasive. They once more

10  contend that the law is unclear as to whether it applies to public speech

11  unconnected to care of a specific patient (it does not) or applies only to speech that

12  is part of treatment (it does). PI Mot. at 28. Rather, AB 2098 speaks clearly on

13  these issues. An ordinary physician would understand that AB 2098's prohibition

14  on advice or treatment to a patient does not to encompass her speech on social

15  media or in casual conversations not connected to providing care to a patient.

16  　　Plaintiffs further contend that AB 2098 is vague because it references

17  "misleading information" as well as "false information." PI Mot. at 28. But as the

18  Supreme Court has stated, "while '[t]here is little doubt that imagination can

19  conjure up hypothetical cases in which the meaning of these terms will be in nice

20  question,' because we are '[c]ondemned to the use of words, we can never expect

21  mathematical certainty from our language." *Hill v. Colorado*, 530 U.S. 703, 733

22  (2000) (citation omitted) (alterations in original). The "Supreme Court has held

23  that 'speculation about possible vagueness in hypothetical situations not before the

24  Court will not support a facial attack on a statute when it is surely valid in the vast

25  majority of its intended applications.'" *Pickup*, 740 F.3d at 1234 (quoting *Hill*, 530

26  U.S. at 733). All that the Fourteenth Amendment requires is that it be "clear what

27  the [statute] as a whole prohibits." *Hill*, 530 U.S. at 733 (citation omitted). AB

28

2098 meets that standard.  Plaintiffs therefore have not established a likelihood of success on their Fourteenth Amendment claim either.

## II.    THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF

First, plaintiffs have failed to demonstrate any irreparable harm.  In their brief, they contend that they suffer irreparable harm because of a loss of constitutional rights.  PI Opp. at 29.  As explained above, however, AB 2098 is a constitutional statute.  *See supra* at pp. 10-27.

Second, the balance of equities and public interest do not favor injunctive relief.  Where, as here, the government is the opposing party, the last two factors of the preliminary injunction analysis—the balance of equities and public interest—merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  To analyze these factors, the Court "balance[s] the competing claims of injury" and "consider[s] the effect of granting or withholding the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (citation omitted).

Here, the State has a strong interest in enforcing AB 2098's obligations to protect the public and would suffer irreparable harm if enjoined from doing so.  *Maryland v. King*, 567 U.S. 1301, 1303 (2013) ("[A]nytime a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.") (internal quotation marks omitted).  In addition, an injunction here would undermine the State's long tradition of regulating physician conduct.  *See Tingley*, 47 F.4th at 1079-81.  California has an indisputable and substantial public interest in ensuring the effective regulation and operation of the medical practice to ensure the health and safety of patients and the public.  That is especially true here, where AB 2098 serves to ensure that patients receive accurate and medically appropriate information and that doctors do not provide patients with substandard care.  And since such care can involve the vaccinations against

1   COVID-19 that have played a critical role in reducing the severity and spread of the

2   disease, an injunction could also undermine the public health.

3       Although plaintiffs allege deprivations of their constitutional rights, any actual

4   burden on those rights that might exist (and defendants contend there is none) is

5   incidental and exceedingly minimal.  State law already defines incompetence, a

6   single instance of gross negligence, or repeated negligent acts as unprofessional

7   conduct —regulations not challenged by plaintiffs in this case.  Cal. Bus. & Prof.

8   Code § 2234(b), (c), (d).  All AB 2098 does is clarify that a single instance of

9   negligence with respect to the treatment and care provided to a patient can

10  constitute unprofessional conduct, if that care involves misinformation or

11  disinformation about COVID-19. This de minimis intrusion into plaintiffs' medical

12  practices must be considered against the lives AB 2098 will save.  Any incremental

13  impact on speech—particularly speech that comes in the form of advice or

14  treatment below the standard of care—is far outweighed by the State's compelling

15  interest in ensuring that doctors provide adequate care for the protection and safety

16  of their patients and the public.

17                          **CONCLUSION**

18      This Court should deny Plaintiffs' motion for a preliminary injunction.

19

20  Dated:  December 13, 2022                    Respectfully submitted,

21                                              ROB BONTA
                                                Attorney General of California
22                                              ANYA M. BINSACCA
                                                EDWARD KIM
23                                              Supervising Deputy Attorneys General
                                                CHRISTINA SEIN GOOT
24                                              Deputy Attorneys General

25
                                                */s/ Kristin Liska*
26                                              KRISTIN A. LISKA
                                                Deputy Attorney General
27                                              *Attorneys for Defendants*

28

# CERTIFICATE OF SERVICE

Case Name:  ***McDonald, Mark, et al. v. Kristina D. Lawson, et al.***

Case No.    **8:22−cv−01805−FWS−ADS**

I hereby certify that on <u>December 13, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **OPPOSITION TO SECOND MOTION FOR PRELIMINARY INJUNCTION**
- **DECLARATION OF WILLIAM PRASIFKA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR PRELIMINARY INJUNCTION**
- **DEFENDANTS' SECOND REQUEST FOR JUDICIAL NOTICE (with EXHIBITS A-F)**

I certify that **all** participants in the case are registered CM/ECF users and that service will be electronically accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>December 13, 2022</u>, at San Francisco, California.


<div style="display:flex; justify-content:space-between;">
<div>
_____<br>
Vanessa Jordan<br>
Declarant
</div>
<div>
*Vanessa Jordan*<br>
_____<br>
Signature
</div>
</div>