ROB BONTA
 Attorney General of California
ANYA BINSACCA, State Bar No. 189613
EDWARD KIM, State Bar No. 195729
 Supervising Deputy Attorneys General
CHRISTINA SEIN GOOT, State Bar No. 229094
KRISTIN LISKA, State Bar No. 315994
 Deputy Attorneys General
 455 Golden Gate Ave.
 San Francisco, CA 94102
 Telephone:  (415) 510-3916
 Fax:  (415) 703-5480
 E-mail:  Kristin.Liska@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **MARK MCDONALD AND JEFF BARKE**<br><br>Plaintiffs,<br><br>v.<br><br>**KRISTINA D. LAWSON, in her official capacity as President of the Medical Board of California; RANDY W. HAWKINS, in his official capacity as Vice President of the Medical Board of California; LAURIE ROSE LUBIANO, in her official capacity as Secretary of the Medical Board of California; MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, ASIF MAHMOOD, NICOLE A. JEONG, RICHARD E. THORP, VELING TSAI, and ESERICK WATKINS, in their official capacities as members of the Medical Board of California; and ROB BONTA, in his official capacity at Attorney General of California,**<br><br>Defendants. | Case No. 8:22-cv-01805-FWS-ADS<br><br>**DEFENDANTS' SECOND REQUEST FOR JUDICIAL NOTICE**<br><br>Date:          December 16, 2022<br>Time:          10:00 a.m.<br>Courtroom:  10D<br>Judge:        Hon. Fred W. Slaughter<br>Trial Date:   Not scheduled<br>Action Filed: 10/4/2022 |

Defendants respectfully request that the Court take judicial notice of the public records and facts identified below, which are not subject to reasonable dispute, under Federal Rule of Evidence 201.

A fact is judicially noticeable when it is not subject to reasonable dispute and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Judicial notice is mandatory if "a party requests it" and the court is "supplied with the necessary information."  Fed. R. Evid. 201(c)(2).  Judicial notice may be taken at any stage of the proceeding.  Fed. R. Evid. 201(d); *Papai v. Harbor Tug & Barge Co*., 67 F.3d 203, 207 n.5 (9th Cir. 1995), *overruled on other grounds*, 520 U.S. 548 (1997).  "Legislative history is properly a subject of judicial notice."  *Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012); *see also, e.g.*, *Chaker v. Crogan*, 428 F.3d 1215, 1233 n.8 (9th Cir. 2005) (taking judicial notice of legislative history of California statute).

Here, Defendants respectfully request that this Court take judicial notice of the following statute and legislative history reports, which are not subject to reasonable dispute:

1.    **Exhibit A**:  A copy of the 1876 Act to Regulate the Practice of Medicine in the State of California, recorded at Stat. 1876, ch. 518, pp. 792-794.

2.    **Exhibit B**:  A copy of the report prepared by the Assembly Committee on Business and Professions on AB 2098 for the April 19, 2022 hearing on the bill.[1]

3.    **Exhibit C:**  A copy of the report prepared for the Assembly on AB 2098 for the bill's third reading, dated April 20, 2022.

4.    **Exhibit D**:  A copy of the report prepared for the Senate Committee on Business, Professions, and Economic Development on AB 2098 for the June 27, 2022 hearing on the bill.

---

[1] Copies of all legislative history reports are available at https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220 AB2098.

1

1      5.  **Exhibit E**:  A copy of the report prepared for the Senate on AB 2098 for

2  the bill's third reading, dated August 13, 2022.

3      7.  **Exhibit F:**  A copy of the report prepared for the Assembly on AB 2098

4  for the vote on the concurrence on Senate Amendments, dated August 22, 2022.

5

6

7

8  Dated:  December 13, 2022         Respectfully submitted,

9                                       ROB BONTA
                                     Attorney General of California

10                                       ANYA M. BINSACCA
                                     EDWARD KIM

11                                       Supervising Deputy Attorneys General
                                     CHRISTINA SEIN GOTT

12                                       Deputy Attorney General

13

14

15                                       */s/ Kristin Liska*

16                                       KRISTIN A. LISKA
                                     Deputy Attorney General
                                     *Attorneys for Defendants*

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT A

792         STATUTES OF CALIFORNIA,

CHAP. DXVIII.—*An Act to regulate the practice of medicine in the State of California.*

[Approved April 3, 1876.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

**Qualifications of practitioners.**    SECTION 1. Every person practicing medicine in any of its departments shall possess the qualifications required by this Act. If a graduate in medicine, he shall present his diploma to the Board of Examiners, herein named, for verification as to its genuineness. If the diploma is found genuine, and if the person named therein be the person claiming and presenting the same, the Board of Examiners shall issue its certificate to that effect, signed by all of the members thereof, and such diploma and certificate shall be conclusive as to the rights of the lawful holder of the same to practice medicine in this State. If not a graduate, the person practicing medicine in this State shall present himself before said Board, and submit himself to such examinations as the said Board shall require, and if the examination shall be satisfactory to the Examiners the said Board shall issue its certificate in accordance with the facts, and the lawful holder of such certificate shall be entitled to all the rights and privileges herein mentioned.

**Examiners, qualifications of.**    SEC. 2. Each State Medical Society incorporated and in active existence on the tenth day of March, eighteen hundred and seventy-six, whose members are required to possess diplomas or licenses from some legally chartered medical institution in good standing, shall appoint, annually, a Board of Examiners, consisting of seven members, who shall hold their office for one year, and until their successors shall be chosen. The Examiners so appointed shall go before a County Judge and make oath that they are regular graduates and licentiates, and that they will faithfully perform the duties of their office. Vacancies occurring in a Board of Examiners shall be filled by the society appointing it, by the selection of alternates or otherwise.

**Powers and duties of Examiners.**    SEC. 3. The Board of Examiners shall organize within three months after the passage of this Act. They shall procure a seal, and shall receive, through their Secretary, applications for certificates and examinations. The President of each Board shall have authority to administer oaths, and the Board take testimony in all meetings relating to their duties. They shall issue certificates to all who furnish satisfactory proof of having received diplomas or licenses from legally chartered medical institutions in good standing. They shall prepare two forms of certificates, one for persons in possession of diplomas or licenses, the other for candidates examined by the Board. They shall furnish to the County Clerks of the several counties a list of all persons receiving certificates. In selecting places to hold their meetings, they shall, as far as is reasonable, accommodate applicants residing in different sections of the State, and due notice shall be

Exhibit A
Page 1

published of all their meetings. Certificates shall be signed by all the members of the Board granting them, and shall indicate the medical society to which the Examining Board is attached.

SEC. 4. Said Board of Examiners shall examine diplomas *Same, fees.* as to their genuineness, and if the diploma shall be found genuine as represented, the Secretary of the Board of Examiners shall receive a fee of one dollar from each graduate or licentiate, and no further charge shall be made to the applicants; but if it be found to be fraudulent or not lawfully owned by the possessor, the Board shall be entitled to charge and collect twenty dollars of the applicant presenting such diplomas. The verification of the diplomas shall consist in the affidavit of the holder and applicant, that he is the lawful possessor of the same, and that he is the person therein named; such affidavit may be taken before any person authorized to administer oaths, and the same shall be attested under the hand and official seal of such officer, if he have a seal. Graduates may present their diplomas and affidavits, as provided in this Act, by letter or by proxy, and the Board of Examiners shall issue its certificate the same as though the owner of the diploma was present.

SEC. 5. All examinations of persons not graduates or *Examination of applicants.* licentiates shall be made directly by the Board, and the certificates given by the Boards shall authorize the possessor to practice medicine and surgery in the State of California; but no examination into the qualifications of persons not holding diplomas or licenses shall be made after the thirty-first day of December, eighteen hundred and seventy-six. After that date no certificates shall be granted by them, except to persons presenting diplomas or licenses from legally chartered medical institutions in good standing.

SEC. 6. Every person holding a certificate from a Board *Certificates to be recorded.* of Examiners shall have it recorded in the office of the Clerk of the county in which he resides, and the record shall be indorsed thereon. Any person removing to another county to practice shall procure an indorsement to that effect on the certificate from the County Clerk, and shall record the certificate in like manner in the county to which he removes, and the holder of the certificate shall pay to the County Clerk the usual fees for making the record.

SEC. 7. The County Clerk shall keep, in a book provided *Clerk to keep register.* for the purpose, a complete list of the certificates recorded by him, with the date of issue and the name of the medical society represented by the Board of Examiners issuing them. If the certificate be based on a diploma or license he shall record the name of the medical institution conferring it, and the date when conferred. The register of the County Clerk shall be open to public inspection during business hours.

SEC. 8. Candidates for examination shall pay a fee of five *Fees for examination.* dollars in advance, which shall be returned to them if a certificate be refused. The fees received by the Board shall be paid into the treasury of the medical society by which the Board shall have been appointed, and the expenses and

794            STATUTES OF CALIFORNIA,

compensation of the Board shall be subject to arrangement with the society.

**Examinations.** SEC. 9. Examinations may be in whole or in part in writing, and shall be of an elementary and practical character, but sufficiently strict to test the qualifications of the candidate as a practitioner.

**Refusal and revocation of certificates.** SEC. 10. The Boards of Examiners may refuse certificates to individuals guilty of unprofessional or dishonorable conduct, and they may revoke certificates for like causes. In all cases of refusal or revocation the applicant may appeal to the body appointing the Board.

**Definition of "physician."** SEC. 11. Any person shall be regarded as practicing medicine, within the meaning of this Act, who shall profess publicly to be a physician and to prescribe for the sick, or who shall append to his name the letters of "M. D." But nothing in this Act shall be construed to prohibit students from prescribing under the supervision of preceptors, or to prohibit gratuitous services in cases of emergency. And this Act shall not apply to commissioned surgeons of the United States army and navy practicing within the limits of this State.

**Licenses.** SEC. 12. Any itinerant vender of any drug, nostrum, ointment, or appliance of any kind intended for the treatment of disease or injury, or who shall, by writing or printing, or any other method, publicly profess to cure or treat diseases, injury or deformity, by any drug, nostrum, manipulation, or other expedient, shall pay a license of one hundred dollars a month, to be collected in the usual way.

**Penalties for violation.** SEC. 13. Any person practicing medicine or surgery in this State without complying with the provisions of this Act, shall be punished by a fine of not less than fifty dollars ($50) nor more than five hundred dollars ($500), or by imprisonment in the County Jail for a period of not less than thirty days nor more than three hundred and sixty-five days, or by both such fine and imprisonment for each and every offense. And any person filing, or attempting to file, as his own, the diploma or certificate of another, or a forged affidavit of identification, shall be guilty of a felony, and upon conviction shall be subject to such fine and imprisonment as are made and provided by the statutes of this State for the crime of forgery.

SEC. 14. This Act shall take effect from and after its passage, but the penalties shall not be enforced till on and after the thirty-first day of December, eighteen hundred and seventy-six.

------

CHAP. DXIX.—*An Act for the relief of J. J. Conlin.*

[Approved April 3, 1876.]

*The People of the State of California, represented in Senate and Assembly, do enact as follows:*

**Claims allowed.** SECTION 1. The Board of Supervisors of the City and County of San Francisco is hereby authorized to appropriate

Exhibit A
Page 3

# EXHIBIT B

Date of Hearing: April 19, 2022

ASSEMBLY COMMITTEE ON BUSINESS AND PROFESSIONS
Marc Berman, Chair
AB 2098 (Low) – As Introduced February 14, 2022

**SUBJECT:** Physicians and surgeons:  unprofessional conduct.

**SUMMARY:** Expressly provides that the dissemination of misinformation or disinformation related to COVID-19 by physicians and surgeons constitutes unprofessional conduct.

**EXISTING LAW:**

1) Enacts the Medical Practice Act, which provides for the licensure and regulation of physicians and surgeons.  (Business and Professions Code (BPC) §§ 2000 *et seq.*)

2) Establishes the Medical Board of California (MBC), a regulatory board within the Department of Consumer Affairs (DCA) comprised of 15 appointed members.  (BPC § 2001)

3) Enacts the Osteopathic Act, which provides for the licensure and regulation of osteopathic physicians and surgeons.  (BPC §§ 2450 *et seq.*)

4) Establishes the Osteopathic Medical Board of California (OMBC), which regulates osteopathic physicians and surgeons who possess effectively the same practice privileges and prescription authority as those regulated by MBC but with a training emphasis on diagnosis and treatment of patients through an integrated, whole-person approach.  (BPC § 2450)

5) Provides that protection of the public shall be the highest priority for both the MBC and the OMBC in exercising their respective licensing, regulatory, and disciplinary functions, and that whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount.  (BPC § 2001.1; § 2450.1)

6) Entrusts the MBC with responsibility for, among other things, the enforcement of the disciplinary and criminal provisions of the Medical Practice Act; the administration and hearing of disciplinary actions; carrying out disciplinary actions appropriate to findings made by a panel or an administrative law judge; suspending, revoking, or otherwise limiting certificates after the conclusion of disciplinary actions; and reviewing the quality of medical practice carried out by physician and surgeon certificate holders under the jurisdiction of the board.  (BPC § 2004)

7) Authorizes the MBC to appoint panels of at least four of its members for the purpose of fulfilling its disciplinary obligations and provides that the number of public members assigned to a panel shall not exceed the number of licensed physician and surgeon members. (BPC § 2008)

8) With approval from the Director of Consumer Affairs, authorizes the MBC to employ an executive director as well as investigators, legal counsel, medical consultants, and other assistance, but provides that the Attorney General is legal counsel for the MBC in any judicial and administrative proceedings.  (BPC § 2020)

9)  Allows the MBC to select and contract with necessary medical consultants who are licensed physicians to assist it in its programs.  (BPC § 2024)

10) Empowers the MBC to take action against persons guilty of violating the Medical Practice Act.  (BPC § 2220)

11) Requires the Director of Consumer Affairs to appoint an independent enforcement monitor no later than March 1, 2022 to monitor the MBC's enforcement efforts, with specific concentration on the handling and processing of complaints and timely application of sanctions or discipline imposed on licensees and persons in order to protect the public.  (BPC § 2220.01)

12) Requires the MBC to prioritize its investigative and prosecutorial resources to ensure that physicians representing the greatest threat of harm are identified and disciplined expeditiously, with allegations of gross negligence, incompetence, or repeated negligent acts that involve death or serious bodily injury to one or more patients receiving the highest priority.  (BPC § 2220.05)

13) Clarifies that the MBC is the only licensing board that is authorized to investigate or commence disciplinary actions relating to the physicians it licenses.  (BPC § 2220.5)

14) Provides that a licensee whose matter has been heard by an administrative law judge, or whose default has been entered, and who is found guilty, or who has entered into a stipulation for disciplinary action with the MBC, may be subject to various forms of disciplinary action. (BPC § 2227)

15) Provides that all proceedings against a licensee for unprofessional conduct, or against an applicant for licensure for unprofessional conduct or cause, shall be conducted in accordance with the Administrative Procedure Act.  (BPC § 2230)

16) Requires the MBC to take action against any licensee who is charged with unprofessional conduct, which includes, but is not limited to, the following:

   a)  Violating or aiding in the violation of the Medical Practice Act.

   b)  Gross negligence.

   c)  Repeated negligent acts.

   d)  Incompetence.

   e)  The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician.

   f)  Any action or conduct that would have warranted the denial of a certificate.

   g)  The failure by a physician, in the absence of good cause, to attend and participate in an investigatory interview by the MBC.

   (BPC § 2234)

17) Provides that a physician shall not be subject to discipline solely on the basis that the treatment or advice they rendered to a patient is alternative or complementary medicine if that treatment or advice was provided after informed consent and a good-faith prior examination; was provided after the physician provided the patient with information concerning conventional treatment; and the alternative complementary medicine did not cause a delay in, or discourage traditional diagnosis of, a condition of the patient, or cause death or serious bodily injury to the patient.  (BPC § 2234.1)

18) Provides that the conviction of any offense substantially related to the qualifications, functions, or duties of a physician constitutes unprofessional conduct.  (BPC § 2236)

19) Provides that violating a state or federal law regulating dangerous drugs or controlled substances, constitutes unprofessional conduct.  (BPC §§ 2237 − 2238)

20) Provides that self-prescribing of a controlled substance, or the use of a dangerous drug or alcoholic beverages to the extent that it is dangerous or injurious to the physician or any other person, or impairs the physician's ability to practice, constitutes unprofessional conduct.  (BPC § 2239)

21) Provides that prescribing, dispensing, or furnishing dangerous drugs without an appropriate prior examination and a medical indication constitutes unprofessional conduct.  (BPC § 2242)

22) Provides that the willful failure to comply with requirements relating to informed consent for sterilization procedures constitutes unprofessional conduct.  (BPC § 2250)

23) Provides that the prescribing, dispensing, administering, or furnishing of liquid silicone for the purpose of injecting such substance into a human breast or mammary constitutes unprofessional conduct.  (BPC § 2251)

24) Provides that the violation of an injunction or cease and desist order relating to the treatment of cancer constitutes unprofessional conduct.  (BPC § 2252)

25) Provides that failure to comply with the Reproductive Privacy Act governing abortion care constitutes unprofessional conduct.  (BPC § 2253)

26) Provides that the violation of laws relating to research on aborted products of human conception constitutes unprofessional conduct.  (BPC § 2254)

27) Provides that the violation of laws relating to the unlawful referral of patients to extended care facilities constitutes unprofessional conduct.  (BPC § 2255)

28) Provides that any intentional violation of laws relating to the rights of involuntarily confined inpatients constitutes unprofessional conduct.  (BPC § 2256)

29) Provides that the violation of laws relating to informed consent for the treatment of breast cancer constitutes unprofessional conduct.  (BPC § 2257)

30) Provides that the violation of laws relating to the use of laetrile or amygdalin with respect to cancer therapy constitutes unprofessional conduct.  (BPC § 2258)

31) Provides that failing to give a patient a written summary prior to silicone implants being used in cosmetic, plastic, reconstructive, or similar surgery constitutes unprofessional conduct. (BPC § 2259)

32) Provides that failing to give a patient a written summary prior to collagen injections being used in cosmetic, plastic, reconstructive, or similar surgery constitutes unprofessional conduct. (BPC § 2259.5)

33) Provides that any violation of extraction and postoperative care standards constitutes unprofessional conduct. (BPC § 2259.7)

34) Provides that the removal of sperm or ova from a patient without written consent constitutes unprofessional conduct. (BPC § 2260)

35) Provides that the violation of laws relating to human cloning constitutes unprofessional conduct. (BPC § 2260.5)

36) Provides that knowingly making or signing any certificate related to the practice of medicine which falsely represents the existence or nonexistence of a state of facts constitutes unprofessional conduct. (BPC § 2261)

37) Provides that altering or modifying the medical record of any person, with fraudulent intent, or creating any false medical record, with fraudulent intent, constitutes unprofessional conduct. (BPC § 2262)

38) Provides that numerous other inappropriate activities or violations of the law constitute unprofessional conduct. (BPC §§ 2263 – 2318)

39) Requires that licensees be given notification of proposed actions to be taken against the licensee by the MBC and be given the opportunity to provide a statement to the deputy attorney general assigned to the case. (BPC § 2330)

**THIS BILL:**

1) Provides that the dissemination or promotion of misinformation or disinformation related to COVID-19 by a physician and surgeon constitutes unprofessional conduct.

2) Includes false or misleading information regarding the nature and risks of the COVID-19 virus, its prevention and treatment, and the development, safety, and effectiveness of COVID-19 vaccines as types of misinformation or disinformation that could be disseminated.

3) Requires the MBC or OMBC to consider the following factors prior to bringing a disciplinary action against a licensee for disseminating misinformation or disinformation:

   a) Whether the licensee deviated from the applicable standard of care.

   b) Whether the licensee intended to mislead or acted with malicious intent.

   c) Whether the misinformation or disinformation was demonstrated to have resulted in an individual declining opportunities for COVID-19 prevention or treatment that was not justified by the individual's medical history or condition.

    d)  Whether the misinformation or disinformation was contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.

4)  Defines "physician and surgeon" as a person licensed by either the MBC or the OMBC.

5)  Provides that violators of the bill's provisions are not guilty of a misdemeanor.

6)  Makes various findings and declarations in support of the bill.

**FISCAL EFFECT:** Unknown; this bill is keyed fiscal by the Legislative Counsel.

**COMMENTS:**

**Purpose.** This bill is sponsored by the **California Medical Association**.  According to the author:

> "AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread. Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this legislation, California will show its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**Background.**

*COVID-19 Pandemic and Vaccines.*  To date, over 984,000 people have died of COVID-19 in the United States, including approximately 90,000 Californians.[1]  On March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency as a result of the impacts of the COVID-19 public health crisis, and on March 19, 2020, the Governor formally issued a statewide "stay at home order," directing Californians to only leave the house to provide or obtain specified essential services.  Subsequent guidance from the State Public Health Officer expressly exempted from that order various professionals regulated by the Department of Consumer Affairs (DCA), including physicians and surgeons providing essential care.

On March 30, 2020, Governor Newsom announced an initiative to "expand California's health care workforce and recruit health care professionals to address the COVID-19 surge" and signed Executive Order N-39-20.  This executive order established a waiver request process under the DCA and included other provisions authorizing the waiver of licensing, certification, and credentialing requirements for health care providers.  Through this waiver process, the DCA issued a series of waivers of law to authorize various healing arts professionals to order and administer COVID-19 vaccines.  These waivers aligned with similar authority granted federally under the Public Readiness and Emergency Preparedness (PREP) Act for Medical Countermeasures Against COVID-19.

---

[1] Data current as of April 11, 2022; the number of Californians who have died from causes related to COVID-19 has risen 20 percent since this bill was introduced with its current findings and declarations.

Vaccines are regulated and overseen by multiple federal entities responsible for ensuring their safety and efficacy.  The federal Food and Drug Administration (FDA) is initially responsible for approving new drugs, determining both that they are safe to administer and that their recommended use is clinically supported.  During states of emergency, the FDA may expedite their review through the Emergency Use Authorization (EUA) process to accelerate the availability of new immunizations or treatments.  Currently, three vaccines have been approved through the EUA process for COVID-19.  These vaccines have additionally been reviewed and found safe by national experts participating in a Western States Scientific Safety Review Workgroup.  Data has continued to show that the risks of infection, hospitalization, and death for vaccinated individuals are dramatically lower than for those who have not been vaccinated.[2]

*Misinformation and Disinformation.*  This bill is intended to target three types of false or misleading information relating to the COVID-19 pandemic.  First, the language refers to nonfactual information regarding "the nature and risks of the virus"—for example, misleadingly comparing COVID-19 to less serious conditions or inaccurately characterizing the deadliness of the disease.  Second, the bill seeks to address false statements regarding its "prevention and treatment"—this would presumably include the promotion of treatments and therapies that have no proven effectiveness against the virus.  The third category is for misinformation or disinformation regarding "the development, safety, and effectiveness of COVID-19 vaccines."

Public skepticism and misunderstanding of diseases, treatments, and immunizations is not unique to COVID-19.  The earliest known group formed to oppose vaccination programs, the National Anti-Vaccination League, was established in the United Kingdom in 1866 following a series of violent protests against mandatory smallpox immunizations in the Vaccination Act of 1853.[3]  In 1918, conspiracy theories were circulated that the Spanish Flu pandemic was a deliberate act of biological warfare, spread through aspirin manufactured by German company Bayer.[4]

What has been historically unprecedented about the dissemination of misinformation and disinformation throughout the COVID-19 pandemic is the omnipresence of media coverage and the prevalence of social media.  False information can easily be spread to millions within days or even hours of it being created.  It can become challenging for a population already feeling overloaded with complex information to differentiate between thoroughly researched, accurate reporting and information that is oversimplified, unproven, or patently false.[5]

A substantial factor in the spread of false information is a phenomenon known as "confirmation bias."  When individuals hold a preexisting belief or suspicion, they will often unconsciously seek out information to validate that predisposition and filter out contradictory evidence.[6]  The persistence of modern media exposure and the internet has exacerbated this effect, as information seeming to support virtually any viewpoint or understanding can now easily be found through the use of search engines and social media.  Many websites further exacerbate the issue of confirmation bias by algorithmically delivering consistent information to users who have demonstrated a pattern of belief or ideology.

---

[2] Dyer, Owen. "COVID-19: Unvaccinated face 11 times risk of death from delta variant, CDC data show." *BMJ (Clinical research ed.)* vol. 374 (2021).
[3] Wolfe, Robert M. "Anti-vaccinationists past and present." *BMJ (Clinical research ed.)* vol. 325 (2002).
[4] Johnson, Norman A. "The 1918 flu pandemic and its aftermath." *Evo Edu Outreach* 11, 5 (2018).
[5] Nelson, Taylor. "The Danger of Misinformation in the COVID-19 Crisis." *Missouri medicine vol. 117*, 6 (2020).
[6] Nickerson, Raymond S. "Confirmation bias: A ubiquitous phenomenon in many guises." *Review of General Psychology*, 2 (1998).

The role of physicians and other health professionals in legitimizing false information during the COVID-19 pandemic has presented serious implications for public safety. For example, the federal Centers for Disease Control and Prevention (CDC) has for decades been recognized as the United States government's primary agency for protecting Americans through expert research and advice related to the control and prevention of communicable disease. The CDC has consistently warned Americans about the threat of COVID-19 and strongly encouraged vaccination. However, throughout the pandemic, many individuals who are predisposed toward skepticism of the government and incredulity toward vaccines have sought to validate those views, despite unambiguous guidance to the contrary from leading health experts.

As a result, health practitioners whose views on COVID-19 and immunization against it are within the extreme minority for their profession are armed with a disproportionately loud voice in the public discourse. Antigovernment cynics and vaccine skeptics cohere to the opinions of those few physicians who will reinforce their beliefs as they seek to appeal to authority in service of their confirmation bias.[7] The effect of this is that a relatively small group of public health contrarians who are licensed as physicians will be afforded the same, if not more, credibility as long-trusted public institutions like the CDC, the FDA, and the American Medical Association, even if those physicians do not specialize in epidemiology or infectious disease prevention.

The incongruity of this reasoning is frequently rationalized in part through conspiracy theories about the medical establishment. This is not novel. When allopathic medicine first achieved dominance during the Progressive Era, there were many who vilified the medical system as financially motivated, accusing "modern medicine men" of oppressing natural therapies in order to profit from a monopoly on health care practice.[8] Other related conspiracy theories frequently involve the United States government, which has been accused of everything from inventing or exaggerating the pandemic to suppressing natural remedies, or even using COVID-19 vaccines as a clandestine method for implanting microchips into Americans.[9]

*Role of State Medical Boards.* Physicians and surgeons in California are regulated by one of two entities: the Medical Board of California (MBC) or the Osteopathic Medical Board of California (OMBC). The MBC licenses and regulates about 153,000 physicians while the OMBC licenses and regulates slightly over 12,000. Despite receiving different forms of medical education and being overseen by separate boards, the essential scope of practice for these two categories of licensees are virtually identical.

In July of 2021, the Federation of State Medical Boards (FSMB) issued a statement positioned as being "in response to a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media." The FSMB warned that physicians who engage in the spread of false information related to COVID-19 were jeopardizing their licenses to practice medicine. While physicians are subject to discipline only by boards located in states where they hold a license, the FSMB's statement was viewed as a serious warning to doctors that they risked disciplinary action if they engaged in spreading inaccurate information.

---

[7] Topf, Joel M., and Williams, Paul N. "COVID-19, social media, and the role of the public physician." *Blood Purification* 50.4-5 (2021).
[8] Burrow, JG. *Organized Medicine in the Progressive Era: The Move Toward Monopoly*. Baltimore, MD: Johns Hopkins University Press (1977).
[9] Rubin, Rita. "When Physicians Spread Unscientific Information About COVID-19." *JAMA* 327 (2002).

Following the FSMB's statement, some state medical boards appeared poised to take action against licensees found to be spreading misinformation or disinformation.  Tennessee's Board of Medical Examiners adopted the FSMB's statement as their own.  However, in response, the state's Republican legislature threatened to disband the board if it sought to take any such action against a physician.  Legislation in at least fourteen states has been introduced to prevent medical boards from holding physicians who spread false information accountable in accordance with the FSMB's guidance.[10]

In contrast to legislative action taken in those states, this bill would seek to confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation are indeed subject to formal discipline.  The bill would expressly establish that such dissemination would constitute "unprofessional conduct"—a term used prolifically in the Medical Practice Act as a general description of numerous forms of conduct for which disciplinary action may be taken.  The MBC or OMBC would be required to consider multiple factors prior to filing an accusation, but would ultimately be authorized to take enforcement action against physicians who have used their licenses to jeopardize public health and safety through the spread of false information.

It is certainly meaningful that this bill would establish as a matter of California law that physicians are subject to discipline for spreading false information.  However, it is more than likely that the MBC and OMBC are both already fully capable of bringing an accusation against a physician for this type of misconduct.  For example, the Medical Practice Act includes "gross negligence" and "repeated negligent acts" within the meaning of unprofessional conduct, representing situations where the physician deviated from the standard of care in the opinion of the MBC and its expert medical reviewers.

If, for example, a physician were to advise patients to inject disinfectant as a way of treating COVID-19—as former President Trump once did, resulting in a sharp rise in reported incidents of misusing bleach and other cleaning products[11]—disseminating that "misinformation" would almost certainly be considered negligent care subject to discipline.  Whether a case of spreading misinformation is sufficient to bring an action for gross negligence would be evaluated using the MBC's expert reviewer guidelines, which provide that "the determining factor is the *degree* of departure from the applicable standard of care."  Similarly, it is arguable that spreading "disinformation" as commonly defined would constitute an "act of dishonesty or corruption"—also statutorily included within the Medical Practice Act's meaning of unprofessional conduct.

Those in opposition to this bill have expressed concern that the MBC would overzealously prosecute doctors for expressing views that are outside the mainstream but not indisputably unreasonable based on the physician's research and training.  This apprehension cannot easily be reconciled with persistent criticisms levied against the MBC by the Legislature and patient safety advocates, who have repeatedly reproved the board for its underwhelming enforcement activities.  Major news editorials have pointed out that the MBC only takes formal disciplinary action in about three percent of cases, and that more than 80 percent of complaints are dismissed without investigation.  As the Legislature persists in its admonishment of the MBC for failing to take aggressive action against physicians who commit unprofessional conduct, it would appear dubious that the board would excessively utilize the authority expressly provided by this bill.

---

[10] https://www.audacy.com/wccoradio/news/national/laws-are-stopping-medical-boards-from-punishing-doctors
[11] Gharpure, Radhika. "Knowledge and Practices Regarding Safe Household Cleaning and Disinfection for COVID-19 Prevention." *Morbidity and Mortality Weekly Report*, 69 (2020).

It stands to reason that Californians who have demonstrated suspicion toward both the medical establishment and their government would be slow to trust the MBC, with a majority of its members consisting of physicians appointed by the Governor.  However, the degree of enmity recently exhibited by physicians and others opposed to COVID-19 prevention policies could be viewed as disturbing.  In December of 2021, it was reported that representatives of an anti-vaccination organization called America's Frontline Doctors had stalked and intimidated Kristina Lawson, President of the MBC.[12]  This harassment was escalated in April of 2022 when that same organization "released a 21-minute video that depicts Lawson in Nazi regalia, a whip in her hand and swastika on her shoulder, and shows a clip of the garage confrontation validating Lawson's description."[13]

America's Frontline Doctors was founded by Dr. Simone Gold, who holds an active license in California as a physician.  Dr. Gold and her organization have vociferously promoted hydroxychloroquine as a COVID-19 treatment, despite evidence increasingly showing it to be ineffective and potentially unsafe.[14]  Dr. Gold has engaged in multiple campaigns to stoke public distrust in COVID-19 vaccines, characterizing them as "experimental" despite numerous safety and efficacy trials successfully confirming their safety and efficacy.[15]  Dr. Gold spoke at a rally held in conjunction with the attempted insurrection on the United States Capitol on January 6, 2021; she was arrested and subsequently pleaded guilty to a misdemeanor relating to that event.

Despite what would appear to be repeated conduct perpetrated by Dr. Gold involving the dissemination of false information regarding COVID-19, Dr. Gold's license remains active with the MBC and there appears to be no record of any disciplinary action taken against her.[16]  Given the air of legitimacy she sustains from her status as a licensed physician, Dr. Gold likely serves as an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California.  Regardless of whether similar authority is already available to the MBC through other enforceable provisions in the Medical Practice Act, it is understandable that the author desires to make this authority explicit and confirm that doctors licensed in California who disseminate misinformation or disinformation should be held fully accountable.

**Current Related Legislation.** AB 1636 (Weber) would prohibit the MBC from granting or reinstating physician certificates to individuals who commit sexual misconduct and require the MBC to revoke the licenses of physicians to commit such misconduct.  *This bill is pending in this committee.*

AB 1767 (Boerner Horvath) would remove licensed midwives from the jurisdiction of the MBC and establish a new board to license and regulate that profession.  *This bill is pending in this committee.*

AB 2060 (Quirk) would change the membership composition of the MBC so that a majority of the board consists of public members.  *This bill is pending in this committee.*

---

[12] https://www.latimes.com/business/story/2021-12-10/covid-anti-vax-confrontations
[13] https://www.latimes.com/business/story/2022-04-06/covid-anti-vaxxers-campaign-against-public-health-advocates-gets-more-extreme
[14] Singh, Bhagteshwar. "Chloroquine or hydroxychloroquine for prevention and treatment of COVID-19." *The Cochrane database of systematic reviews vol. 2*, 2 (2021).
[15] https://www.medpagetoday.com/infectiousdisease/covid19/90536
[16] https://search.dca.ca.gov/details/8002/G/70224/595d067c562f072a5e7b25c913b285cf

**Prior Related Legislation.** SB 806 (Roth, Chapter 649, Statutes of 2021) extended the sunset date for the MBC until January 1, 2023 and made numerous reforms to the Medical Practice Act.

AB 1909 (Gonzalez) would have provided that performing an examination on a patient for the purpose of determining whether the patient is a virgin constitutes unprofessional conduct. *This bill was not presented for a vote in this committee.*

AB 1278 (Nazarian) would have provided that failing to post an Open Payments database notice constitutes unprofessional conduct. *This bill was held on the Assembly Appropriations Committee's suspense file.*

SB 1448 (Hill, Chapter 570, Statutes of 2018) requires physicians and surgeons, osteopathic physicians and surgeons, podiatrists, acupuncturists, chiropractors and naturopathic doctors to notify patients of their probationary status beginning July 1, 2019.

**ARGUMENTS IN SUPPORT:**

The **California Medical Association** (CMA) is sponsoring this bill. According to the CMA: "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort." The CMA goes on to argue that "while the MBC may have the ability to discipline licensees for unprofessional conduct under Business and Professions Code section 2234, AB 2098 makes clear that the MBC has the statutory authority to take such actions against physicians that spread COVID-19 misinformation or disinformation."

The **American Academy of Pediatrics, California** is in support of this bill, writing: "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. When they choose to spread inaccurate information, physicians contradict their responsibilities and further erode public trust in the medical profession. By passing this bill, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**ARGUMENTS IN OPPOSITION:**

**A Voice for Choice Advocacy** opposes this bill, writing: "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19."

**Californians for Good Governance** opposes this bill "based on concerns about its unconstitutional restrictions on free speech." The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest." The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

**POLICY ISSUE(S) FOR CONSIDERATION:**

*Lack of Definitions.*  The intent of this bill is made clear in the subdivision providing that "it shall constitute unprofessional conduct for a physician and surgeon to disseminate or promote misinformation or disinformation related to COVID-19."  However, the terms "misinformation," "disinformation," and "disseminate" are not defined.  Provisions outlining what factors the MBC or OMBC must consider prior to bringing a disciplinary action do suggest how false information should be deemed enforceable under the bill, with some of the language taken directly from definitions provided by the CDC on its public guidance regarding misinformation and disinformation.[17]  To ensure greater clarity with regards to how this bill should be interpreted and implemented by the MBC and the OMBC within their existing enforcement architecture, the author should consider amendments restructuring the bill to provide for clearer definitions.

*Constitutionality.*  Many of the opposition arguments regarding this bill have revolved around the concept of "free speech" and whether a state law penalizing physicians for conveying information determined to be false is lawful under the United States Constitution.   It is certainly true that the First Amendment prohibits laws "abridging the freedom of speech."  However, the Supreme Court of the United States has repeatedly confirmed that this constitutional right is not absolute.

A key factor in determining whether a statute like the one proposed in this bill violates the First Amendment is whether the law would in fact regulate professional *speech* as opposed professional *conduct*.  The United States Court of Appeals for the Ninth Circuit discussed this distinction extensively in its decision upholding the constitutionality of California's ban on licensed health professionals providing therapies intended to change a patient's sexual orientation or identity.[18]  That decision noted that "doctor-patient communications *about* medical treatment receive substantial First Amendment protection, but the government has more leeway to regulate the conduct necessary to administering treatment itself."

To illustrate the critical difference between the regulation of professional speech versus professional conduct, the Ninth Circuit suggested that the issue be viewed "along a continuum."  First, the Ninth Circuit stated that "where a professional is engaged in a public dialogue, First Amendment protection is at its greatest.  Thus, for example, a doctor who publicly advocates a treatment that the medical establishment considers outside the mainstream, or even dangerous, is entitled to robust protection under the First Amendment—just as any person is—even though the state has the power to regulate medicine."

The Ninth Circuit then suggested that "at the midpoint of the continuum, within the confines of a professional relationship, First Amendment protection of a professional's speech is somewhat diminished."  As an example, the decision cited *Planned Parenthood v. Casey*, in which the Supreme Court upheld a requirement that doctors disclose truthful, nonmisleading information to patients about certain risks of abortion.  In this case, the Supreme Court ruled that "the physician's First Amendment rights not to speak are implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State."[19]

---

[17] https://www.cdc.gov/vaccines/covid-19/health-departments/addressing-vaccine-misinformation.html
[18] *Pickup v. Brown*, 728 F.3d 1042 (2015).
[19] *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992).

The Ninth Circuit ultimately ruled that California's ban on gay conversion therapy fell at the far end of the continuum, in that it consisted of "the regulation of professional conduct, where the state's power is great, even though such regulation may have an incidental effect on speech." The ruling explained that while much of the practice of medicine requires speech to effectuate treatment and therapy in the form of prescriptions, recommendations, and counseling, this is incidental to the regulation of professional conduct, which is the core purpose of all state and federal license requirements. The Supreme Court declined to grant review of the Ninth Circuit's decision, and the California law remains in effect.

A recent decision issued by the Supreme Court in *National Institute of Family and Life Advocates v. Becerra*—which declared that a California law requiring crisis pregnancy centers to make disclosures about pregnancy options was unconstitutional—has frequently been cited as a key precedent for determining whether state laws implicating professional speech are impermissible under the First Amendment.[20] In that decision, the Supreme Court declined to recognize the Ninth Circuit's treatment of "professional speech" as a separate category afforded less protection than other forms of speech. However, the Supreme Court did affirm that "states may regulate professional conduct, even though that conduct incidentally involves speech."

Whether this bill would be considered constitutionally valid would in large part depend on how it is interpreted and enforced. If the MBC or the OMBC were to take action against a physician for statements made to the general public about COVID-19 through social media or at a public protest, a court may find that this speech falls at the end of the spectrum where the First Amendment's protections are strongest. However, if a physician were to be subjected to formal discipline for communications made to a patient under their care in the form of treatment or advice, this would quite likely be considered professional conduct that may be more heavily regulated through the state's police power.

**AMENDMENTS:**

1)  To clarify the meaning of terms used in the bill to align with the boards' existing authority to regulate professional conduct, insert the following provisions to the definitions contained in subdivision (c):

    *(3) "Misinformation" means false information that is contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.*

    *(4) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.*

    *(5) "Disseminate" means the communication of information from the licensee to a patient under the licensee's care in the form of treatment or advice.*

2)  To reflect that much of the language currently provided as factors for a board to consider has been relocated to the bill's definitions, strike the current subdivision (b) and insert the following:

---

[20] *National Institute of Family and Life Advocates v. Becerra*, 585 U.S. ___ (2018).

AB 2098
Page 13

*(b) Prior to bringing a disciplinary action against a licensee under this section, the board shall consider both whether the licensee departed from the applicable standard of care and whether the misinformation or disinformation resulted in harm to patient health.*

3) To add a severability clause to protect the enforceability of the bill following any adverse ruling on the validity of a certain provision or application, insert a new Section 3 as follows:

*The provisions of this act are severable.  If any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.*

4) To update statistics in the bill's findings and declarations, amend Section 1 to replace "5,000,000" with "6,000,000 and "75,000" with "90,000."

**REGISTERED SUPPORT:**

California Medical Association *(Sponsor)*
American Academy of Pediatrics, California
American College of Obstetricians and Gynecologists District IX
California Chapter of the American College of Emergency Physicians
California Podiatric Medical Association
California Rheumatology Alliance
California Society of Anesthesiologists
Children's Specialty Care Coalition
Families for Opening Carlsbad Schools
Numerous individuals

**REGISTERED OPPOSITION:**

A Voice for Choice Advocacy
California Health Coalition Advocacy
Californians for Good Governance
Catholic Families 4 Freedom CA
Central Coast Health Coalition
Children's Health Defense California Chapter
Concerned Women for America
Depression and Bipolar Support Alliance California
Educate. Advocate.
Frederick Douglass Foundation of California
Homewatch Caregivers of Huntington Beach
Nuremberg 2.0 LTD.
Pacific Justice Institute
Physicians for Informed Consent
Protection of the Educational Rights for Kids
Restore Childhood
Siskiyou Conservative Republicans
Stand Up Sacramento County
Numerous individuals

**Analysis Prepared by**:  Robert Sumner / B. & P. / (916) 319-3301

Exhibit B
Page 13

# EXHIBIT C

ASSEMBLY THIRD READING
AB 2098 (Low)
As Amended  April 20, 2022
Majority vote

## SUMMARY

Expressly provides that the dissemination of misinformation or disinformation related to COVID-19 by physicians and surgeons constitutes unprofessional conduct.

**Major Provisions**

1) Provides that the dissemination or promotion of misinformation or disinformation related to COVID-19 by a physician and surgeon constitutes unprofessional conduct.

2) Includes false or misleading information regarding the nature and risks of the COVID-19 virus, its prevention and treatment, and the development, safety, and effectiveness of COVID-19 vaccines as types of misinformation or disinformation that could be disseminated.

3) Requires the Medical Board of California (MBC) or Osteopathic Medical Board of California (OMBC) to consider both whether the licensee departed from the applicable standard of care and whether the misinformation or disinformation resulted in harm to patient health prior to bringing a disciplinary action against a licensee for disseminating misinformation or disinformation:

4) Defines "physician and surgeon" as a person licensed by either the MBC or the OMBC.

5) Defines "misinformation" as false information that is contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.

6) Defines "disinformation" as misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

7) Defines "disseminate" as the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

8) Provides that violators of the bill's provisions are not guilty of a misdemeanor.

9) Makes various findings and declarations in support of this bill.

## COMMENTS

*COVID-19 Pandemic and Vaccines.*  To date, over 984,000 people have died of COVID-19 in the United States, including approximately 90,000 Californians.  On March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency as a result of the impacts of the COVID-19 public health crisis, and on March 19, 2020, the Governor formally issued a statewide "stay at home order," directing Californians to only leave the house to provide or obtain specified essential services.  Subsequent guidance from the State Public Health Officer expressly exempted from that order various professionals regulated by the Department of Consumer Affairs (DCA), including physicians and surgeons providing essential care.

Exhibit C
Page 1

On March 30, 2020, Governor Newsom announced an initiative to "expand California's health care workforce and recruit health care professionals to address the COVID-19 surge" and signed Executive Order N-39-20.  This executive order established a waiver request process under the DCA and included other provisions authorizing the waiver of licensing, certification, and credentialing requirements for health care providers.  Through this waiver process, the DCA issued a series of waivers of law to authorize various healing arts professionals to order and administer COVID-19 vaccines.  These waivers aligned with similar authority granted federally under the Public Readiness and Emergency Preparedness (PREP) Act for Medical Countermeasures Against COVID-19.

Vaccines are regulated and overseen by multiple federal entities responsible for ensuring their safety and efficacy.  The federal Food and Drug Administration (FDA) is initially responsible for approving new drugs, determining both that they are safe to administer and that their recommended use is clinically supported.  During states of emergency, the FDA may expedite their review through the Emergency Use Authorization (EUA) process to accelerate the availability of new immunizations or treatments.  Currently, three vaccines have been approved through the EUA process for COVID-19.  These vaccines have additionally been reviewed and found safe by national experts participating in a Western States Scientific Safety Review Workgroup.  Data has continued to show that the risks of infection, hospitalization, and death for vaccinated individuals are dramatically lower than for those who have not been vaccinated.

*Misinformation and Disinformation.*  This bill is intended to target three types of false or misleading information relating to the COVID-19 pandemic.  First, the language refers to nonfactual information regarding "the nature and risks of the virus"—for example, misleadingly comparing COVID-19 to less serious conditions or inaccurately characterizing the deadliness of the disease.  Second, the bill seeks to address false statements regarding its "prevention and treatment"—this would presumably include the promotion of treatments and therapies that have no proven effectiveness against the virus.  The third category is for misinformation or disinformation regarding "the development, safety, and effectiveness of COVID-19 vaccines."

Public skepticism and misunderstanding of diseases, treatments, and immunizations is not unique to COVID-19.  The earliest known group formed to oppose vaccination programs, the National Anti-Vaccination League, was established in the United Kingdom in 1866 following a series of violent protests against mandatory smallpox immunizations in the Vaccination Act of 1853.  In 1918, conspiracy theories were circulated that the Spanish Flu pandemic was a deliberate act of biological warfare, spread through aspirin manufactured by German company Bayer.

What has been historically unprecedented about the dissemination of misinformation and disinformation throughout the COVID-19 pandemic is the omnipresence of media coverage and the prevalence of social media.  False information can easily be spread to millions within days or even hours of it being created.  It can become challenging for a population already feeling overloaded with complex information to differentiate between thoroughly researched, accurate reporting and information that is oversimplified, unproven, or patently false.

A substantial factor in the spread of false information is a phenomenon known as "confirmation bias."  When individuals hold a preexisting belief or suspicion, they will often unconsciously seek out information to validate that predisposition and filter out contradictory evidence.  The persistence of modern media exposure and the internet has exacerbated this effect, as information seeming to support virtually any viewpoint or understanding can now easily be found through the

Exhibit C
Page 2

use of search engines and social media.  Many websites further exacerbate the issue of confirmation bias by algorithmically delivering consistent information to users who have demonstrated a pattern of belief or ideology.

The role of physicians and other health professionals in legitimizing false information during the COVID-19 pandemic has presented serious implications for public safety.  For example, the federal Centers for Disease Control and Prevention (CDC) has for decades been recognized as the United States government's primary agency for protecting Americans through expert research and advice related to the control and prevention of communicable disease.  The CDC has consistently warned Americans about the threat of COVID-19 and strongly encouraged vaccination.  However, throughout the pandemic, many individuals who are predisposed toward skepticism of the government and incredulity toward vaccines have sought to validate those views, despite unambiguous guidance to the contrary from leading health experts.

As a result, health practitioners whose views on COVID-19 and immunization against it are within the extreme minority for their profession are armed with a disproportionately loud voice in the public discourse.  Antigovernment cynics and vaccine skeptics cohere to the opinions of those few physicians who will reinforce their beliefs as they seek to appeal to authority in service of their confirmation bias.  The effect of this is that a relatively small group of public health contrarians who are licensed as physicians will be afforded the same, if not more, credibility as long-trusted public institutions like the CDC, the FDA, and the American Medical Association, even if those physicians do not specialize in epidemiology or infectious disease prevention.

The incongruity of this reasoning is frequently rationalized in part through conspiracy theories about the medical establishment.  This is not novel.  When allopathic medicine first achieved dominance during the Progressive Era, there were many who vilified the medical system as financially motivated, accusing "modern medicine men" of oppressing natural therapies in order to profit from a monopoly on health care practice.  Other related conspiracy theories frequently involve the United States government, which has been accused of everything from inventing or exaggerating the pandemic to suppressing natural remedies, or even using COVID-19 vaccines as a clandestine method for implanting microchips into Americans.

*Role of State Medical Boards.*  Physicians and surgeons in California are regulated by one of two entities: the Medical Board of California (MBC) or the Osteopathic Medical Board of California (OMBC).  The MBC licenses and regulates about 153,000 physicians while the OMBC licenses and regulates slightly over 12,000.  Despite receiving different forms of medical education and being overseen by separate boards, the essential scope of practice for these two categories of licensees are virtually identical.

In July of 2021, the Federation of State Medical Boards (FSMB) issued a statement positioned as being "in response to a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media."  The FSMB warned that physicians who engage in the spread of false information related to COVID-19 were jeopardizing their licenses to practice medicine.  While physicians are subject to discipline only by boards located in states where they hold a license, the FSMB's statement was viewed as a serious warning to doctors that they risked disciplinary action if they engaged in spreading inaccurate information.

Following the FSMB's statement, some state medical boards appeared poised to take action against licensees found to be spreading misinformation or disinformation.  Tennessee's Board of

Exhibit C
Page 3

Medical Examiners adopted the FSMB's statement as their own.  However, in response, the
state's Republican legislature threatened to disband the board if it sought to take any such action
against a physician.  Legislation in at least fourteen states has been introduced to prevent medical
boards from holding physicians who spread false information accountable in accordance with the
FSMB's guidance.

In contrast to legislative action taken in those states, this bill would seek to confirm that in
California, physicians who disseminate COVID-19 misinformation or disinformation are indeed
subject to formal discipline.  The bill would expressly establish that such dissemination would
constitute "unprofessional conduct"—a term used prolifically in the Medical Practice Act as a
general description of numerous forms of conduct for which disciplinary action may be taken.
The MBC or OMBC would be required to consider multiple factors prior to filing an accusation,
but would ultimately be authorized to take enforcement action against physicians who have used
their licenses to jeopardize public health and safety through the spread of false information.

It is certainly meaningful that this bill would establish as a matter of California law that
physicians are subject to discipline for spreading false information.  However, it is more than
likely that the MBC and OMBC are both already fully capable of bringing an accusation against
a physician for this type of misconduct.  For example, the Medical Practice Act includes "gross
negligence" and "repeated negligent acts" within the meaning of unprofessional conduct,
representing situations where the physician deviated from the standard of care in the opinion of
the MBC and its expert medical reviewers.

If, for example, a physician were to advise patients to inject disinfectant as a way of treating
COVID-19 – as former President Trump once did, resulting in a sharp rise in reported incidents
of misusing bleach and other cleaning products – disseminating that "misinformation" would
almost certainly be considered negligent care subject to discipline.  Whether a case of spreading
misinformation is sufficient to bring an action for gross negligence would be evaluated using the
MBC's expert reviewer guidelines, which provide that "the determining factor is the *degree* of
departure from the applicable standard of care."  Similarly, it is arguable that spreading
"disinformation" as commonly defined would constitute an "act of dishonesty or corruption"—
also statutorily included within the Medical Practice Act's meaning of unprofessional conduct.

Those in opposition to this bill have expressed concern that the MBC would overzealously
prosecute doctors for expressing views that are outside the mainstream but not indisputably
unreasonable based on the physician's research and training.  This apprehension cannot easily be
reconciled with persistent criticisms levied against the MBC by the Legislature and patient safety
advocates, who have repeatedly reproved the board for its underwhelming enforcement
activities.  Major news editorials have pointed out that the MBC only takes formal disciplinary
action in about three percent of cases, and that more than 80 percent of complaints are dismissed
without investigation.  As the Legislature persists in its admonishment of the MBC for failing to
take aggressive action against physicians who commit unprofessional conduct, it would appear
dubious that the board would excessively utilize the authority expressly provided by this bill.

It stands to reason that Californians who have demonstrated suspicion toward both the medical
establishment and their government would be slow to trust the MBC, with a majority of its
members consisting of physicians appointed by the Governor.  However, the degree of enmity
recently exhibited by physicians and others opposed to COVID-19 prevention policies could be
viewed as disturbing.  In December of 2021, it was reported that representatives of an anti-

Exhibit C
Page 4

vaccination organization called America's Frontline Doctors had stalked and intimidated Kristina Lawson, President of the MBC.  This harassment was escalated in April of 2022 when that same organization "released a 21-minute video that depicts Lawson in Nazi regalia, a whip in her hand and swastika on her shoulder, and shows a clip of the garage confrontation validating Lawson's description."

America's Frontline Doctors was founded by Dr. Simone Gold, who holds an active license in California as a physician.  Dr. Gold and her organization have vociferously promoted hydroxychloroquine as a COVID-19 treatment, despite evidence increasingly showing it to be ineffective and potentially unsafe.  Dr. Gold has engaged in multiple campaigns to stoke public distrust in COVID-19 vaccines, characterizing them as "experimental" despite numerous safety and efficacy trials successfully confirming their safety and efficacy.  Dr. Gold spoke at a rally held in conjunction with the attempted insurrection on the United States Capitol on January 6, 2021; she was arrested and subsequently pleaded guilty to a misdemeanor relating to that event.

Despite what would appear to be repeated conduct perpetrated by Dr. Gold involving the dissemination of false information regarding COVID-19, Dr. Gold's license remains active with the MBC and there appears to be no record of any disciplinary action taken against her.  Given the air of legitimacy she sustains from her status as a licensed physician, Dr. Gold likely serves as an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California. Regardless of whether similar authority is already available to the MBC through other enforceable provisions in the Medical Practice Act, it is understandable that the author desires to make this authority explicit and confirm that doctors licensed in California who disseminate misinformation or disinformation should be held fully accountable.

**According to the Author**
"AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread. Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this legislation, California will show its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**Arguments in Support**
The *California Medical Association* (CMA) is co-sponsoring this bill.  According to the CMA: "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort."

*ProtectUS* is co-sponsoring this bill, writing: "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. They have a professional and ethical obligation to counsel and treat patients based not on their own opinion or beliefs, but on medical guidelines and peer-reviewed scientific evidence. When they choose to spread inaccurate information and lend credibility to conspiracy theories, physicians discourage patients from accessing life-saving vaccines. And their actions disproportionately affect the most

Exhibit C
Page 5

vulnerable members of society – those who have the least access to credible information, and the fewest resources available should they become sick."

**Arguments in Opposition**

*A Voice for Choice Advocacy* opposes this bill, writing: "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19."

*Californians for Good Governance* opposes this bill "based on concerns about its unconstitutional restrictions on free speech." The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest." The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

## FISCAL COMMENTS

According to the Assembly Appropriations Committee, no costs to the MBC, which currently implements an allegation code for COVID-19-related complaints and tracks discipline related to unprofessional conduct, meeting the requirements of this bill; and minor and absorbable costs to the OMBC.

## VOTES

**ASM BUSINESS AND PROFESSIONS: 12-5-2**
**YES:** Berman, Bloom, Mia Bonta, Gipson, Irwin, Lee, McCarty, Medina, Mullin, Ward, Ting, Akilah Weber
**NO:** Flora, Chen, Cunningham, Megan Dahle, Fong
**ABS, ABST OR NV:** Grayson, Arambula

**ASM APPROPRIATIONS: 12-4-0**
**YES:** Holden, Bryan, Calderon, Carrillo, Mike Fong, Gabriel, Eduardo Garcia, Jones-Sawyer, Quirk, Robert Rivas, Akilah Weber, Wilson
**NO:** Bigelow, Megan Dahle, Davies, Fong

## UPDATED

VERSION: April 20, 2022

CONSULTANT:  Robert Sumner / B. & P. / (916) 319-3301                    FN: 0002384

Exhibit C
Page 6

# EXHIBIT D

# SENATE COMMITTEE ON
# BUSINESS, PROFESSIONS AND ECONOMIC DEVELOPMENT
## Senator Richard Roth, Chair
### 2021 - 2022  Regular

| | | | |
|---|---|---|---|
| **Bill No:** | AB 2098 | **Hearing Date:** | June 27, 2022 |
| **Author:** | Low | | |
| **Version:** | June 21, 2022 | | |
| **Urgency:** | No | **Fiscal:** | Yes |
| **Consultant:** | Sarah Mason | | |

**Subject:**  Physicians and surgeons: unprofessional conduct

**SUMMARY:**  Makes disseminating misinformation, as defined, or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines, by a physician and surgeon unprofessional conduct.

**Existing law:**

1) Establishes various practice acts in the Business and Professions Code (BPC) governed by various boards within the Department of Consumer Affairs (DCA) which provide for the licensing and regulation of health care professionals.  (Business and Professions Code (BPC) §§ 500 *et seq.*)

2) Regulates the practice of medicine under the Medical Practice Act (Act), which establishes the Medical Board of California (MBC) to administer and enforce the Act. (Business and Professions Code (BPC) § 2000 *et. seq.*)

3) Enacts the Osteopathic Act, which provides for the licensure and regulation of osteopathic physicians and surgeons. (BPC §§ 2450 et seq.)

4) Provides that protection of the public shall be the highest priority for both the MBC and the Osteopathic Medical Board of California (OMBC) in exercising their respective licensing, regulatory, and disciplinary functions, and that whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount. (BPC § 2001.1; § 2450.1)

5) Provides that all proceedings against a licensee for unprofessional conduct, or against an applicant for licensure for unprofessional conduct or cause, shall be conducted in accordance with the Administrative Procedure Act. (BPC § 2230)

6) Establishes various violations that constitute unprofessional conduct. (BPC §§ 725 *et. seq)*

7) Requires the MBC to take action against any licensee who is charged with unprofessional conduct, which includes, but is not limited to, the following:

   a)  Violating or aiding in the violation of the Medical Practice Act.

b) Gross negligence.

c) Repeated negligent acts.

d) Incompetence.

e) The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician.

f) Any action or conduct that would have warranted the denial of a certificate.

g) The failure by a physician, in the absence of good cause, to attend and participate in an investigatory interview by the MBC. (BPC § 2234)

8) Provides that a physician shall not be subject to discipline solely on the basis that the treatment or advice they rendered to a patient is alternative or complementary medicine if that treatment or advice was provided after informed consent and a good-faith prior examination; was provided after the physician provided the patient with information concerning conventional treatment; and the alternative complementary medicine did not cause a delay in, or discourage traditional diagnosis of, a condition of the patient, or cause death or serious bodily injury to the patient. (BPC § 2234.1)

**This bill**:

1) Provides that it is unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including:

a) False or misleading information about the nature and risks of the virus,

b) COVID-19 prevention and treatment; and

c) The development, safety, and effectiveness of COVID-19 vaccines.

2) Defines the following for the purposes of 1) and 2):

a) "Board" means the MBC or OMBC.

b) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.

c) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.

d) "Misinformation" means false information that is contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.

e) "Physician and surgeon" means person licensed by the MBC or OMBC.

3)   Specifies that violators of these provisions are not guilty of a misdemeanor.

4)   Makes findings and declarations that:

   a)   The global spread of the SARS-CoV-2 coronavirus, or COVID-19, has claimed the lives of over 6,000,000 people worldwide, including nearly 90,000 Californians.

   b)   Data from the federal Centers for Disease Control and Prevention (CDC) shows that unvaccinated individuals are at a risk of dying from COVID-19 that is 11 times greater than those who are fully vaccinated.

   c)   The safety and efficacy of COVID-19 vaccines have been confirmed through evaluation by the federal Food and Drug Administration (FDA) and the vaccines continue to undergo intensive safety monitoring by the CDC.

   d)   The spread of misinformation and disinformation about COVID-19 vaccines has weakened public confidence and placed lives at serious risk.

   e)   Major news outlets have reported that some of the most dangerous propagators of inaccurate information regarding the COVID-19 vaccines are licensed health care professionals.

   f)   The Federation of State Medical Boards has released a statement warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information.

   g)   In House Resolution No. 74 of the 2021–22 Regular Session, the California State Assembly declared health misinformation to be a public health crisis, and urged the State of California to commit to appropriately combating health misinformation and curbing the spread of falsehoods that threaten the health and safety of Californians.

**FISCAL EFFECT:**  According to the Assembly Committee on Appropriations, the bill will not result in costs to MBC, which currently implements an allegation code for COVID-19-related complaints and tracks discipline related to unprofessional conduct, meeting the requirements of this bill. The Committee noted that the bill will result in minor and absorbable costs to OMBC.

**COMMENTS:**

1.   **Purpose.**  The bill is sponsored by the California Medical Association. According to the Author, "AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread.

   Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this

legislation, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

2.  **Background.**

*COVID-19 Misinformation and Disinformation.* In March 2020, Governor Newsom declared a State of Emergency due to the COVID-19 pandemic that was beginning to spread widely. Center for Disease Control (CDC) and State Public Health Officials began issuing regular updates to inform the state on the long and short impacts of the virus, best ways to prevent spreading and contracting the virus which include wearing surgical and N-95 masks and receiving the COVID-19 vaccine, and awareness of symptoms. As the CDC and State Public Health officials began to learn more about the virus, spread, and overall impacts, the information was disseminated to doctors to help patients survive the virus if contracted, prevent patients from getting the virus, and cope with long term side effects now known as "long COVID". During the course of the pandemic, all healthcare professionals spent countless days treating patients and learning about the virus.

In December 2020, an emergency-approved COVID-19 vaccine began to roll out first to the aging population and healthcare professionals and eventually to all adults, and now all children. While scientists began working on creating the vaccine, misinformation and disinformation spread widely. CDC makes the distinction that misinformation is shared by people who not intend harm and disinformation is false information to deliberately disseminate with malice. This bill makes a distinction, but does not differentiate consequences for doctors.

Misinformation has resulted in less than desired vaccine rates, continued unnecessary spread and risk to communities. As of June 21, 2022, only 75.6% of people 5 and older are fully vaccinated[1]. Yale Medicine reports that a community needs 95% of the population to reach herd immunity. Part of the low vaccine rate is attributed to misinformation causing fear about potential side effects. Vaccine hesitancy is directly linked to misinformation.[2] Researchers at the Center for Health Security at the Johns Hopkins Bloomberg School of Public Health recently estimated that 2 million to 12 million people in the US were unvaccinated against COVID-19 because of misinformation or disinformation.

In November 21, the American Medical Association adopted a new policy to combat misinformation because "[health professional] using their professional license to validate the disinformation they are spreading has seriously undermined public health efforts"[3] The CDC and State Public Health Officials have published a myths and facts page to clarify misinformation. Myths the CDC is actively informing Americans about include: vaccines do not contain microchips, the vaccine will not make you magnetic, and the vaccine will not change your DNA.  Origination of misinformation is not clear; however, the White House reported in 2021 that much

---

[1] https://covid19.ca.gov/vaccination-progress-data/#overview
[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8528483/
[3] https://www.ama-assn.org/press-center/press-releases/ama-adopts-policy-combat-disinformation-health-care-professionals

of the COVID-19 vaccine misinformation began with a number of online social media users.

The CDC and State Public Health Officials are generally recognized as the leading experts in issue guidance for all public health matters which in the recent past has included sharing information on heart disease, diabetes, and communicable diseases. However, the CDC and public health officials' knowledge and public trust has been questioned. In peer-reviewed journal, a study determined that "prophylaxis of COVID-19 misinformation might be achieved by taking concrete steps to improve trust in science and scientists, such as building understanding of the scientific process and supporting open science initiatives."[4] Doctors providing accurate information would serve as an imperative piece of this recommendation to combat current misinformation.

In Florida, a doctor filed a complaint the Florida Department of Health allegedly a doctor was spreading misinformation about the safety and effectiveness of the COVID-19 vaccine and the use of masks for prevention. Ultimately there was no action taken against the doctor accused of spreading misinformation because state law does not prohibit misinformation or disinformation from doctors.[5] Other reports of physicians providing false information remains an issue.

Physicians and healthcare professionals play a critical role in keeping communities healthy. A physician's recommendation and information sharing will educate and inform decisions made by their patients. As such, providing accurate information will ultimately impact patient's health. NPR reported that, "The Center for Countering Digital Hate, which tracks vaccine misinformation online, says that even though the number of doctors involved in spreading this sort of bad information is tiny, they're having an outsized influence."[6] This bill would explicating hold physicians accountable for providing misinformation or disinformation about COVID-19 vaccines. This bill does not, however, include other healthcare professionals which have also been reported as spreading misinformation and disinformation.

*Physician and surgeon enforcement.* The enforcement process begins with a complaint.  Complaints are received from various sources, including the public, generated internally by MBC or OMBC, or based on information MBC and OMBC receive from various entities through mandatory reports to the boards.

MBC licensee complaints are received by the Central Complaint Unit, which starts the process of determining next steps for a complaint.  All complaints that pertain to treatment provided by a physician require patient medical records to be obtained. MBC reports that it is "subject to significant limitations in its authority to inspect and review medical records in the possession of a licensee. Generally, the Board must obtain patient consent prior to requesting records from a licensee. However, obtaining patient consent (for example, in cases involving inappropriate prescribing of opioids) may be difficult. If the patient refuses to give consent, then the Board

---

[4] https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-020-10103-x
[5] https://jamanetwork.com/journals/jama/fullarticle/2789369
[6] https://www.npr.org/sections/health-shots/2021/09/14/1035915598/doctors-covid-misinformation-medical-license

must establish good cause to issue a subpoena and may have to file a motion to compel in superior court to enforce the subpoena. Without quick access to records, investigations take longer to complete. In some cases, the Board is required to close complaints because its investigation cannot proceed without relevant medical records." Complaints regarding quality of care are received and reviewed by OMBC's Complaint Unit (CU) in Sacramento by a medical consultant. The CU medical consultant determines whether the quality of care issues presented in the complaint and supporting documents warrant investigation.

Pursuant to Business and Professions Code (BPC) Section 2220.08, before a quality of care complaint for MBC licensees is referred for further investigation, it must be reviewed by one or more medical experts with the pertinent education, training, and expertise to evaluate the specific standards of care issues raised by the complaint to determine if further field investigation is required.  When a medical reviewer determines that a complaint warrants referral for further investigation, CCU transfers the complaint to the Health Quality Investigation Unit (HQIU) in the DCA's Division of Investigation (DOI) which handles investigations for a number of health related boards within DCA to be investigated by a sworn investigator, a peace officer. There are 12 HQIU field offices located throughout California that handle these investigations.

MBC's complaint priorities are outlined in BPC section 2220.05 in order to ensure that physicians representing the greatest threat of harm are identified and disciplined expeditiously. MBC must ensure that it is following this section of law when investigating complaints, including complaints alleging the following as being the highest priority:

- Gross negligence, incompetence, or repeated negligent acts that involve death or serious bodily injury to one or more patients, such that the physician and surgeon represents a danger to the public

- Drug or alcohol abuse by a physician and surgeon involving death or serious bodily injury to a patient

- Repeated acts of clearly excessive prescribing, furnishing, or administering of controlled substances, or repeated acts of prescribing, dispensing, or furnishing of controlled substances without a good faith prior examination of the patient and medical reason therefor

- Repeated acts of clearly excessive recommending of cannabis to patients for medical purposes, or repeated acts of recommending cannabis to patients for medical purposes without a good faith prior examination of the patient and a medical reason for the recommendation

- Sexual misconduct with one or more patients during a course of treatment or an examination,

- Practicing medicine while under the influence of drugs or alcohol; and

- Repeated acts of clearly excessive prescribing, furnishing, or administering psychotropic medications to a minor without a good faith prior examination of the patient and medical reason therefor.

For complaints about physicians and surgeons that are subsequently investigated and meet the necessary legal prerequisites, a Deputy Attorney General (DAG) in the Office of the Attorney General (OAG) drafts formal charges, known as an "Accusation". A hearing before an Administrative Law Judge (ALJ) is subsequently scheduled, at which point settlement negotiations take place between the DAG, the physician and their attorney and MBC or OMBC staff.  Often times these result in a stipulated settlement, similar to a plea bargain in criminal court, where a licensee admits to having violated charges set forth in the accusation, or admits that the MBC or OMBC could establish a factual and legal basis for the charges in the Accusation at hearing, and accepts penalties for those violations.  If a licensee contests charges, the case is heard before an ALJ who subsequently drafts a proposed decision.  This decision is reviewed by a panel of MBC members or the OMBC Board who either adopt the decision as proposed, adopt the decision with a reduced penalty or adopt the decision with an increased penalty.  If probation is ordered, a copy of the final decision is referred to MBC's Probation Unit or OMBC's probation monitor for assignment to an inspector who monitors the licensees for compliance with the terms of probation.

3. **Arguments in Support.**  According to The <u>American College of Obstetricians and Gynecologists District IX (ACOG)</u>, "In response to the surge of misinformation, AB 2098 will constitute unprofessional conduct for a physician and surgeon to spread disinformation related to COVID-19, including false or misleading information regarding the virus, its prevention and treatment; and development, safety, and effectiveness of COVID-19 vaccines.

Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. When they choose to spread inaccurate information, physicians contradict their responsibilities and further erode public trust in the medical profession. By passing this bill, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

The <u>California Medical Association</u> writes, "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort.

In July, the Federation of State Medical Boards (FSMB) released a statement1 in response to the dramatic increase in COVID-19 misinformation and disinformation. The FSMB stated, "physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary actions by state medical boards, including the suspension and revocation of their medical licenses … they also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factual, scientifically grounded and consensus-driven for the betterment of public health. Spreading

inaccurate COVID-19 vaccine information contradicts that responsibility, threatens to further erode public trust in the medical profession, and puts all patients at risk."

While the MBC may have the ability to discipline licensees for unprofessional conduct under Business and Professions Code section 2234, AB 2098 makes clear that the MBC has the statutory authority to take such actions against physicians that spread COVID-19 misinformation or disinformation."

The <u>County Health Executives Association of California (CHEAC)</u> writes, "The United States Surgeon General Dr. Vivek H. Murthy recently stated "Health misinformation is a serious threat to public health. It can cause confusion, sow mistrust, harm people's health, and undermine public health efforts." Unfortunately, throughout the COVID-19 pandemic, we have witnessed a small minority of medical professionals spread misinformation and disinformation that has led some Californians to decline COVID-19 vaccines, reject public health measures such as masking and physical distancing, and use unproven treatments, such as ivermectin. The American Board of Medical Specialties (ABMS), consisting of the boards that determine whether physicians can be board-certified, issued a statement in September 2021 stating, "The spread of misinformation and the misapplication of medical science by physicians and other medical professionals is especially harmful as it threatens the health and wellbeing of our communities and at the same time undermines public trust in the profession and established best practices in care." Further, a recent article in the Journal of the American Medical Association states that the power of social media amplifies the message of the small minority of physicians making these types of false claims. AB 2098 clarifies in statute that the dissemination of COVID-19 misinformation and disinformation is unprofessional conduct and would give clear direction to the Medical Board of California and the Osteopathic Medical Board of California on how to evaluate a potential disciplinary action against a physician or surgeon who may be investigated for this reason."

According to the <u>American Academy of Pediatrics, California</u>, "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. When they choose to spread inaccurate information, physicians contradict their responsibilities and further erode public trust in the medical profession. By passing this bill, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

4. **Arguments in Opposition.**  According to a <u>Voice for Choice Advocacy</u>, "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established "standard of care" or "contemporary scientific consensus" for treating SARS-COV-2/COVID-19.

We are still in a time of evolution with this virus and its treatment, as we have been for the past 2+ years. SARS-COV-2 has mutated becoming more transmissible but less severe. While a handful of treatments have been authorized by the FDA, such as monoclonal antibodies and anti-viral medications, there are hundreds more in clinical trials that will come to market in the next months and years.

In the meantime, if this bill passes, California risks losing even more doctors to other states because they do not want to be put in the position of possibly being disciplined because they were using the latest research, which had not become standard of care yet, or trying adjunct treatments for better outcomes, that may not have been discovered or written about yet, or using protocols from other countries or states. If it were not for doctors trying different approaches throughout the past two years, we would still be using ventilators ineffectively."

Association of American Physicians and Surgeons, Inc. write, "We believe it is unethical for physicians to participate in any process that impedes the free exchange of scientific and clinical ideas through public allegations of misconduct or threats of punishment. Use of the stigmatizing label "misinformation" in a medical disciplinary environment is anti-scientific and unethical. *To our colleagues:* In addressing differences of opinion regarding patient management, we call on all physicians to abstain from making public allegations of professional misconduct against colleagues. *To Medical Board Members*: Decisions on sanctions against individual physicians exert the gravest of influence, reaching into life and- death clinical decision-making. AAPS believes the proper role for a medical practice board is to provide a legal mechanism for patients and physicians to investigate and resolve allegations of professional misconduct. This can only be accomplished in an environment with clearly defined rules, access to full legal due process, and scientific integrity. It is ethically improper to use disciplinary boards to resolve debates about the interpretation of medical science."

According to California Health Coalition Advocacy, "CHCA has the following concerns about this bill:

- Doctors go through rigorous education and training and should be allowed to voice their medical and professional opinions freely.
- Science and medicine have historically been advanced through minority voices. The stifling of dissenting opinion will have long lasting effects on the advancement of health care.
- The unintended consequence might be that the healthcare provider shortage would be exacerbated by the proposed law.
- California Business and Professions code recognizes that: "Since the National Institute of Medicine has reported that it can take up to 17 years for a new best practice to reach the average physician and surgeon, it is prudent to give attention to new developments not only in general medical care, but in the actual treatment of specific diseases, particularly those that are not yet broadly recognized in California." Division 2, Chapter 5, Article 12, Section 2234.1
- The understanding of the data and science related to COVID-19 continues to change as more studies are done. Standards of care are being updated as new information and treatments emerge. Any attempt at determining "contemporary scientific consensus" will be fleeting.
- Top doctors in their field from UCSF, Stanford, and other well respected institutions are speaking out about their lack of support for COVID-19 vaccines for children. Would these respected doctors be disciplined if AB 2098 were to pass?"

Californians for Good Governance opposes this bill "based on concerns about its unconstitutional restrictions on free speech." The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest." The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

5.  **Comments.** MBC supports this bill if it is amended. According to MBC, it "faces considerable challenges investigating cases involving a violation of the [Act] related to COVID-19. Oftentimes, complaints received by the Board pertaining to COVID-19 are made by a member of the public and not the patient of the physician. In some COVID-19 related investigations, the Board is unable to identify any specific patients who have been treated by the physician in question. Without a patient's name, it is impossible to obtain their consent for records and the Board will be unable to identify what patient records to seek in an investigative subpoena."

    MBC notes that its request for enhanced authority to inspect medical records would assist in overcoming this challenge.  MBC also states that "The definition of 'misinformation' is unclear and may lead to legal challenges following the imposition of discipline under this proposed law. If this occurs, the Board will have to use its financial resources, its staff time, and the staff time of the Attorney General's Office to defend against such litigation. Further, the Board may face significant challenges proving the dissemination of "disinformation," as it would be required to establish the physician's intent. Under current law, to prove a violation of the standard of care, the intent of the licensee, generally, is not relevant. MBC requests that the definition be updated to read

    > "Misinformation" means false information that is contradicted by contemporary scientific consensus ***contrary to the standard of care*** ~~to an extent where its dissemination constitutes gross negligence by the licensee~~.

    According to MBC, "This amendment connects the potential violation to the standard of care, which is a well-established concept followed by the Board and related administrative entities involved in the disciplinary process."

6.  **Should this bill only apply to physicians and surgeons?** Physician and surgeons are not the only licensed health care providers licensed who may engage in practices that this bill seeks to address.  Earlier this year, this Committee, in coordination with the Assembly Committee on Business and Professions, asked questions through the sunset review oversight process about efforts health care licensing programs are undertaking in order to curb the spread of medical misinformation. One example was highlighted in a staff prepared background paper for the sunset review oversight of the Board of Chiropractic Examiners noting that in Spring 2020, that board reported that several complaints were received about licensed doctors of chiropractic who were advertising that chiropractic care can help patients reduce their risk of COVID-19 infection. That board investigated the complaints, and the licensees subsequently removed advertisements from their

**AB 2098 (Low)**                                              Page **11** of 12

websites. Given that many additional licensed health care providers also have a "high degree of public trust and therefore must be held accountable for the information they spread", as the Author notes for physicians and surgeons in identifying the rationale for this measure, it is unclear why only one category of professional would be specified through statue designating their activities as unprofessional conduct. *The Author may wish to continue discussing whether other health care licensees should be included in the provisions of this bill.*

**SUPPORT AND OPPOSITION:**

Support:

California Medical Association (Sponsor)
American Academy of Pediatrics, California
American College of Obstetricians and Gynecologists District IX
California Chapter of The American College of Emergency Physicians
California Podiatric Medical Association
California Rheumatology Alliance
California Society of Anesthesiologists
Children's Specialty Care Coalition
County Health Executives Association of California
Families for Opening Carlsbad Schools
Pandemic Patients
Protect US
Teens for Vaccines INC.

Opposition:

A Voice for Choice Advocacy
Association of American Physicians and Surgeons
California Health Coalition Advocacy
Californians for Good Governance
Catholic Families 4 Freedom CA
Central Coast Health Coalition
Children's Health Defense California Chapter
Coalition for Informed Consent
Concerned Women for America
Dbsa California
Educate. Advocate.
Family Details LLC
Frederick Douglass Foundation of California
Freedom Keepers United, CA Freedom Keepers
Front Line Covid-19 Critical Care Alliance
Homewatch Caregivers of Huntington Beach
Natomas USD for Freedom
Not On Our Watch
Nuremberg 2.0 Ltd.
Pacific Justice Institute
Physicians for Informed Consent
Protection of The Educational Rights for Kids

Real Impact.
Restore Childhood
Siskiyou Conservative Republicans
Stand Up Sacramento County
Towards an Internet of Living Beings
Whittier Parents for Choice

**-- END --**

# EXHIBIT E

SENATE RULES COMMITTEE                                    AB 2098
Office of Senate Floor Analyses
(916) 651-1520   Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:    AB 2098
Author:     Low (D), et al.
Amended:    6/21/22 in Senate
Vote:       21

---

SENATE BUS., PROF. & ECON. DEV. COMMITTEE:  9-4, 6/27/22
AYES:  Roth, Archuleta, Dodd, Eggman, Hurtado, Leyva, Min, Newman, Pan
NOES:  Melendez, Bates, Jones, Ochoa Bogh
NO VOTE RECORDED:  Becker

SENATE APPROPRIATIONS COMMITTEE:  5-2, 8/11/22
AYES:  Portantino, Bradford, Laird, McGuire, Wieckowski
NOES:  Bates, Jones

ASSEMBLY FLOOR:  53-20, 5/26/22 - See last page for vote

---

**SUBJECT:**  Physicians and surgeons:  unprofessional conduct

**SOURCE:**  California Medical Association

---

**DIGEST:**  This bill makes disseminating misinformation, as defined, or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines, by a physician and surgeon unprofessional conduct.

**ANALYSIS:**

Existing law:

1) Regulates the practice of medicine under the Medical Practice Act (Act), which establishes the Medical Board of California (MBC) to administer and enforce the Act. (Business and Professions Code (BPC) § 2000 *et. seq.*)

2) Enacts the Osteopathic Act, which provides for the licensure and regulation of osteopathic physicians and surgeons. (BPC §§ 2450 et seq.)

3) Provides that protection of the public shall be the highest priority for both the MBC and the Osteopathic Medical Board of California (OMBC) in exercising their respective licensing, regulatory, and disciplinary functions, and that whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount. (BPC § 2001.1; § 2450.1)

4) Provides that all proceedings against a licensee for unprofessional conduct, or against an applicant for licensure for unprofessional conduct or cause, shall be conducted in accordance with the Administrative Procedure Act. (BPC § 2230)

5) Establishes various violations that constitute unprofessional conduct. (BPC §§ 725 *et. seq)*

6) Requires the MBC to take action against any licensee who is charged with unprofessional conduct, which includes, but is not limited to, the following:
   a) Violating or aiding in the violation of the Medical Practice Act.
   b) Gross negligence.
   c) Repeated negligent acts.
   d) Incompetence.
   e) The commission of any act involving dishonesty or corruption that is substantially related to the qualifications, functions, or duties of a physician.
   f) Any action or conduct that would have warranted the denial of a certificate.
   g) The failure by a physician, in the absence of good cause, to attend and participate in an investigatory interview by the MBC. (BPC § 2234)

7) Provides that a physician shall not be subject to discipline solely on the basis that the treatment or advice they rendered to a patient is alternative or complementary medicine if that treatment or advice was provided after informed consent and a good-faith prior examination; was provided after the physician provided the patient with information concerning conventional treatment; and the alternative complementary medicine did not cause a delay in, or discourage traditional diagnosis of, a condition of the patient, or cause death or serious bodily injury to the patient. (BPC § 2234.1)

This bill:

1) Provides that it is unprofessional conduct for a physician and surgeon to disseminate misinformation or disinformation related to COVID-19, including: false or misleading information about the nature and risks of the virus; COVID-19 prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines.

2) Defines the following:
   a) "Board" means the MBC or OMBC.
   b) "Disinformation" means misinformation that the licensee deliberately disseminated with malicious intent or an intent to mislead.
   c) "Disseminate" means the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice.
   d) "Misinformation" means false information that is contradicted by contemporary scientific consensus to an extent where its dissemination constitutes gross negligence by the licensee.
   e) "Physician and surgeon" means person licensed by the MBC or OMBC.

3) Specifies that violators of these provisions are not guilty of a misdemeanor.

4) Makes findings and declarations about the impacts of COVID-19, information about COVID-19 vaccines, and impacts of misinformation and disinformation about COVID-19 vaccines

## Background

*COVID-19 Misinformation and Disinformation.* In March 2020, Governor Newsom declared a State of Emergency due to the COVID-19 pandemic that was beginning to spread widely. In December 2020, an emergency-approved COVID-19 vaccine began to roll out first to the aging population and healthcare professionals and eventually to all adults, and now all children. While scientists began working on creating the vaccine, misinformation and disinformation spread widely. CDC makes the distinction that misinformation is shared by people who not intend harm and disinformation is false information to deliberately disseminate with malice. This bill makes a distinction, but does not differentiate consequences for doctors.

Misinformation has resulted in less than desired vaccine rates, continued unnecessary spread and risk to communities. Reports show that as of June 21, 2022, only 75.6% of people 5 and older are fully vaccinated. Yale Medicine reports that a community needs 95% of the population to reach herd immunity. Part of the low vaccine rate is attributed to misinformation causing fear about potential side effects. Researchers at the Center for Health Security at the Johns Hopkins Bloomberg School of Public Health recently estimated that 2 million to 12 million people in the US were unvaccinated against COVID-19 because of misinformation or disinformation.

In November 2021, the American Medical Association adopted a new policy to combat misinformation because "[health professional] using their professional

license to validate the disinformation they are spreading has seriously undermined public health efforts". The CDC and State Public Health Officials have published a myths and facts page to clarify misinformation. Origination of misinformation is not clear; however, the White House reported in 2021 that much of the COVID-19 vaccine misinformation began with a number of online social media users.

Physicians and healthcare professionals play a critical role in keeping communities healthy. A physician's recommendation and information sharing will educate and inform decisions made by their patients. As such, providing accurate information will ultimately impact patient's health. NPR reported that, "The Center for Countering Digital Hate, which tracks vaccine misinformation online, says that even though the number of doctors involved in spreading this sort of bad information is tiny, they're having an outsized influence." This bill would explicating hold physicians accountable for providing misinformation or disinformation about COVID-19 vaccines. This bill does not, however, include other healthcare professionals which have also been reported as spreading misinformation and disinformation.

## Comments

According to MBC, it "faces considerable challenges investigating cases involving a violation of the [Act] related to COVID-19. Oftentimes, complaints received by the Board pertaining to COVID-19 are made by a member of the public and not the patient of the physician. In some COVID-19 related investigations, the Board is unable to identify any specific patients who have been treated by the physician in question. Without a patient's name, it is impossible to obtain their consent for records and the Board will be unable to identify what patient records to seek in an investigative subpoena." MBC notes that its request for enhanced authority to inspect medical records would assist in overcoming this challenge.  MBC also states that "The definition of 'misinformation' is unclear and may lead to legal challenges following the imposition of discipline under this proposed law. MBC requests that the definition be updated to read  "Misinformation" means false information that is contradicted by contemporary scientific consensus *contrary to the standard of care* ~~to an extent where its dissemination constitutes gross negligence by the licensee~~.

Physicians and surgeons are not the only licensed health care providers licensed who may engage in practices that this bill seeks to address.  In 2022, the Senate Committee on Business, Professions, and Economic Development, in coordination with the Assembly Committee on Business and Professions, asked questions through the sunset review oversight process about efforts health care licensing

programs are undertaking in order to curb the spread of medical misinformation. One example was highlighted in a staff prepared background paper for the sunset review oversight of the Board of Chiropractic Examiners noting that in Spring 2020, that board reported that several complaints were received about licensed doctors of chiropractic who were advertising that chiropractic care can help patients reduce their risk of COVID-19 infection. That board investigated the complaints, and the licensees subsequently removed advertisements from their websites. Given that many additional licensed health care providers also have a "high degree of public trust and therefore must be held accountable for the information they spread", as the Author notes for physicians and surgeons in identifying the rationale for this measure, it is unclear why only one category of professional would be specified through statue designating their activities as unprofessional conduct.

**FISCAL EFFECT:**   Appropriation:  No   Fiscal Com.:   Yes   Local:  No

According to the Senate Appropriations Committee, OMBC estimates a fiscal impact of $10,000 and MBC anticipates any fiscal impact to be absorbable within existing resources as the board currently implements an allegation code for COVID-19 related complaints and tracks discipline related to unprofessional conduct. Actual enforcement costs to the MBC and OMBC are indeterminate and would depend on the volume of complaints received specific to COVID-19 misinformation and disinformation, as well as the complexity of any subsequent investigations. The Office of Information Services within the Department of Consumer Affairs estimates $1,600 for workload associated with making information technology changes.

**SUPPORT:**  (Verified  8/11/22)

California Medical Association (source)
American Academy of Pediatrics, California
American College of Emergency Physicians, California Chapter
American College of Obstetricians and Gynecologists District IX
California Podiatric Medical Association
California Rheumatology Alliance
California Society of Anesthesiologists
Children's Specialty Care Coalition
County Health Executives Association of California
Families for Opening Carlsbad Schools
Pandemic Patients

AB 2098
Page 6

Protect US
Teens for Vaccines, Inc.

**OPPOSITION:** (Verified  8/11/22)

A Voice for Choice Advocacy
Association of American Physicians and Surgeons
California Health Coalition Advocacy
Californians for Good Governance
Catholic Families 4 Freedom, California
Central Coast Health Coalition
Children's Health Defense California Chapter
Coalition for Informed Consent
Concerned Women for America
Depression and Bipolar Support Alliance, California
Educate. Advocate.
Family Details LLC
Frederick Douglass Foundation of California
Freedom Keepers United, California Freedom Keepers
Front Line Covid-19 Critical Care Alliance
Homewatch Caregivers of Huntington Beach
Natomas USD for Freedom
Not On Our Watch
Nuremberg 2.0 Ltd.
Pacific Justice Institute
Physicians for Informed Consent
Protection of The Educational Rights for Kids
Real Impact.
Restore Childhood
Siskiyou Conservative Republicans
Stand Up Sacramento County
Towards an Internet of Living Beings
Whittier Parents for Choice

**ARGUMENTS IN SUPPORT:** Supporters write that licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. When they choose to spread inaccurate information, physicians contradict their responsibilities and further erode public trust in the medical profession. By passing this bill, California will demonstrate its unwavering support for a scientifically informed populous to protect ourselves from COVID-19. The California Medical Association notes that "While the MBC may have the ability to discipline licensees

for unprofessional conduct under Business and Professions Code section 2234, AB 2098 makes clear that the MBC has the statutory authority to take such actions against physicians that spread COVID-19 misinformation or disinformation." Supporters state that health misinformation is a serious threat to public health that can cause confusion, sow mistrust, harm people's health, and undermine public health efforts.

**ARGUMENTS IN OPPOSITION:**   According to A Voice for Choice Advocacy, "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19." Opponents also note that doctors should be allowed to voice their medical and professional opinions freely and state that an unintended consequence of this bill might be that the healthcare provider shortage would be exacerbated.  Opponents also express concerns about unconstitutional restrictions on free speech.

ASSEMBLY FLOOR:  53-20, 5/26/22
AYES:  Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Cooper, Daly, Mike Fong, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Gray, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Stone, Ting, Villapudua, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon
NOES:  Bigelow, Chen, Choi, Cooley, Cunningham, Megan Dahle, Davies, Flora, Fong, Gallagher, Kiley, Lackey, Mathis, Nguyen, Patterson, Seyarto, Smith, Valladares, Voepel, Waldron
NO VOTE RECORDED:  Berman, Grayson, Mayes, Nazarian, O'Donnell

Prepared by:   Sarah Mason / B., P. & E.D. /
8/13/22 9:49:29

**\*\*\*\*  END  \*\*\*\***

# EXHIBIT F

CONCURRENCE IN SENATE AMENDMENTS
AB 2098 (Low)
As Amended  August 22, 2022
Majority vote

## SUMMARY

Expressly provides that the dissemination of misinformation or disinformation related to
COVID-19 by physicians and surgeons constitutes unprofessional conduct.

**Senate Amendments**

1)  Strikes the requirement that the Medical Board of California (MBC) or the Osteopathic
    Medical Board of California (OMBC) must consider certain factors prior to bringing a
    disciplinary action against a licensee under this bill.

2)  Adjusts the definition of "misinformation" to mean false information that is contradicted by
    contemporary scientific consensus contrary to the standard of care.

3)  Rearranges this bill's definitions so that they are listed in alphabetical order.

## COMMENTS

*Misinformation and Disinformation.*  This bill is intended to target three types of false or
misleading information relating to the COVID-19 pandemic.  First, the language refers to
nonfactual information regarding "the nature and risks of the virus" – for example, misleadingly
comparing COVID-19 to less serious conditions or inaccurately characterizing the deadliness of
the disease.  Second, the bill seeks to address false statements regarding its "prevention and
treatment" – this would presumably include treatments and therapies that have no proven
effectiveness against the virus.  The third category is for misinformation or disinformation
regarding "the development, safety, and effectiveness of COVID-19 vaccines."

Public skepticism and misunderstanding of diseases, treatments, and immunizations is not unique
to COVID-19.  The earliest known group formed to oppose vaccination programs, the National
Anti-Vaccination League, was established in the United Kingdom in 1866 following a series of
violent protests against mandatory smallpox immunizations in the Vaccination Act of 1853.  In
1918, conspiracy theories were circulated that the Spanish Flu pandemic was a deliberate act of
biological warfare, spread through aspirin manufactured by German company Bayer.

What has been historically unprecedented about the dissemination of misinformation and
disinformation throughout the COVID-19 pandemic is the omnipresence of media coverage and
the prevalence of social media.  False information can easily be spread to millions within days or
even hours of it being created.  It can become challenging for a population already feeling
overloaded with complex information to differentiate between thoroughly researched, accurate
reporting and information that is oversimplified, unproven, or patently false.

A substantial factor in the spread of false information is a phenomenon known as "confirmation
bias."  When individuals hold a preexisting belief or suspicion, they will often unconsciously
seek out information to validate that predisposition and filter out contradictory evidence.  The
persistence of modern media exposure and the internet has exacerbated this effect, as information
seeming to support virtually any viewpoint or understanding can now easily be found through the

use of search engines and social media.  Many websites further exacerbate the issue of
confirmation bias by algorithmically delivering consistent information to users who have
demonstrated a pattern of belief or ideology.

The role of physicians and other health professionals in legitimizing false information during the
COVID-19 pandemic has presented serious implications for public safety.  For example, the
federal Centers for Disease Control and Prevention (CDC) has for decades been recognized as
the United States government's primary agency for protecting Americans through expert research
and advice related to the control and prevention of communicable disease.  The CDC has
consistently warned Americans about the threat of COVID-19 and strongly encouraged
vaccination.  However, throughout the pandemic, many individuals who are predisposed toward
skepticism of the government and incredulity toward vaccines have sought to validate those
views, despite unambiguous guidance to the contrary from leading health experts.

As a result, health practitioners whose views on COVID-19 and immunization against it are
within the extreme minority for their profession are armed with a disproportionately loud voice
in the public discourse.  Antigovernment cynics and vaccine skeptics cohere to the opinions of
those few physicians who will reinforce their beliefs as they seek to appeal to authority in service
of their confirmation bias.  The effect of this is that a relatively small group of public health
contrarians who are licensed as physicians will be afforded the same, if not more, credibility as
long-trusted public institutions like the CDC, the FDA, and the American Medical Association,
even if those physicians do not specialize in epidemiology or infectious disease prevention.

The incongruity of this reasoning is frequently rationalized in part through conspiracy theories
about the medical establishment.  This is not novel.  When allopathic medicine first achieved
dominance during the Progressive Era, there were many who vilified the medical system as
financially motivated, accusing "modern medicine men" of oppressing natural therapies in order
to profit from a monopoly on health care practice.  Other related conspiracy theories frequently
involve the United States government, which has been accused of everything from inventing or
exaggerating the pandemic to suppressing natural remedies, or even using COVID-19 vaccines
as a clandestine method for implanting microchips into Americans.

*Role of State Medical Boards.*  Physicians and surgeons in California are regulated by one of two
entities: the Medical Board of California (MBC) or the Osteopathic Medical Board of California
(OMBC).  The MBC licenses and regulates about 153,000 physicians while the OMBC licenses
and regulates slightly over 12,000.  Despite receiving different forms of medical education and
being overseen by separate boards, the essential scope of practice for these two categories of
licensees are virtually identical.

In July of 2021, the Federation of State Medical Boards (FSMB) issued a statement positioned as
being "in response to a dramatic increase in the dissemination of COVID-19 vaccine
misinformation and disinformation by physicians and other health care professionals on social
media platforms, online and in the media."  The FSMB warned that physicians who engage in
the spread of false information related to COVID-19 were jeopardizing their licenses to practice
medicine.  While physicians are subject to discipline only by boards located in states where they
hold a license, the FSMB's statement was viewed as a serious warning to doctors that they risked
disciplinary action if they engaged in spreading inaccurate information.

Following the FSMB's statement, some state medical boards appeared poised to take action
against licensees found to be spreading misinformation or disinformation.  Tennessee's Board of

Medical Examiners adopted the FSMB's statement as their own.  However, in response, the state's Republican legislature threatened to disband the board if it sought to take any such action against a physician.  Legislation in at least fourteen states has been introduced to prevent medical boards from holding physicians who spread false information accountable in accordance with the FSMB's guidance.

In contrast to legislative action taken in those states, this bill would seek to confirm that in California, physicians who disseminate COVID-19 misinformation or disinformation are indeed subject to formal discipline.  The bill would expressly establish that such dissemination would constitute "unprofessional conduct" – a term used prolifically in the Medical Practice Act as a general description of numerous forms of conduct for which disciplinary action may be taken.  The MBC or OMBC would be authorized to take enforcement action against physicians who have used their licenses to jeopardize public health and safety through the spread of false information.

It is certainly meaningful that this bill would establish as a matter of California law that physicians are subject to discipline for spreading false information.  However, it is more than likely that the MBC and OMBC are both already fully capable of bringing an accusation against a physician for this type of misconduct.  For example, the Medical Practice Act includes "gross negligence" and "repeated negligent acts" within the meaning of unprofessional conduct, representing situations where the physician deviated from the standard of care in the opinion of the MBC and its expert medical reviewers.

If, for example, a physician were to advise patients to inject disinfectant as a way of treating COVID-19 – as former President Trump once did, resulting in a sharp rise in reported incidents of misusing bleach and other cleaning products – disseminating that "misinformation" would almost certainly be considered negligent care subject to discipline.  Whether a case of spreading misinformation is sufficient to bring an action for gross negligence would be evaluated using the MBC's expert reviewer guidelines, which provide that "the determining factor is the *degree* of departure from the applicable standard of care."  Similarly, it is arguable that spreading "disinformation" as commonly defined would constitute an "act of dishonesty or corruption"— also statutorily included within the Medical Practice Act's meaning of unprofessional conduct.

Those in opposition to this bill have expressed concern that the MBC would overzealously prosecute doctors for expressing views that are outside the mainstream but not indisputably unreasonable based on the physician's research and training.  This apprehension cannot easily be reconciled with persistent criticisms levied against the MBC by the Legislature and patient safety advocates, who have repeatedly reproved the board for its underwhelming enforcement activities.  Major news editorials have pointed out that the MBC only takes formal disciplinary action in about three percent of cases, and that more than 80 percent of complaints are dismissed without investigation.  As the Legislature persists in its admonishment of the MBC for failing to take aggressive action against physicians who commit unprofessional conduct, it would appear dubious that the board would excessively utilize the authority expressly provided by this bill.

It stands to reason that Californians who have demonstrated suspicion toward both the medical establishment and their government would be slow to trust the MBC, with a majority of its members consisting of physicians appointed by the Governor.  However, the degree of enmity recently exhibited by physicians and others opposed to COVID-19 prevention policies could be viewed as disturbing.  In December of 2021, it was reported that representatives of an anti-

vaccination organization called America's Frontline Doctors had stalked and intimidated Kristina Lawson, President of the MBC.  This harassment was escalated in April of 2022 when that same organization "released a 21-minute video that depicts Lawson in Nazi regalia, a whip in her hand and swastika on her shoulder, and shows a clip of the garage confrontation validating Lawson's description."

America's Frontline Doctors was founded by Dr. Simone Gold, who holds an active license in California as a physician.  Dr. Gold and her organization have vociferously promoted hydroxychloroquine as a COVID-19 treatment, despite evidence increasingly showing it to be ineffective and potentially unsafe.  Dr. Gold has engaged in multiple campaigns to stoke public distrust in COVID-19 vaccines, characterizing them as "experimental" despite numerous safety and efficacy trials successfully confirming their safety and efficacy.  Dr. Gold spoke at a rally held in conjunction with the attempted insurrection on the United States Capitol on January 6, 2021; she was arrested and subsequently pleaded guilty to a misdemeanor relating to that event.

Despite what would appear to be repeated conduct perpetrated by Dr. Gold involving the dissemination of false information regarding COVID-19, Dr. Gold's license remains active with the MBC and there appears to be no record of any disciplinary action taken against her.  Given the air of legitimacy she sustains from her status as a licensed physician, Dr. Gold likely serves as an illustrative example of the type of behavior that the author of this bill seeks to unequivocally establish as constituting unprofessional conduct for physicians in California.  Regardless of whether similar authority is already available to the MBC through other enforceable provisions in the Medical Practice Act, it is understandable that the author desires to make this authority explicit and confirm that doctors licensed in California who disseminate misinformation or disinformation should be held fully accountable.

**According to the Author**
"AB 2098 is crucial to addressing the amplification of misinformation and disinformation related to the COVID-19 pandemic. Licensed physicians, doctors, and surgeons possess a high degree of public trust and therefore must be held accountable for the information they spread. Providing patients with accurate, science-based information on the pandemic and COVID-19 vaccinations is imperative to protecting public health. By passing this legislation, California will show its unwavering support for a scientifically informed populous to protect ourselves from COVID-19."

**Arguments in Support**
The *California Medical Association* (CMA) is co-sponsoring this bill.  According to the CMA: "The COVID-19 pandemic has unfortunately led to increasing amounts of misinformation and disinformation related to the disease including how the virus is transmitted, promoting untested treatments and cures, and calling into question public health efforts such as masking and vaccinations. Many health professionals, including physicians, have been the culprits of this misinformation and disinformation effort."

*ProtectUS* is co-sponsoring this bill, writing: "Licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. They have a professional and ethical obligation to counsel and treat patients based not on their own opinion or beliefs, but on medical guidelines and peer-reviewed scientific evidence. When they choose to spread inaccurate information and lend credibility to conspiracy theories, physicians discourage patients from accessing life-saving vaccines. And their actions disproportionately affect the most

vulnerable members of society—those who have the least access to credible information, and the fewest resources available should they become sick."

**Arguments in Opposition**

*A Voice for Choice Advocacy* opposes this bill, writing: "While we agree that physicians and surgeons should be disciplined for maliciously sharing misinformation and disinformation, there are already measures in place for the California Medical Board to discipline for such offenses. Furthermore, AB 2098 is overly broad and would be impossible to implement because there is no definition and no established 'standard of care' or 'contemporary scientific consensus' for treating SARS-COV-2/COVID-19."

*Californians for Good Governance* opposes this bill "based on concerns about its unconstitutional restrictions on free speech."  The organization argues that "while the state may be able to claim that providing the public with accurate information regarding Covid-19 is a compelling interest, it cannot possibly argue that the blunt weapon that AB 2098 represents is narrowly tailored to that interest."  The organization further states that "in a country such as ours, which was established on the foundation of civil liberties such as free speech, the truth is something hashed out in the marketplace of ideas, rather than dictated by the government."

## FISCAL COMMENTS

According to the Senate Appropriations Committee, the OMBC estimates a fiscal impact of $10,000, which is anticipated to be absorbable within existing resources; the MBC anticipates any fiscal impact to be absorbable within existing resources as the board currently implements an allegation code for COVID-19 related complaints and tracks discipline related to unprofessional conduct; actual enforcement costs to the MBC and OMBC are indeterminate and would depend on the volume of complaints received specific to COVID-19 misinformation and disinformation, as well as the complexity of any subsequent investigations.  The Office of Information Services within the Department of Consumer Affairs estimates $1,600 for workload associated with making information technology changes.

## VOTES:

**ASM BUSINESS AND PROFESSIONS: 12-5-2**
**YES:** Berman, Bloom, Mia Bonta, Gipson, Irwin, Lee, McCarty, Medina, Mullin, Ward, Ting, Akilah Weber
**NO:** Flora, Chen, Cunningham, Megan Dahle, Fong
**ABS, ABST OR NV:** Grayson, Arambula

**ASM APPROPRIATIONS: 12-4-0**
**YES:** Holden, Bryan, Calderon, Carrillo, Mike Fong, Gabriel, Eduardo Garcia, Jones-Sawyer, Quirk, Robert Rivas, Akilah Weber, Wilson
**NO:** Bigelow, Megan Dahle, Davies, Fong

**ASSEMBLY FLOOR: 53-20-5**
**YES:** Aguiar-Curry, Arambula, Bauer-Kahan, Bennett, Bloom, Boerner Horvath, Mia Bonta, Bryan, Calderon, Carrillo, Cervantes, Cooper, Daly, Mike Fong, Friedman, Gabriel, Cristina Garcia, Eduardo Garcia, Gipson, Gray, Haney, Holden, Irwin, Jones-Sawyer, Kalra, Lee, Levine, Low, Maienschein, McCarty, Medina, Mullin, Muratsuchi, Petrie-Norris, Quirk, Quirk-Silva, Ramos, Reyes, Luz Rivas, Robert Rivas, Rodriguez, Blanca Rubio, Salas, Santiago, Stone, Ting, Villapudua, Ward, Akilah Weber, Wicks, Wilson, Wood, Rendon
**NO:** Bigelow, Chen, Choi, Cooley, Cunningham, Megan Dahle, Davies, Flora, Fong, Gallagher, Kiley, Lackey, Mathis, Nguyen, Patterson, Seyarto, Smith, Valladares, Voepel, Waldron
**ABS, ABST OR NV:** Berman, Grayson, Mayes, Nazarian, O'Donnell

**SENATE FLOOR: 32-8-0**
**YES:** Allen, Archuleta, Atkins, Becker, Bradford, Caballero, Cortese, Dodd, Durazo, Eggman, Glazer, Gonzalez, Hertzberg, Hueso, Hurtado, Kamlager, Laird, Leyva, Limón, McGuire, Min, Newman, Ochoa Bogh, Pan, Portantino, Roth, Rubio, Skinner, Stern, Umberg, Wieckowski, Wiener
**NO:** Bates, Borgeas, Dahle, Grove, Jones, Melendez, Nielsen, Wilk

## UPDATED

VERSION: August 22, 2022

CONSULTANT:  Robert Sumner / B. & P. / (916) 319-3301                     FN: 0004498