Robert H. Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 600-2733
Facsimile: (951) 600-4996

Daniel R. Suhr (*Pro Hac Vice*)
dsuhr@libertyjusticecenter.org
Reilly Stephens (*Pro Hac Vice*)
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK MCDONALD AND JEFF BARKE,<br><br>Plaintiffs,<br><br>v.<br><br>KRISTINA D. LAWSON, *in her official capacity as President of the Medical Board of California*; RANDY W. HAWKINS, *in his official capacity as Vice President of the Medical Board of California*; LAURIE ROSE LUBIANO, *in her official capacity as Secretary of the Medical Board of California*; MICHELLE ANNE BHOLAT, DAVID E. RYU, RYAN BROOKS, JAMES M. HEALZER, ASIF MAHMOOD, NICOLE A. JEONG, RICHARD E. THORP, VELING TSAI, and ESERICK WATKINS, *in their official capacities as members of the Medical Board of California*; and ROBERT BONTA, *in his official capacity at Attorney General of California*,<br><br>Defendants. | Case No. 8:22-cv-01805-FWS-ADS<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF SECOND MOTION FOR PRELIMINARY INJUNCTION**<br><br>DATE: December 16, 2022<br>TIME: 10:00 A.M.<br>JUDGE: Hon. Fred W. Slaughter<br>CTRM: 10D |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................2

INTRODUCTION ..............................................................................................................3

LEGAL STANDARD .........................................................................................................3

ARGUMENT ......................................................................................................................4

    I.    Plaintiffs have standing to challenge AB 2098. ..................................................4

    II.    The Plaintiffs are likely to succeed on the merits of their claims that AB 2098 abridges their right to speak and is void for vagueness. .........................10

    III.    The other preliminary injunction factors favor granting Plaintiffs' Motion. .................................................................................................................16

CONCLUSION .................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Regents v. Southworth*, 529 U.S. 217 (2000) ............................................................... 13

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ........................................................ *passim*

*Friends of the Wild Swan v. Weber*, 767 F.3d 936 (9th Cir. 2014) .......................................... 4

*Gore v. Board of Med. Quality Assurance*, 110 Cal. App. 3d 184 (1980) ............................... 9

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010) ................................................................... 10

*Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ............... 10, 15

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) .................................................................... 11

*Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) .................................................................................................................................... 4

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011) ............................................ 4

*Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022) ............................................ 5, 7, 11

*United States v. Moore*, 423 U.S. 122 (1975) ........................................................................ 12

*United States v. Wunsch*, 84 F.3d 1110 (9th Cir. 1996) ......................................................... 14

*Victory Processing, LLC v. Fox*, 937 F.3d 1218 (9th Cir. 2019) ............................................ 10

*Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) ................................ 10

**Other Authorities**

"Covid-19 pandemic is over in the US - Joe Biden," BBC.com (Sept. 20, 2022), https://www.bbc.com/news/world-us-canada-62959089 .................................................. 13

"Governor Newsom to End the COVID-19 State of Emergency," Press Release (Oct. 17, 2022), https://www.gov.ca.gov/2022/10/17/governor-newsom-to-end-the-covid-19-state-of-emergency/. ............................................................................... 13

## INTRODUCTION

Plaintiffs Dr. Mark McDonald and Dr. Jeff Barke submit this Reply in support of their Motion for Preliminary Injunction. *See* Dkt. 35 ("PI Memo."). This Court should enjoin AB 2098 ("the Act") while this case proceeds, because the chilling effect on Plaintiffs' right to speak is real and substantial, constitutes irreparable injury, and the protection of such First Amendment rights is always in the public interest.

Defendants California Medical Board Members and the California Attorney General (collectively, "the Board" or "the State") want it both ways: as to standing, the Act is a modest change that poses no threat to doctors who advise patients against, say, getting vaccinated; as to the government interest and the balance of harms, this is a vital public health regulation that is needed to prevent people from not getting vaccinated. In both cases, their arguments are contradicted by the statute itself, which outlaws simply the giving of advice to a patient, with no textual limitation that such advice cause harm, be part of a broader course of treatment, or even induce a patient to follow it. Plaintiffs have told their patients to avoid vaccines, that masks can be harmful, and that they follow treatment protocols at odds with the official guidance. The Board would insist that we just wait and see whether those practices lead to disciplinary action; Plaintiffs' submit that if the Board doesn't think these practices violate AB 2098, it should say so. Because it won't, this Court's intervention is necessary.

## LEGAL STANDARD

Plaintiffs disagree with the Board's description of the legal burden for a preliminary injunction. The Board asserts that to secure such relief, the "Plaintiffs, as the movants here, bear the burden of proving each of these elements . . . by a clear showing." Resp. 7. This mischaracterizes the proper test. For a First Amendment claim such as this, the Plaintiffs must only raise a colorable First Amendment claim, in which case the burden then rests *on the government* to defend its law. "When seeking a preliminary injunction 'in

the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).

Plaintiffs also dispute the Defendants' notion they must make a "clear showing" of their likelihood of success on the merits. In the Ninth Circuit, if a plaintiff shows "serious questions going to the merits," then a preliminary injunction may still issue if the "balance of hardships tips sharply in the plaintiff's favor." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014).

## ARGUMENT

### I. Plaintiffs have standing to challenge AB 2098.

As Plaintiffs' counsel explained at the hearing for Plaintiffs' original motion, Plaintiffs had initially been circumspect in describing their past conduct and future intentions, because the Board holds regulatory power over them and therefore might attempt to use those representations against them in a disciplinary proceeding. However, this Court made clear that more specificity was required, and therefore Plaintiffs' First Amended Complaint, *see* Dkt. 68 ("FAC"), and the new set of declarations attached to their Second Preliminary Injunction Motion, *see* Dkt. 71-2 ("2nd McDonald Decl."") and Dkt. 71-3 ("2nd Barke Decl."), both provide significantly more detail as to their past practice and also more explicitly state their intention to continue such practices in the future if not chilled by the Act. For the Board, this is not enough, because Plaintiffs' still maintain that their practices are based on their extensive research and best medical judgment. The Board argues that Plaintiffs must not simply plead that they will do things the Board would treat as a violation of the standard of care, but that Plaintiffs must plead that they intend to violate the standard of care. Under the Board's argument, no doctor would ever have standing to challenge AB 2098 unless they were willing to plead that they are an incompetent quack.

That is not the law. "The unique standing considerations in the First Amendment context tilt dramatically toward a finding of standing when a plaintiff brings a pre-enforcement challenge." *Tingley v. Ferguson*, 47 F.4th 1055, 1066 (9th Cir. 2022) (cleaned up). "The Supreme Court has dispensed with rigid standing requirements for First Amendment protected speech claims and has instead endorsed a 'hold your tongue and challenge now' approach." *Id.*

The Board says Plaintiffs' plans are insufficiently concrete, Resp. 8, but the second set of declarations are much more detailed. As for examples of past conduct Plaintiffs' intend to continue, Dr. McDonald has "provided medically accurate information that questions the efficacy of masks, discusses the negative aspects of the vaccines, and disagrees with policies that in his view did tremendous personal and economic harm," and while he believes that information to be medically accurate, "Much of the information and opinion [he] provide[s] in response to those patient questions undermines the government's preferred position as expressed by the CDC or State of California." 2nd McDonald Decl. ¶ 9. In addition, as to some patients under his care, he "prescribed or advised ivermectin or hydroxychloroquine to treat the patient. In other instances, where patients are concerned COVID-19, [he] recommended a course of Vitamin D and other natural supplements to minimize any negative outcomes from the disease." *Id.* at ¶ 10. McDonald also pleads that he "fully intends to continue providing information about masking, treatment, diagnosis, and vaccination that is in line with his best medical advice, formulated based on his research and experience", that "[p]atients continue to come to [him] with requests for medical advice, information, and treatment for COVID-19, and will do so for the foreseeable future", and that "the medical advice [he] give[s] has been contrary to the government's version of the scientific consensus, and [he] intends to continue giving that advice in order to best serve his patients." *Id.* at ¶ 13. Indeed, he "feels it is [his] professional duty to continue to provide [his] patients with medically sound advice." *Id.* at ¶ 35.

As to Dr. Barke, over the course of the pandemic he "provided scores of patients with [his] best medical advice on issues including testing, treatment, masking, and vaccination." 2nd Barke Decl. at ¶ 10. His usual "treatment protocol includes medications and supplements in various doses involving: Ivermectin, fluvoxamine, aspirin, vitamin D, quercetin, zinc, monoclonal antibodies, and steroids." *Id.* at ¶ 11. Also, "he advised or prescribed ivermectin and hydroxychloroquine to treat COVID-19." *Id.* at 13. He "pointed [his patients] to countless studies to bolster the point that masks do not prevent respiratory viral illnesses and in the case of young children can even be harmful to them." *Id.* at 15. When "about preventing COVID-19 through vaccination, [he has] provided" what in his view is "medically accurate information about vaccination." *Id.* at ¶ 16. That includes "tailoring [his] medical advice" about vaccines "to the medical needs of the patient, including age, other medical conditions, and likelihood of exposure. [He] also include[s] information about natural immunity as an alternative to vaccination or boosters." *Id.* While he always gives advice consistent with his best medical judgment, "the recommendations, information, and treatment that [he] provided [his] patients ran contrary to what the U.S. Centers for Disease Control and other official bodies were pushing on the American people," *id.* at ¶ 17, and he "did not hide from [his] patients information and advice that was contrary to the official received wisdom when [he] believed that wisdom was incorrect or not best for that individual patient." *Id.* at ¶ 18. Dr. Barke "fully intends to continue providing information about masking, treatment, diagnosis, and vaccination that is in line with his best medical advice, formulated based on my reading and experience. Patients are continuing to come to [him] with requests for medical advice, information, and treatment, for COVID-19, and will do so for the foreseeable future." *Id.* at ¶ 19.

The Board says this is not enough, because "plaintiffs continue to fail to allege a concrete plan to violate AB 2098" and "contend their care has always been in compliance with the standard of care." Resp. at ¶ 8. First, it is clearly sufficient as a matter of law to allege that specific past conduct established a concrete plan for future conduct.

*Tingley*, 47 F.4th at 1068. Second, the entire dispute in this case is that Plaintiffs' best medical judgment regarding the standard of care requires them to give advice that the Board would treat as the equivalent of gross negligence—any single instance of such advice is grounds for revocation of their medical license. *See* Resp. at 29. In other words, just because the Plaintiffs believe they have acted within the standard of care does not mean the State of California shares that conclusion. If the official position of the State of California is that advising patients to take ivermectin and hydroxychloroquine, and telling patients that masks and vaccines are harmful and should be avoided, are unquestionably within the standard of care for COVID, then Plaintiffs' would be happy for this court to refer this case to a magistrate judge for settlement negotiations, so an appropriate settlement agreement can be reached clarifying that none of what Plaintiffs have done and intend to continue doing would ever subject a doctor to AB 2098 liability.

But Plaintiffs expect this is not, in fact, the Board's position, because their brief argues at length about the public health necessity of AB 2098—emphasizing the vital importance of vaccination and other measures to protect the public health. *See, e.g.,* Resp. at 16 ("The Legislature was concerned that physicians were spreading misinformation and disinformation to patients that could dissuade patients from receiving critical or necessary care to prevent COVID-19 (such as vaccinations) or to treat COVID-19."); 28-29 ("since such care can involve the vaccinations against COVID-19 that have played a critical role in reducing the severity and spread of the disease, an injunction could also undermine the public health."). The Board's uncertainly as to whether Plaintiffs have plead sufficient allegations to make out violations of AB 2098 exists only within the confines of their standing section.

The same tension undermines the Board's contention that the Plaintiffs do not face a credible threat of prosecution. Resp. 9. The Ninth Circuit has "interpreted the government's failure to disavow enforcement of the law as weighing in favor of standing." *Tingley*, 47 F.4th at 1068. Here the Board has not disavowed enforcement. Indeed, it would be quite bold for the Board to announce that it is not going to enforce a recently enacted

statute, and to do so while arguing the statute is extremely important. Plus, Dr. McDonald has very personal experience of the Board's enthusiasm to prosecute those who supposedly spread COVID misinformation. If mere tweets lead to an investigation, he is entirely justified to fear that conversations with actual patients will lead to similar results.

The Board also objects that Plaintiffs' have not alleged that their speech was allowed under existing law, yet their own description of what the Act means demonstrates otherwise: "Without AB 2098, it was already unprofessional conduct for a doctor to engage in an act of gross negligence, multiple acts of negligence, or incompetence," and "AB 2098's sole change is to make a single incident of ordinary negligence (i.e., treatment below the standard of care) unprofessional conduct." Resp. at 10. This is not a correct reading of the statute, which outlaws simply "advice" "contrary to the standard of care," But even under their reading this is no minor change: before AB 2098, any single incident could only be unprofessional conduct if it met the standard for *gross negligence*, otherwise it would be incumbent on the board to demonstrate a *pattern* of "negligent" behavior. Under such a standard, Dr. McDonald might well be protected, because his advice to patients to, for instance, avoid vaccines and masking, was incidental to his regular psychiatry practice. Under the Act providing that same advice *once* to a *single* patient can be treated as "unprofessional conduct."

Even if AB 2098 simply codified the Board's preexisting interpretation, that would not mean the Plaintiffs lack standing. Indeed, it reinforces the credibility of the threat of enforcement that the Board has been directed by the Legislature to make this a priority given the Legislature's decision to codify the Board's prior practice, and lower the standard the Board must prove to take disciplinary action. The threat of enforcement is now even more real, because a single act of COVID advice can cost a plaintiff his license, whereas before several such acts were necessary. Also, to state the obvious, Plaintiffs filed a lawsuit because they believe this law will apply to them, i.e., that they will have to change the advice they give patients in order to avoid losing their licenses.

Again, the Act treats any disagreement regarding the Board's view science of COVID, including even a single, isolated statement, as the equivalent of gross negligence. Such a single statement is now, by law, "an extreme departure from the standard of care." Resp. at 3 (quoting *Gore v. Board of Med. Quality Assurance*, 110 Cal. App. 3d 184, 196 (1980)). How are Plaintiffs to navigate such a regime? Many things that are now the mainstream scientific consensus were rejected by authorities at one stage or another of the pandemic including the utility of mask wearing, *see* PI Memo. at 8, and the merits of closing schools, *Id.* at 9. The official position of the public health authorities was that the vaccine developed by Johnson & Johnson was safe and effective; now the official CDC guidance warns of potentially serious risks not presented by the other available vaccines. *See id.* at 10. A doctor who advised his patients in early 2021 that the Johnson & Johnson vaccine appeared more dangerous than other alternatives would have violated the Act, and been subject to sanction. Under this law, every doctor in California takes a serious risk if he does anything except quote official guidance verbatim.

The Board's last point is that any chilling effect here is "subjective" and therefore not actual or imminent injury. Resp. at 10. But there is nothing subjective here: Plaintiffs must now be concerned that any statement they make to a patient could be used against them as evidence of gross negligence. Indeed, the Board confines the real import of their argument to a footnote, in which they make clear that even if Plaintiffs were to plead that they *had already been* subject to a disciplinary proceeding under AB 2098, they would still not be able to challenge the act as unconstitutional. Resp. 10, n.2. If someone actively being prosecuted under a law can't challenge the law as unconstitutional, who ever could?

Finally, the Defendants entirely ignore the Plaintiffs' void-for-vagueness claim in their standing analysis. The entire point of Plaintiffs' second claim is that it is impossible for a doctor to know exactly what the Board will define as the "scientific consensus." In other words, it is hard to allege with sufficient specifics to suit the State what medical advice Plaintiffs will offer their patients when they have no way of knowing what the Board will decide is within or outside the "scientific consensus." "In the First Amendment context, a

fear of prosecution will only inure if the plaintiff's intended speech arguably falls within the statute's reach." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (cleaned up). Here, because Plaintiffs' intention to continue their past speech to their patients regarding COVID-19 "arguably falls within the statute's reach," especially given their vagueness claim, and because the Board has shown its enthusiasm for vigorous enforcement of its "misinformation" standards with its action against Dr. McDonald, Plaintiffs clearly have standing.

## II. The Plaintiffs are likely to succeed on the merits of their claims that AB 2098 abridges their right to speak and is void for vagueness.

The Board's arguments on the merits begin with the flawed premise that speech by professionals is subject to some special rational basis standard. *See* Resp. 11-16. But the Supreme Court expressly rejected the Ninth Circuit's professional speech doctrine. *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) (*NIFLA*). And there are multiple reasons to think more than rational basis applies here. Far from mere rational basis, "professional speech may be entitled to the strongest protection our Constitution has to offer." *Conant v. Walters*, 309 F.3d 629, 637 (9th Cir. 2002). Plus, this law is content-based (it only applies to speech about one particular topic, COVID-19) and viewpoint-based (it only bars speech about that topic that contradicts the government's definition of the current scientific consensus, even as there are multiple other viewpoints that dissent from the government's definition of what the science shows and whether it's a consensus). In both senses, it is presumptively unconstitutional and subject to strict scrutiny. *Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1226 (9th Cir. 2019).

Defendants attempt to work their way around *NIFLA* by dubbing certain speech they wish to suppress "conduct," Resp. 11, but calling speech itself conduct "is a dubious constitutional enterprise" that "is unprincipled and susceptible to manipulation." *See Wollschlaeger v. Governor of Florida*, 848 F.3d 1293, 1308-09 (11th Cir. 2017) (en banc) (cleaned up).

Of course, *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), held that *NIFLA* had left open a narrow remainder of the Ninth Circuit's professional speech doctrine as articulated in *Pickup v. Brown*, 740 F.3d 1208, 1221 (9th Cir. 2014). But the conversion therapy bans in *Pickup* and *Tingley* addressed a particular *treatment strategy*—techniques to change a minor's sexual orientation—whereas AB 2098 outlaws providing patients "information" that the Board believes they should not be provided. This makes *Tingley* obviously distinguishable. The Board is wrong to say, "AB 2098 similarly regulates the kind of care that a physician can provide." Resp. 13. AB 2098 does not regulate care at all—it does not prevent a doctor from prescribing ivermectin or hydroxychloroquine for COVID. It regulates doctors' *speech* about ivermectin or hydroxychloroquine (we assume; it's so vague that we can't say for certain whether those two drugs are in or out of the contemporary scientific consensus concerning the standard of care). This is why *Tingley* is so obviously distinguishable—in *Tingley*, the care was delivered via speech (i.e., verbal counseling therapy). This is why the Defendants are right when they say, "The fact that such care 'is performed through speech alone' made no difference" in *Tingley*—in that case, care delivered as speech is still care, even if it is also speech. Resp. 11. Here, however, there is no speech component to the actual treatment of COVID-19. Unlike with conversion therapy or nutrition advice, words have no effect on a patient's COVID; one cannot verbally counsel away a virus.

That distinction makes this case much closer to *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), in which the government failed in its defense of a rule that a doctor merely *recommending* marijuana to a patient was a basis to revoke a medical license. In *Conant* the Ninth Circuit "distinguished prohibiting doctors from treating patients with marijuana—which the government could do—from prohibiting doctors from simply recommending marijuana." *Tingley*, 47 F.4th at 1072. AB 2098 does not outlaw *treating* patients with, say, ivermectin; it outlaws *recommending* to patients that some studies have found that drug effective to treat COVID, in the same manner a doctor in *Conant* might recommend to a patient that some studies have found marijuana effective at treating

glaucoma. The Defendants' own brief says, "AB 2098 thus circumscribes the care a physician recommends or provides to their patients for a specific health issue." Resp. 12. *Accord id*. at 13. If AB 2098 restricts what a doctor can verbally recommend to a patient, it clearly violates the holding of *Conant*.

According to the Board, *Conant* only protected medical information that complies with the standard of care. Resp. 13-14. But that is hardly so—one will search in vain in *Conant* for any mention of the standard of care. That's also hard to credit when the federal government says marijuana has "no currently accepted medical use in treatment in the United States" and "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1) (definition of a Schedule I drug). The people of California obviously disagree with Congress on that point and believe there are legitimate medical uses for marijuana, which disagreement they enacted into state law. Fair enough—this debate just illustrates Plaintiffs' point that doctors' speech to patients cannot be limited to a government's definition of what it believes to be the standard of care. The closest they come is in quoting a portion of the concurrence, Resp. 14, but in context that paragraph is distinguishing *United States v. Moore*, 423 U.S. 122 (1975), in which a doctor wrote prescriptions for controlled substances, charging by the amount of controlled substance, and didn't actually examine the patients—in other words, Dr. Moore was acting as a drug dealer, entirely outside the scope of medical practice.

At bottom, the government may establish that a particular medical treatment is the official appropriate standard of care, and it may punish doctors who deviate from that standard. And when that care is delivered through speech, it may regulate that care. But it may not punish doctors for discussing with their patients the doctors' view that the official treatment is in fact not the best or only treatment.

Plus, one should not lose sight of *Conant*'s concern for a robust public policy debate. Marijuana regulation is obviously a subject of intense debate in public policy circles. The district court in *Conant*, which was affirmed by the Ninth Circuit, wanted to protect the patient's right to receive the recommendation and take non-medical action: "the patient

upon receiving the recommendation could petition the government to change the law. By chilling doctors' ability to recommend marijuana to a patient, the district court held that the prohibition compromises a patient's meaningful participation in public discourse." *Conant*, 309 F.3d at 634-35. In the same way, on a topic as charged as the government's response to COVID-19, the government's decision to censor minority views limits public debate. This law is viewpoint discrimination: it establishes one official viewpoint on a contested topic (whatever the Board defines as the contemporary scientific consensus) and uses the power of the state to punish all who dare share a different viewpoint out loud to their patients. That violates the First Amendment's fundamental command: "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views." *Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000).

The Board asserts that even if its law does burden Plaintiffs' First Amendment rights, it is nevertheless justified by the Government's interests. But the Board's description of its interests would permit it to enact any regulation of physician speech it desired—clearly *Conant* and *Wollschlaeger* were wrongly decided if we applied the Board's definition of its own interests.

The Board's description of its interests in fighting the COVID pandemic also fails to account for the stage we are in. The President of the United States has declared the pandemic is over[1], and the Governor of California has announced his intention to end the emergency declaration.[2] Though the government may have had a compelling interest in COVID-19 regulation in the past, that interest is certainly different today, and the Board cannot rely on precedents from a previous phase to justify its current policy.

Besides, the Act is in no way tailored narrowly to those interests. Take protection of the public from negligent or incompetent physicians. Resp. 16. AB 2098 does not impose a

---

[1] "Covid-19 pandemic is over in the US - Joe Biden," BBC.com (Sept. 20, 2022), https://www.bbc.com/news/world-us-canada-62959089.

[2] "Governor Newsom to End the COVID-19 State of Emergency," Press Release (Oct. 17, 2022), https://www.gov.ca.gov/2022/10/17/governor-newsom-to-end-the-covid-19-state-of-emergency/.

standard of negligence or incompetence—instead, it relies on a standard of contemporary scientific consensus, with which disagreement could be widespread and reasonable. If the California legislature had wanted to limit AB 2098 to a negligence standard, it could have—but instead, it made the "dissemination" of "information" a strict liability offense.

The Board objects that "AB 2098 thus circumscribes the *care* a physician recommends or provides *to their patients* for a *specific health issue*." Resp. at 12. But their interpretation is at war with the statute itself. The statute defines "disseminate" as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice." That is not limited to care, and that is not limited to dealing with a specific health issue. Rather, simply providing "advice" to "a patient under the licensee's care" fits squarely within the language of the Act. At best, the Board's assertions of the limited nature of AB 2098 could be treated as an articulation of its expected enforcement strategy, but this Court cannot take its predictions of its enforcement priorities as a statement of the law—as nothing would bind the board to that modesty. *See United States v. Wunsch*, 84 F.3d 1110, 1118 (9th Cir. 1996) ("California has failed to show that this new policy represents an authoritative and binding construction of [the law] rather than a mere enforcement strategy, which would not be binding on the courts.").

The importance of ensuring patients have access to accurate, complete, and truthful information does not require policing the speech of individual doctors. If the state wants to ensure the general public has access to what it believes is accurate information, it can set up a website; it can even run an ad campaign. But it cannot commandeer the speech of others to repeat its message. Those are essentially the facts of *NIFLA*, in which the state required pregnancy centers to post the State's message regarding abortion on their premises. *See* 138 S. Ct. at 2369. California's argument in *NIFLA* was that their state interest in making sure patients had accurate information about abortion allowed them to control the speech of medical professionals. *Id.* at 2375 ("California asserts a single interest to justify the licensed notice: providing low-income women with information about state-sponsored services."). Like in *NIFLA*, too, here the State is seeking to use its power to

shape the marketplace of ideas, to suppress one viewpoint in favor of its preferred viewpoint. *See NIFLA*, 138 S.Ct. at 2379-80 (Kennedy, J., concurring) ("This law is a paradigmatic example of the serious threat presented when government seeks to impose its own message in the place of individual speech, thought, and expression."). That "is a matter of serious constitutional concern." *Id*. And we should not lose sight of the fact that California's supposed desire to provide information arose in the context of medical treatment; the state could not force non-abortion clinics to post government information about alternative medical options. If California could not constitutionally force pro-life pregnancy centers to provide the government's preferred medical information, how can California force doctors to only provide the government's preferred medical information?

What is more, at no point does the State respond to the Plaintiffs' arguments that the law is content-based and viewpoint-discriminatory. Even if the State were correct that regulations of medical practice such as this one are normally subject to rational basis review, this law *still* should receive strict scrutiny because it is content-based and viewpoint-discriminatory. The State does not contest that this law only targets medical advice that speaks about a particular subject and recites a particular viewpoint.

Regarding vagueness, the Board objects that the scientific consensus can be objective that "apples contain sugar, that measles is caused by a virus, that Down syndrome is caused by a chromosomal abnormality, etc." Resp. at 26. But Down syndrome was first identified in 1862, and apples and measles have been known to humanity since antiquity. As the name of the virus itself suggests, COVID-19 just passed its third birthday; Plaintiffs submit a greater range of uncertainty is warranted when experience is short. The appropriate medical response to COVID is a topic on which "there is a genuine difference of expert opinion on the subject, with significant scientific and anecdotal evidence supporting both points of view." *Conant*, 309 F.3d at 643 (Kozinski, J., concurring). How is any doctor to know what constitutes "the contemporary scientific consensus" when that consensus is constantly changing and evolving, there are a variety of studies and reports, and a genuine difference of expert opinions?

The Board's response is also cold comfort: we can charge you with violating the law, and if we don't prove (to ourselves) that your advice violates the scientific consensus, then we won't take your license away in the end. Resp. 23. Of course, the government could use such an excuse to defeat any pre-enforcement void-for-vagueness challenge: if we don't prove our case, the jury won't convict and you can go free. But that is not the legal standard: the question is whether a doctor of ordinary intelligence would know what the Board defines as "the contemporary scientific consensus as to the standard of care." And in this instance, when the so-called scientific consensus is dynamic and constantly evolving, a doctor of ordinary intelligence cannot be expected to know what is "in or out."

### III. The other preliminary injunction factors favor granting Plaintiffs' Motion.

The Board claims Plaintiffs can claim no irreparable harm because the loss of their professions and livelihood could be remedied by money damages. Plaintiffs' doubt the Board means to waive sovereign immunity from damages in such an event, but even if the Board were to pay Plaintiffs' for their lost income, the reputational harm of being stripped of one's medical licenses remains acute. And that says nothing of the core question of the right to speak, which is so fundamental that even a temporary abridgment of that right is irreparable. *See* PI Memo. at 27. Nor does it take account of the patients' right to receive their doctors' speech. *See Conant*, 309 F.3d at 640 (Kozinski, J., concurring) ("Those immediately and directly affected by the federal government's policy are the patients, who will be denied information crucial to their well-being.").

This also means that the balance of equities and public interest favor plaintiff, as the enforcement of First Amendment rights is always equitable and in the public interest. *Id.* The Board's argument on the balance of harms and public interest mostly relies on harms to patients from bad medical advice, but nothing in AB 2098 requires that a doctor's advice *harm* a patient. Rather, the Act proscribes the *giving of advice* that the Board considers *bad advice*. That's it. When Plaintiffs advise their patients that Vitamin D and Zinc are a better regimen for COVID treatment than the official guidance, there's no particular risk

that these common over-the-counter supplements will cause harm. But under AB 2098, that advice is considered gross negligence.

And because the Plaintiffs have raised at least "serious questions" going to the merits, they believe an injunction should issue because this balance of harms tips sharply in their favor. One can hardly name a more important right to protect than free speech, and the effects of the government's policy on the marketplace of ideas for medical innovation affects the plaintiffs' patients, patients across California, and ultimately patients across the nation as doctors decline the risk associated with questioning the State's preferred view on a scientific question.

## CONCLUSION

"The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. Only doctor-patient conversations that include discussions of [COVID-19] trigger the policy. Moreover, the policy does not merely prohibit the discussion of [COVID-19]; it condemns expression of a particular viewpoint, i.e., that [contrary to the Board's view of the contemporary scientific consensus]. Such condemnation of particular views is especially troubling in the First Amendment context." *Conant*, 309 F.3d at 637. So too here. For the reasons stated above, and in Plaintiffs' earlier Memorandum, the Motion for Preliminary Injunction should be granted.

Dated: December 14, 2022

Respectfully submitted,

/s/ Daniel R. Suhr
Daniel R. Suhr (*Pro Hac Vice*)
dsuhr@libertyjusticecenter.org
Reilly Stephens (*Pro Hac Vice*)
rstephens@libertyjusticecenter.org
Liberty Justice Center
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
Phone: 312-637-2280

Robert H. Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683

mgondeiro@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone: 951) 600-2733
Facsimile: (951) 600-4996

*Attorneys for Plaintiffs*